UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 14 CR 50005 |
| vs. | ) | |
| | ) | Judge Frederick J. Kapala |
| CHARLES DEHAAN | ) | |

### UNITED STATES' POST-HEARING BRIEF IN SUPPORT OF SENTENCING GUIDELINES ENHANCEMENTS

Respectfully submitted,

ZACHARY T. FARDON
United States Attorney

By:   /s/ *Scott R. Paccagnini*
SCOTT R. PACCAGNINI
Assistant United States Attorney
327 South Church Street - Room 3300
Rockford, Illinois 61101
(815) 987-4444

**Table of Contents**

Procedural Background..................................................................................................1

Factual Background ......................................................................................................2

    A.  Plea Agreement ..................................................................................................2

    B.  Defendant's Admissions ...................................................................................3

    C.  Employees .........................................................................................................8

    D.  Police Reports ...................................................................................................9

    E.  Medicare Background .....................................................................................10

    F.  Deceased Patients...........................................................................................14

    G.  Patients............................................................................................................17

    H.  Billing and Loss Analysis ...............................................................................43

Argument .....................................................................................................................44

    A.  Defendant Caused More than $1.5 Million in Losses to Medicare ...........44

    B.  The PSR Correctly Applied an Enhancement to Ten or More Victims......62

    C.  The PSR Correctly Applied an Enhancement for Vulnerable Victims and Large Number of Vulnerable Victims.........................................................63

**Table of Cases**

*United States v. Anderson*, 349 F.3d 568, 573 (8th Cir. 2003) .................................................... 65

*United States v. Callaway*, 762 F.3d 754, 760 (8th Cir. 2014) .................................................... 63

*United States v. Echols,* 574 Fed. Appx. 350, 351 (5th Cir. 2014) ......................................... 60, 61

*United States v. Gieger*, 190 F.3d 661, 664 (5th Cir. 1999) ...................................................... 64

*United States v. Grimes*, 173 F.3d 634, 637 (7th Cir. 1999) ..................................................... 63

*United States v. Hebron*, 684 F.3d 554, 563 (5th Cir. 2012) ................................................. 46, 47

*United States v. Jones*, 664 F.3d 966, 984 (5th Cir. 2011) .................................................... 60, 61

*United States v. Kaufman*, 546 F.3d 1242, 1268-69 (10th Cir. 2008) ......................................... 66

*United States v. Moon*, 513 F.3d 527, 541 (7th Cir. 2008) ......................................................... 64

*United States v. Mooty*, 25 Fed. App'x 501, 501 (8th Cir. 2002) ................................................. 66

*United States v. Roy*, 819 F.3d 998, 1002 (7th Cir. 2016) ......................................................... 63

*United States v. Sidhu*, 130 F.3d 644, 655 (5th Cir. 1997) ......................................................... 64

*United States v. Sims*, 329 F.3d 937, 944 (7th Cir. 2003) .......................................................... 63

*United States v. Sriram*, 482 F.3d 956, 960 (7th Cir. 2007) ............................... 45,47,48,50,61,62

*United States v. St. John,* 625 Fed. Appx. 661, 663 (5th Cir. 2015) ...................................... 46, 47

*United States v. Triana,* 468 F.3d 308, 311 (6th Cir. 2006) .................................................. 60, 61

**Rules and Statutes**

42 C.F.R. § 424.22(a) ................................................................................................................. 59

18 U.S.C. § 1028(d)(7) .............................................................................................................. 62

18 U.S.C. § 1347 .......................................................................................................................... 1

U.S.S.G. § 1B1.3 ........................................................................................................................ 63

U.S.S.G. § 2B1.1 ......................................................................................................... 45,60,61,62

U.S.S.G. § 2H4.1 ........................................................................................................................ 66

U.S.S.G. § 3A1.1 .................................................................................................... 63, 64, 65

U.S.S.G. § 3A1.1(b)(2) ................................................................................................ 66

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 14 CR 50005 |
| vs. | ) | |
| | ) | Judge Frederick J. Kapala |
| CHARLES DEHAAN | ) | |

**UNITED STATES' POST-HEARING BRIEF IN SUPPORT OF
SENTENCING GUIDELINES ENHANCEMENTS**

The UNITED STATES OF AMERICA, by ZACHARY T. FARDON, United States Attorney for the Northern District of Illinois, respectfully submits the following post-hearing brief in support of certain sentencing Guidelines enhancements.

The evidence presented establishes that defendant chose the Current Procedural Terminology ("CPT") code regardless of whether defendant saw the patient or not and regardless of the level of medical decision making necessary and ultimately submitted fraudulent claims to Medicare for payment at the highest codes. Defendant's actions resulted in a conservative loss amount of $3,159,712.04. The evidence presented also establishes that defendant fraudulently certified patients for home health care resulting in home health agencies submitting $2,787,054.58 in claims to Medicare.

## I. PROCEDURAL BACKGROUND

Defendant was charged in a superseding indictment with twenty-three counts of health care fraud, in violation of Title 18, United States Codes, Section 1347. On May 20, 2016, defendant pleaded guilty as part of a plea agreement to two counts of health care fraud. As part of the plea agreement, the government and defendant agreed to disagree on the loss amount, loss of more than $1,000,000 involving Medicare, vulnerable victim, large number of vulnerable victims, and abuse of trust.

1

The assigned probation officer found, as outlined in the Presentence Investigation Report, that defendant's offenses involved ten or more victims, a large number of vulnerable victims, and an abuse of trust. PSR at 7-8. The probation officer did not address the loss amount. PSR at 9. Defendant objected to the government's loss amount calculation and also to the PSR's enhancements for ten or more victims and a large number vulnerable victims.[1] On September 21, 2016, during defendant's sentencing hearing, the government called numerous witnesses. The hearing was continued to October 12, 2016, during which Federal Bureau of Investigation Alex Payne testified.

## II.  FACTUAL BACKGROUND

### A.  Plea Agreement

#### 1.  *In-Home Patients*

Defendant admitted that as a physician licensed in Illinois, who is issued a Medicare provider number, he agreed to abide by the policies and procedures, rules and regulations governing payment. R. 93. Defendant also admitted that he knew Medicare authorized payment for home visits and physician services only if those services were actually provided and were medically necessary. *Id*. Defendant also admitted that he knew that Medicare did not authorize payment for services and treatments that were not actually provided or for which the patient did not meet the criteria necessary for service or treatment. *Id*.

Defendant admitted that he devised a scheme to bill Medicare for medical services purportedly provided to patients when defendant knew he did not provide any reimbursable service. R. 93. Defendant admitted that this included defendant billing Medicare at the highest payment levels for routine, non-complex, visits with new and established patients even though

---

[1] Defendant did not object to the abuse of trust enhancement.

defendant knew the visit did not qualify for the highest levels of payment. *Id.* Defendant also admitted that some of the patients he billed at the highest levels but did not actually see were deceased on the date of the alleged visit resulting in defendant billing Medicare for a visit after the patient's death. *Id.*

### 2. *Homebound Patients*

Defendant also admitted that as part of his scheme, he certified patients as homebound that were not actually homebound. R. 93. Defendant admitted that as a result of his false certifications, home health agencies were able to bill Medicare for claims for the patients' care. *Id.*

### B. Defendant's Admissions

### 1. *Admissions to Law Enforcement*

Federal Bureau of Investigation Special Agent Aaron Woodill testified that he interviewed defendant on January 24, 2014. S. Tr. 218. During the interview, defendant said that if a patient needs home health services that he initiates a referral for home health services. *Id.* at 220. Defendant said he gets his patients from various sources, including other physicians, hospitals, and home health agencies. *Id.* at 221. Defendant explained that home health companies have patients that need doctors to visit their patients. *Id.* Defendant explained that for a patient to qualify for home health services, the patient must be homebound, meaning the individual has difficulty leaving the home or it is a taxing effort to leave home. *Id.* Defendant said he rarely turns down a patient for home health care and that some of the patients he certified for home health services were not homebound, but that all the patients wanted the service. *Id.* Defendant said that home health agencies tell him what services the patients need, and "I certify." *Id.* at 222. Defendant said he questions the validity of some patients he sees, but can always find a reason why the patient needs home health. *Id.* at 224. With regard to whether or not his patients were homebound, defendant admitted, "I will have some issues with." *Id.* Special Agent Woodill testified that by

3

"I will have some issues with," defendant was saying "he knows that the patients he certified or some of the patients he certified were not homebound, and he knew he was going to have issues with that." *Id.*

Defendant explained he determines a patient's need based on the patient's diagnosis, history and what the patient says to him. S. Tr. 224. If defendant cannot see a reason to certify the patient for home health based on the diagnosis and patient's history, then defendant will rely on what the patient says. S. Tr. 224-225. Defendant said he will find a reason to certify a patient as homebound. *Id.* at 225.

With regard to allegations that defendant inappropriately touched his patients, defendant said he did not sexually assault any patients. S. Tr. 225. Defendant said all the women were lying and that they were looking for something. *Id.* Defendant mentioned Ms. Holliman, who defendant said he kicked out of his practice because she was stealing money from her mom and Ms. Holliman threatened to tell people they had sex if defendant did not prescribe Ms. Holliman medication. *Id.* at 226. For patients that already have a primary care doctor, defendant said he tells the patient to keep their doctor and defendant will see them in their home. *Id.* at 227. Defendant said that many of his patients complain that their primary care doctors won't sign off on services that defendant will. *Id.*

### 2. *Email Admissions*

#### i. *Matthew Turman*

Federal Bureau of Investigation Special Agent Alex Payne testified about emails that show defendant submitted claims to Medicare for visits that did not happen. S. Tr. 387-396. On June 12, 2012, defendant submitted a claim to Medicare for $261.94 under CPT code 99349 for a forty-minute visit with Debra Porter on June 8, 2012. Ex. 81C. Although defendant acknowledged that

he did not see Ms. Porter, as described below, on June 8, 2012, defendant created an electronic note for a purported visit with Ms. Porter. Ex. 43B. Specifically, the electronic visit note for June 8, 2012, indicates that Ms. Porter reported during the visit exercise intolerance, nose/sinus problems, teeth abnormalities, chest pain on exertion and shortness of breath when walking, abdominal pain and change in appetite, muscle weakness, arthralgia/joint pain, and back pain, weakness, depression and sleep disturbances, and fatigue. *Id*. The visit note also indicates defendant did a physical examination of Ms. Porter during the visit that consisted of checking her head, eyes, ears, nose, mouth, throat, neck, lungs, heart, abdomen, skin, back, strength, tone, and reflexes. *Id*.

On June 14, 2012, Matt Turman, an employee at MD at Home, sent defendant an email with the Subject "Patient's Not Seen but notes filled out in Athena," stating, "Hey Chuck, I've had the following patients calls us about not being seen but we have visit notes in Athena that have been billed: Debra Porter: 6/8 Rockford; Ray Kaczmarek: 6/6 Rockford; and Rosie Butler: 6/7 Bolingbrook. Let me know if I need to reschedule and stop billing or what the situation is." S. Tr. 394; Ex. 43A. In response, defendant wrote, "Deb Porter/I called and went to apartment twice and did not get a response. Bill but reschedule." *Id*.

### ii.   *Lou Pavelchik*

On September 20, 2012, defendant submitted a claim to Medicare for $366.62 under CPT code 99350 for a sixty-minute visit with Michael Mattingly on September 20, 2012. Ex. 81C. A summary letter was generated for the visit which indicates, "The following list includes any diagnoses that were discussed at your visit, and information about any order(s) that your physician has deemed appropriate for these conditions. 1. Chronic Venous Embolism and Thrombosis of Deep Vessels of Proximally Lower Extremity (453.51). 2. Immune Thrombocytopenic Purpura

5

(287.31).  3.  Essential Hypertension; Benign (401.1).  4.  Pulmonary Embolism and Infarction (415.1).  5.  Depressive Disorder, Not Elsewhere Classified (311).  6.  Osteoarthritis, Unspecified Whether Generalized or Localized; Site Unspecified (715.90).  Discussion:  Care and management reviewed and adjusted.  Ex. 40B.

On September 21, 2012, Lou Pavelchik, an employee at MD at Home, sent defendant an email with the Subject "Michael Mattingly and billing" stating, "Dr. DeHaan, I spoke to Mariana, who had already billed the visit since it looked as if you have seen Mr. Mattingly.  In order to delete the billing since it was already posted she has to call Medicare.  I know historically if we call to reverse charges too many times that it will send a red flag to Medicare.  Can you either text me at [deleted] or email me in the evening all the patients that were not seen.  Since I arrive at the office shorting after 6:00AM each morning I can take out those visits prior to Mariana coming in and billing them.  This will hopefully reduce the possibility of Red Flags going to Medicare."  S. Tr. 388.  In response, defendant wrote, "I do not want to remove billing for Mattingly.  I confirmed by phone call that I would be there at 4-5pm.  I arrived on time.  I knocked and even opened the door and called for a response.  This took up my time and I could have seen another patient in his time slot.  I do not want to remove the billing charge.  Let me know if you disagree."  *Id.* at 388-389.  According to the report of visit written by defendant, defendant reviewed Mr. Mattingly's "medication history without changes."  *Id.* at 389.  Defendant also indicated that he reviewed various diagnoses with Mr. Mattingly.  *Id.* at 390.

On November 28, 2012, defendant submitted a claim to Medicare for $366.62 under CPT code 99350 for a sixty-minute visit with Debra Drajin on November 26, 2012.  Ex. 81C.  A summary letter was generated stating, "The following list includes any diagnoses that were discussed at your visit, and information about any order(s) that your physician has deemed

appropriate for these conditions. 1. Lumbago (724.2). 2. Osteoarthritis, Generalized; Multiple Sites (715.09). 3. Pressure Ulcer; Lower Back (707.03). 4. Myalgia and Myositis, Unspecified (729.1). 5. Essential Hypertension; Benign (401.1). 6. Depressive Disorder, Not Elsewhere Classified (311)." Ex. 40D.

On December 3, 2012, Mr. Pavelchik sent defendant an email with the Subject "Debra Drajin" stating, "Dr. DeHaan, Patient called and stated that she was not seen on 11/26 when scheduled. Patient is scheduled for 12/5/12. There was a visit that was billed to Medicare that we will have to refund. Please advise." S. Tr. 390; Ex. 40C. In response, defendant wrote, "She was seen that day. I spoke with her at the apartment but swhe [sic] did not need the visit. She asked for an order for home health which I ordered." *Id.*

### iii. *Dana Robinson*

On October 20, 2012, defendant wrote a letter to Dana Robinson, President of MD at Home. S. Tr. 391-392; Ex. 42. In the letter, defendant wrote:

> We recently had a meeting and discussed billing issues for patients. Three patients were presented who claimed no visit had been made yet they were billed. A policy was discussed. One of those patients admitted that she was wrong about her claim that I had not been to her home. She has cognitive impairment and stated she would call the office to apologize. The other 2 patients had confirmed appointments through the office and in addition had agreed to my visit when I called in the morning to give an ETA regarding the visit. On arriving as agreed, they were not available for the visit. We had communicated and I followed through on expectations. I physically showed up at the homes and left a card or document regarding my visit. I billed those visits according to our prior discussions. As you recall, we discussed these situations in the past. I explained what I do and why. We agreed to this approach with billing. As I now understand this prior practice is changed and you do not want billing unless I physically engage with the patient. Since our discussion this week, I will comply. We discussed some possible solutions to the expected effect this will have on our productivity.

*Id.* at 392-393. Ms. Robinson said it was not MD at Home's policy to charge for visits that did not occur. *Id.* at 393.

### C.     Employees

#### 1.     *Nicole Ranz*

Agent Payne testified that Nicole Ranz, a nurse practitioner who worked for defendant from early 2006 until January 31, 2010, said defendant instructed her to bill most of her visits at CPT code 99350. S. Tr. 244-245. Defendant instructed Ms. Ranz to bill CPT 99349 if she quickly treated the patient. *Id.* at 245. Defendant's company was audited by Medicare in 2006 or 2007 because defendant was billing so many high codes. *Id.* Defendant subsequently instructed Ms. Ranz not to bill some visits at CPT 99350 but to instead bill more visits at CPT code 99349. *Id.* Ms. Ranz also said that defendant changed her billing codes based on the fact that one of the visits she billed at 99349 was subsequently changed to 99350 without her knowledge. *Id.* at 246. Furthermore, Ms. Ranz said many patients said that defendant normally spent 5 to 10 minutes with them and that he sometimes just stood in the doorway and never came into their home. *Id.* One patient told Ms. Ranz that defendant billed for a lesion removal that never occurred. *Id.*

#### 2.     *Natalie Parivan*

Agent Payne testified that Natalie Parivan started working for defendant in 2009 and left in January 2010. S. Tr. 315. During the time Ms. Parivan worked for defendant, she noticed that defendant was seeing patients that were not on the schedule. *Id.* Ms. Parivan also recalled receiving phone calls from patients inquiring as to why they received certain charges on their bills. *Id.* at 316. Ms. Parivan recalled receiving calls from patients complaining that defendant was not at the residence for that long or defendant was not there at all on the date charged. *Id.* Ms. Parivan told defendant about the complaints and defendant subsequently provided her with a follow up note for the specific date and patient. *Id.*

### D.    Police Reports

Special Agent Alex Payne testified that six women filed complaints with the Rockford Police Department against defendant prior to his arrest in 2014.

1.    Kimberly Anderson, case number 11-060591.1, alleged that on May 16, 2011, while working in a home health capacity, defendant arrived to check on a patient and while doing so grabbed Anderson's buttocks and breasts.  S. Tr. 345.

2.    Starlene Petrus, case number 11-068832.1, alleged that on or about May 20, 2011, defendant came to her apartment to look at her leg.  S. Tr. 345.  While there, defendant rubbed Ms. Petrus' leg and breast.  *Id*.  After several minutes of rubbing Ms. Petrus' breast, defendant stood up, adjusted himself, and left.  *Id*.

3.    Susan Lapin, case number 11-075533, alleged that during 2010-2011, defendant examined her and during the initial visit and subsequent visits, defendant rubbed Ms. Lapin's breasts and became visibly aroused.  S. Tr. 346.

4.    Jeanette Haug, case number 11-076092, alleged that defendant told her he had to check her breasts.    S. Tr. 347.  Defendant had Ms. Haug remove her shirt and lay back in her reclining chair.  *Id*.  Defendant massaged Ms. Haug's breasts and then got on top of Ms. Haug and continued to massage Ms. Haug's breasts.  *Id*.  Defendant then left.  *Id*.

5.    Ada Myrick, case number 11-076675, alleged that defendant asked Ms. Myrick to lay back in her chair so he could exam her.  S. Tr. 347.  Defendant listened to Ms. Myrick's heart close to her breast and started to moan.  *Id*.  Ms. Myrick said defendant was visibly aroused.  *Id*.

6.    Debra Alloway, case number 13-072857, alleged that defendant asked her to put a bikini on when he came to exam her.  S. Tr. 347.

### E.    Medicare Background

Health and Human Services Special Agent Renee Reyes testified about Medicare policies and the requirements for billing certain CPT codes.  S. Tr. 152-181.  Specifically, Agent Reyes testified that Chapter 30.3.13 of the Medicare Claims Processing Manual provides that "CMS's policy is to allow physicians and suppliers to charge Medicare beneficiaries for missed appointments, provided that they do not discriminate against Medicare beneficiaries but also charge non-Medicare patients for missed appointments. . . . Medicare does not make any payments for missed appointment fees/charges that are imposed by providers, physicians, or other suppliers. Charges to beneficiaries for missed appointments should not be billed to Medicare." *Id.* at 152-153.

Agent Reyes also testified that Chapter 30.6.1 of the Medicare Claims Processing Manual provides that "Medical necessity of a service is the overarching criterion for payment in addition to the individual requirements of a CPT code.  It would not be medically necessary or appropriate to bill a higher level of evaluation and management service when a lower level of service is warranted." S. Tr. 154-155.  Chapter 30.6.1 further provides that the "duration of a visit is an ancillary factor and does not control the level of the service to be billed unless more than 50 percent of the face-to-face time . . . is spent providing counseling or coordination of care . . . ." *Id.* at 155. Chapters 30.6.14.1 (A) and (B) state that "Home services codes 99341-99350 are paid when they are billed to report evaluation and management services provided in a private residence.  A home visit cannot be billed by a physician unless the physician was actually present in the beneficiary's home."  *Id.* at 158.  For a home service provided by a physician under 99341-99350, "the beneficiary does not need to be confined to the home.  The medical record must document the medical necessity of the home visit made in lieu of an office or outpatient visit."  *Id.* at 159.

Agent Reyes also testified that Chapter 30 of the Medicare Benefit Policy Manual provides that "[i]n order for a patient to be eligible to receive covered home health services under both Part A and B, the law requires that a physician certify in all cases that the patient is confined to his/her home. An individual does not have to be bedridden to be considered confined to the home. However, the condition of these patients should be such that there exists a normal inability to leave home and, consequently, leaving home would require a considerable and taxing effort." S. Tr. 159.

Agent Reyes also testified about the CPT codes. Specifically, Agent Reyes testified about the 2009, 2010, 2011, 2012 and 2013 requirements to bill CPT codes 99341-99350 as outlined in the CPT manuals for each respective year. S. Tr. 163-180. In selecting the proper level of service, the CPT code manual instructs the doctor to recognize the seven components (history, examination, medical decision making, counseling, coordination of care, nature of presenting problem, and time). *Id.* at 167. History, examination and medical decision making are key components in selecting the level of service. *Id.* An exception to this rule is visits that consists predominantly of counseling or coordination of care. *Id.* at 174.

There are four types of history: 1) problem focused: chief complaint; brief history of present illness or problem; 2) expanded problem focused: chief complaint; brief history of present illness; problem pertinent system review; 3) detailed: chief complaint; extended history of present illness; problem pertinent system review extended to include a review of a limited number of additional systems; pertinent past, family, and/or social history directly related to the patient's problems; 4) comprehensive: chief complaint; extended history of present illness; review of systems that is directly related the problem(s) identified in the history of present illness plus a review of all additional body systems; complete past, family, and social history. Exs. 55-59.

11

There are four types of examination:  1) problem focused:  a limited examination of the affected body area or organ system; 2) expanded problem focused: a limited examination of the affected body area or organ system and other symptomatic or related organ system(s); 3) detailed: an extended examination of the affected body area(s) and other symptomatic or related organ system(s); and 4) comprehensive: a general multisystem examination or a complete examination of a single organ system.  Exs. 55-59.  The following body areas are recognized: head, neck, chest, abdomen, genitalia, back and each extremity.  *Id.*

Medical decision making refers to the complexity of establishing a diagnosis and/or selecting a management option measured by: the number of possible diagnoses and/or the number of management options that must be considered; the amount and/or complexity of medical records, diagnosis tests and/or other information that must be obtained, reviewed, and analyzed; and the risk of significant complications, morbidity and/or mortality.  Exs. 55-59.  Four types of medical decision making are recognized:  straightforward, low complexity, moderate complexity, and high complexity.  *Id.*  To qualify for a given type of decision making, two of three following elements must be met or exceeded: number of diagnoses or management options, amount and/or complexity of data to be reviewed, and risk of complications and/or morbidity or mortality.  *Id.*

For a new patient home visit, the following are required for the specified CPT code:

99341: requires a problem focused history, a problem focused examination and straightforward medical decision making.  S. Tr. 175.  Usually, the presenting problem(s) are of low severity and physicians typically spend 20 minutes face-to-face with the patient and/or family.  *Id.*

99342: requires an expanded problem focused history, an expanded problem focused examination, and medical decision making of low complexity.  S. Tr. 175-176.  Usually, the

presenting problem(s) are of moderate severity and physicians typically spend 30 minutes face-to-face with the patient and/or family. *Id.*

99343: requires a detailed history, a detailed examination, and medical decision making of moderate complexity. S. Tr. 176. Usually, the presenting problem(s) are of moderate to high severity and physicians typically spend 45 minutes face-to-face with the patient and/or family. *Id.*

99344: requires a comprehensive history, a comprehensive examination, and medical decision making of moderate complexity. S. Tr. 176-177. Usually, the presenting problem(s) are of high severity and physicians typically spend 60 minutes face-to-face with the patient and/or family. *Id.*

99345: requires a comprehensive history, a comprehensive examination, and medical decision making of high complexity. S. Tr. 177. Usually, the patient is unstable or has developed a significant new problem requiring immediate physician attention and physicians typically spend 75 minutes face-to-face with the patient and/or family. *Id.*

For an established patient home visit, the following are required for the specified CPT code:

99347: requires two of the following three components: a problem focused interval history, a problem focused examination, and straightforward medical decision making. S. Tr. 177-178. Usually, the presenting problem(s) are self-limited or minor and physicians typically spend 15 minutes face-to-face with the patient and/or family. *Id.*

99348: requires two of the following three components: an expanded problem focused interval history, an expanded problem focused examination, and medical decision making of low complexity. S. Tr. 178. Usually, the presenting problem(s) are low to moderate severity and physicians typically spend 25 minutes face-to-face with the patient and/or family. *Id.*

99349: requires two of the following three components: a detailed interval history, a detailed examination, and medical decision making of moderate complexity. S. Tr. 178-179. Usually, the presenting problem(s) are low to moderate severity and physicians typically spend 40 minutes face-to-face with the patient and/or family. *Id.*

99350: requires two of the following three components: a comprehensive interval history, a comprehensive examination, and medical decision making of moderate to high complexity. S. Tr. 179. Usually, the presenting problem(s) are moderate to high severity and the patient may be unstable or may have developed a significant new problem requiring immediate physician attention and physicians typically spend 60 minutes face-to-face with the patient and/or family. *Id.*

### F. Deceased Patients

Agent Alex Payne testified that defendant submitted claims to Medicare for thirteen patients for visits that occurred after the patient's date of death. S. Tr. 247-266.

#### 1. *Clifford Anderson*

Clifford Anderson died on March 9, 2011. S. Tr. 248-249; Ex. 11A. Defendant billed Medicare $189 for a forty-minute visit (99349) with Mr. Anderson on April 22, 2011. Ex. 81C.

#### 2. *Charlotte Barrett*

Charlotte Barrett died on April 26, 2011. S. Tr. 249; Ex. 12A. Defendant billed Medicare $189 for a forty-minute visit (99349) with Mr. Barrett on May 18, 2011. S. Tr. 253; Ex. 81C.

#### 3. *Clinton Powell*

Clinton Powell died on August 15, 2012. S. Tr. 250; Ex. 13A. Defendant billed Medicare $416.18 for a seventy-five-minute visit (99345) with Mr. Powell on August 17, 2012. S. Tr. 253; Ex. 81C.

14

### 4. *Michael Burton*

Michael Burton died on February 23, 2013. S. Tr. 252; Ex. 14A. Defendant billed Medicare $241.42 for a forty-minute visit (99349) with Mr. Burton on April 10, 2013. S. Tr. 253; Ex. 81C.

### 5. *Carol Haugen*

Carol Haugen died on April 28, 2013. S. Tr. 254; Ex. 15A. Defendant billed Medicare $482.42 for a forty-minute visit (99349) with Ms. Haugen on June 12, 2013 and another forty-minute visit (99349) with Ms. Haugen on July 17, 2013. S. Tr. 254; Ex. 81D.

### 6. *Alice Bruner*

Alice Bruner died on May 4, 2010. S. Tr. 255; Ex. 16A. Defendant billed Medicare $378 for a forty-minute visit (99349) with Ms. Bruner on May 13, 2010, and another forty-minute visit (99349) with Ms. Bruner on July 7, 2010. S. Tr. 256; Ex. 81D.

### 7. *Irene Griffin*

Irene Griffin died on March 24, 2009. S. Tr. 256; Ex. 19A. Defendant billed Medicare $189 for a forty-minute visit (99349) with Ms. Griffin on April 10, 2010. *Id.*

### 8. *Carrie Jarman*

Carrie Jarman died on April 9, 2010. S. Tr. 257; Ex. 20A. Defendant billed Medicare $378 for a forty-minute visit (99349) with Ms. Jarman on April 10, 2010. Ex. 81C. Defendant certified Ms. Jarman's death certificate April 12, 2010. Ex. 20A.

### 9. *Marilyn Jacobson*

Marilyn Jacobson died on January 29, 2011. S. Tr. 257; Ex. 21A. Defendant billed Medicare $243 for a high visit (99306) with Ms. Jacobson on February 4, 2011. Ex. 81C.

### 10. *Charles Johnson*

Charles Johnson died on December 28, 2010.  S. Tr. 259; Ex. 22A.  Defendant billed Medicare $189 for a forty-minute visit (99349) with Mr. Johnson on January 17, 2011.  S. Tr. 259.

### 11. *Jean Trestik*

Jean Trestik died on December 15, 2009.  S.Tr. 259-260; Ex. 23A.  Defendant billed Medicare $189 for a forty-minute visit (99349) with Ms. Trestik on April 10, 2010.  S.Tr. 260.

### 12. *Neva Villareal*

Neva Villareal died on December 12, 2013.  S. Tr. 260; Ex. 24A.  Defendant billed Medicare $241 for a forty-minute visit (99349) with Ms. Villareal on December 27, 2013. S. Tr. 265.  Defendant, moreover, created an electronic visit note for the purported December 27, 2013, encounter even though the visit could not have happened.  Ex. 24B.  Specifically, the December 27, 2013, electronic visit note for Ms. Villareal indicates that Ms. Villareal reported during the visit exercise intolerance, irritation and vision change, difficulty hearing, nose/sinus problems, teeth abnormalities, shortness of breath when walking, muscle weakness, arthralgia/joint pain, and back pain, weakness depression and fatigue.  S. Tr. 262; Ex. 24B.  The visit note also indicates defendant did a physical examination of Ms. Villareal during the visit that consisted of checking her head, eyes, ears, nose, mouth, throat, neck, lungs, heart, abdomen, skin, back, strength, tone, and reflexes.  Ex. 24B.  The note also reflects "counseling and patient education greater than 50% of visit."  *Id.*

### 13. *Norman West*

Norman West died on January 13, 2010.  S. Tr. 265; Ex. 25A.  Defendant billed Medicare $189 for a forty-minute visit (99349) with Mr. West on February 20, 2010.  Ex. 81C.

### G.    Patients

#### 1.    *Sue Lapin*

Sue Lapin testified that in July 2011, she provided a signed written statement to the Rockford Police Department regarding defendant.  In her statement, Ms. Lapin wrote that "the first time anything happened it was in October of 2010 . . . .  [Defendant] was in my apartment and I was supposed to be getting fit for an electric wheelchair.  I was sitting at the table in a chair.  Dr. DeHaan was in front of me looking me up and down."  S. Tr. 24.  Ms. Lapin continued, "two weeks later he came back to my apartment.  This time he was wearing some scrubs.  I could tell that he did not have any underwear on because his penis was very visible through his pants.  *Id.* at 24-25.  "The electronic wheelchair had been delivered, and Dr. DeHaan asked me how I liked my chair.  He came up to me, and I was sitting in the chair, and he started to feel my legs.  I thought he was checking how I fit in the chair, but he rubbed my legs for a long time and also my butt.  He took his hands off my legs and then started rubbing my breasts."  *Id.* at 25.  Ms. Lapin continued, "I was shocked as he had one hand on each of my breasts.  He rubbed on them for what I thought was a long time, but I'm not sure how long.  He told me he did this to make sure my breasts would fit in the chair."  *Id.*  Ms. Lapin then wrote that defendant "stepped back from me and pulled down his surgical pants and exposed his erect penis to me.  He did not say anything, just stood there in front of me.  [Defendant] pulled up his pants and said I'll be back."  *Id.*

Ms. Lapin wrote that defendant came back to her apartment again wearing scrubs in January 2011.  S. Tr. 26.  Defendant "came in and said he was there to check me.  He again started rubbing my breasts and on my buttocks as I was sitting at my dining room table.  [Defendant] walked into my bedroom and asked me to come in there.  I told him no.  I told him I think you better leave.  I asked him why you are there.  He told me he had other patients in this facility."  *Id.*

Ms. Lapin testified that during defendant's visits described in her statement defendant never provided any medical services other than checking her blood pressure once. *Id.* at 27.

In 2013, defendant again came to Ms. Lapin's apartment. S. Tr. 28. Ms. Lapin testified that she did not request his visit; he just showed up. *Id.* Ms. Lapin testified that she told defendant to leave and he did so. *Id.* Ms. Lapin also testified that during the last visit defendant provided no medical services. *Id.* at 28-29.

### 2. *Linda Schultz*

Linda Schultz testified that defendant became her doctor in 2009. S. Tr. 55. Ms. Schultz testified that during visits defendant wore "blue or green britches" with no underwear. *Id.* at 58. During defendant's first visit, defendant took Ms. Schultz off of Tropodol and also "played with my right breast and [had] me playing with him down there." *Id.* at 56. Ms. Schultz testified that defendant "played with me every time he come visit." *Id.* at 57. Ms. Schultz also testified that she touched defendant's penis during every visit. *Id.* Ms. Schultz said defendant "didn't much medical exam to me. All he did is he come there, and he was always—he would always pull his pants down and pull it out. He had me playing with it, . . . ." *Id.* According to Ms. Schultz, during his visits with her, defendant performed no medical examination or removed any earwax. *Id.* at 58-59. Defendant never took Ms. Schultz's blood pressure or treated any wound or any type of skin condition. *Id.* Defendant did, however, tell Ms. Schultz that he would write her whatever prescriptions she wanted. *Id.* Ms. Schultz also testified that for about two years she complained about her oxygen but defendant did nothing because "he was too busy playing with hisself and didn't care nothing about me, I guess." *Id.* at 63. It was only after Ms. Schultz's landlord called defendant to complain about Ms. Schultz's oxygen level that anything was done about Ms. Schultz's oxygen. *Id.*

### 3. *Jeff Rowland*

Jeff Rowland testified that his primary doctor is Dr. Arthur Rone. S. Tr. 80. Mr. Rowland testified that Dr. Rone, who is located at the Mercy Clinic off Rockton Road in Rockford, Illinois, has been his primary doctor for close to 20 years. *Id.* Mr. Rowland testified he takes a bus or gets a ride to Dr. Rone's office. S. Tr. 92. Mr. Rowland suffers from various mental limitations including anxiety. *Id.* at 87. Dr. Rone has treated Mr. Rowland's various mental limitations. *Id.* at 93.

Mr. Rowland testified that in 2013, a home health agency had defendant come to his apartment. *Id.* at 81. During defendant's first visit, defendant met with Mr. Rowland and his wife, Kathy Rowland, for fifteen minutes. *Id.* During the meeting, defendant performed no medical examination on either him or Ms. Rowland. *Id.* Rather, defendant provided Mr. Rowland prescriptions for medications Mr. Rowland was already taking. *Id.*

Defendant came to Mr. Rowland's apartment a second time. S. Tr. 82. During the second visit, defendant stood in the hallway and did not come into the apartment. *Id.* During this visit, defendant again performed no medical examination. *Id.* During both visits, defendant wore medical scrubs. *Id.*

### 4. *Kathy Rowland*

Kathy Rowland testified that she suffers from bipolar, thyroid issues, high cholesterol, and heart issues. S. Tr. 94-95. Ms. Rowland also testified that she leaves her apartment, which she shares with her husband, Jeff Rowland, to run errands. *Id.* Like Mr. Rowland, Ms. Rowland testified her primary care physician is Dr. Arthur Rone. *Id.* Ms. Rowland testified that she is not homebound and that she takes public transportation to see Dr. Rone. *Id.*

Ms. Rowland testified that defendant came twice to her apartment. S. Tr. 96. Ms. Rowland testified that defendant "appeared at the outside of my apartment. He only came in once to talk to both of us, but it was only like five minutes at a time. They billed me for a longer length of time, which I did not pay because I figured it was a bunch of BS." S. Tr. 96. During the visit where defendant came into the apartment, Ms. Rowland said defendant "just wrote down a prescription for cough medicine or some meds that we asked for, and that was about it. And he didn't check us for vitals or nothing like a doctor would." *Id.* During the second visit, Ms. Rowland testified that defendant came to the apartment but "he wouldn't come it. He was in his scrubs. Every time I seen him he would be in his scrubs, not normal clothes." *Id.* at 97. With regard to the bill she received for the visit, Mr. Rowland testified that defendant "charged me like a half hour to an hour for the appointment and I'm like that's fraud. You're not supposed to charge a patient that much time unless it was he was billing me for something else." *Id.*

### 5. *Dr. Arthur Rone*

Special Agent Alex Payne testified that during the investigation, he interviewed Dr. Arthur Rone. S. Tr. 104. Special Agent Payne testified that Dr. Rone said he has been the primary care physician of Jeffery and Kathy Rowland for approximately 20 years. *Id.* at 105. He typically sees the Rowlands between two and three times per year. *Id.* They usually arrive together for appointments, but Mr. Rowland may have come on his own occasionally. *Id.* They typically receive one full physical per year with one or two follow-up appointments as needed." *Id.* Dr. Rone told Special Agent Payne that he recalled several years ago the Rowlands came to his office with numerous medications that he had not prescribed. *Id.* Dr. Rone said the Rowlands received the medications because an agency had a doctor come to their apartment. *Id.* Dr. Rone instructed the Rowlands not to take the medications. *Id.*

20

Dr. Rone said he did not believe the Rowlands needed skilled nursing in their home or have mobility problems that would prevent them from leaving their home. *Id.* Dr. Rone noted that he saw Ms. Rowland on September 12, 2013, and Mr. Rowland on December 27, 2013. *Id.* at 106. Dr. Rone conducted a physical examination of both during their respective visits and found nothing that would indicate either needed skilled nursing or physical therapy in their home. *Id.*

### 6. *Gaynatia Johnson*

Gaynatia Johnson testified that she suffers from diabetes, asthma, and high blood pressure. S. Tr. 109. Ms. Johnson said she takes medications for her ailments. *Id.* Ms. Johnson testified that defendant became her doctor in 2012 and would normally visit her, sometimes scheduled and sometimes unscheduled, twice a month. *Id.* at 110. Ms. Johnson said defendant's visits lasted 10 to 15 minutes, never an hour, and that defendant never removed any skin lesions. *Id.* at 110-111. Ms. Johnson said defendant checked her blood pressure, listened to her heart, and checked her feet. *Id.* at 111. Ms. Johnson also said defendant looked at sores on her legs and used gauze on her legs. *Id.* at 118.

During one visit, Ms. Johnson said defendant once inappropriately touched her. S. Tr. 111. Ms. Johnson testified that defendant touched her breast and became visibly aroused. *Id.* Ms. Johnson said she could see that his penis was erect. *Id.* at 112. During the visit, defendant wore a green shirt and pants that Ms. Johnson described as "hospital stuff." *Id.* Ms. Johnson testified she called defendant's office once to complain. S. Tr. 112-113. Ms. Johnson said she told the woman who answered the phone at defendant's office that defendant "was fiddling on me and his thing popped up." *Id.* at 113. Ms. Johnson also spoke to the building manager. *Id.* at 114.

Ms. Johnson testified that at some point she started sitting in on defendant's visits with her neighbor, Debra Gash. S. Tr. 113. Ms. Johnson said defendant "felt on her, and Debbie called

21

me. She got upset." S. Tr. 113. Ms. Johnson testified that she did not see defendant do anything to Ms. Gash. *Id.* at 120.

### 7.    *Jane Kempel*

Jane Kempel testified that between 2010 and 2016 she was the executive director for Rockford Supportive Living. S. Tr. 124. At Rockford Supportive Living, each resident chose their own doctor. *Id.* at 125-126. Nurses employed by Rockford Supportive Living also cared for residents. *Id.* at 126.

Ms. Kempel testified defendant was the medical director for Rockford Supportive Living. S. Tr. 126. Ms. Kempel testified that during her time at Rockford Supportive Living she received numerous complaints from residents about defendant's billing. *Id.* at 127. Ms. Kempel testified that residents "would just bring me the bills and said that they did not see Dr. DeHaan on these certain days, and I would hand them over to our Medicaid coordinator, and she would take care of them." *Id.* Ms. Kempel said she did not know the results of the billing complaints. *Id.* at 131.

Ms. Kempel testified she also received complaints from female residents Doris Wynn, Sue Lapin, Star Petrus, and Ada Myrick about defendant inappropriately touching them. *Id.* at 127-128. Ms. Kempel testified she filed a formal complaint with the Rockford Police Department but nothing happened. *Id.* at 128. Ms. Kempel also approached defendant about the allegations. *Id.* Defendant said the patients had dementia. *Id.* After confronting defendant, Ms. Kempel implemented a policy that defendant had to be accompanied by a nurse during all resident visits. *Id.*

### 8.    *Debra Gash*

Debra Gash testified that she suffers from diabetes, high blood pressure, high cholesterol, stomach issues, anxiety, and bipolar disorder. S. Tr. 135. Ms. Gash testified that she has been in

a wheelchair for the past five or six years but she is able to bathe herself, dress herself, cook for herself, and manage her own medications. *Id.* at 136-137.

Ms. Gash testified that defendant became her doctor in 2009 or 2010. S. Tr. 137. Ms. Gash said that defendant's visits typically lasted 20 minutes during which he would address any problems she had. *Id.* at 138. Defendant wore scrubs during the visits. Ms. Gash testified that at some point she requested that Gaynatia Johnson sit in on defendant's visits because she was scared of defendant. *Id.* Specifically, Ms. Gash said once while defendant was examining her stomach he touched her breast. *Id.* at 139. Ms. Gash also testified that sometimes she noticed that defendant was aroused. *Id.* Ultimately, Ms. Gash switched doctors because she "wanted a different doctor that [she] would be able to trust and do the things that needed to be done and not try to take advantage of someone." *Id.* at 140.

Ms. Gash testified that her friend, Brinda Cooks, warned her about defendant. S. Tr. 141. Ms. Gash said Ms. Cooks would "tell me things that they would do in her bedroom and everything. That was sexually." *Id.*

### 9. *Joan Ann Shortridge*

Joan Ann Shortridge answered questions under oath during a videotaped examination. S. Tr. 187. Ms. Shortridge said she suffers from severe agoraphobia, panic attacks, ulcerative colitis, high blood pressure, high cholesterol, contractions in her leg, and hypothyroidism. Ex. 34F.

Ms. Shortridge said that after her hip surgery in 2009 her visits with defendant changed. Ex. 34F. Defendant stopped checking Ms. Shortridge's blood pressure and no longer used a stethoscope to check Ms. Shortridge's breathing. *Id.* Instead, defendant put his ear on Ms. Shortridge's breast and licked her breast and nipple. *Id.* Defendant never check Ms. Shortridge's ears, nose, throat, glands, and never discussed any medical issues with Ms. Shortridge other than

asking about her leg. *Id.* Ms. Shortridge said during the first visit after her hip surgery, in February 2009, defendant rubbed his leg against the frame of her bed and when he stood up Ms. Shortridge noticed defendant had an erection. *Id.*

Ms. Shortridge said during a subsequent visit defendant checked a cyst near her vagina without gloves. *Id.* Ms. Shortridge said defendant inserted his fingers in her vagina and she told him to stop. After defendant stopped, he stood up and pulled his scrub pants down and started to masturbate. *Id.* Ms. Shortridge said defendant wiped his semen on her and said, "That's my love for you." *Id.* Ms. Shortridge said defendant threatened her not to tell because no one would believe her. *Id.* During the visit, defendant provided no medical services. *Id.*

Ms. Shortridge said defendant did not perform normal breast examinations. *Id.* Unlike other breast examinations where Ms. Shortridge would raise an arm over her head, Ms. Shortridge said defendant told her not to lift her arm. *Id.* Rather, defendant would feel her breast with his hands and play with her breast. *Id.*

Ms. Shortridge said defendant also told her to whisper during his visits. *Id.* Ms. Shortridge said defendant was afraid people outside of her room would hear. *Id.* Defendant always closed the door while Ms. Shortridge's boyfriend or family members sat in the other room. *Id.* One time, after defendant masturbated and left, Ms. Shortridge's brother came into her room and asked if she received her prescription; she didn't. *Id.* Ms. Shortridge's brother then went outside to defendant's car to receive her prescription. Ms. Shortridge's brother noticed that defendant had a wet spot on his scrub pants. When he provided the prescription to Ms. Shortridge he asked her if defendant used the bathroom. *Id.* Ms. Shortridge responded, "I don't know," because at the time her brother did not know what defendant was doing to Ms. Shortridge. *Id.*

Ms. Shortridge said that defendant acted in a sexual manner during every visit from February 2009 until 2012. *Id.* Ms. Shortridge said other than asking about her hip, defendant never discussed medical issues with her. *Id.* Ms. Shortridge said defendant provided no medical services and never removed skin or tissue. *Id.* Rather, during these visits defendant would place her hand on his penis and sometimes laid in bed with her. *Id.* Ms. Shortridge said when he would pull down his scrub pants and masturbate, she noticed that he had a scar about an inch or a little bigger on the lower right-side of his abdomen with very little pubic hair. *Id.* Ms. Shortridge said she didn't notice the scar when defendant had his scrub pants on. Ms. Shortridge also said that she had a pull-up bar at one point but that defendant never messed with the pull-up bar. *Id.*

Ms. Shortridge said that she would write notes in her calendar about defendant's visits. *Id.* On May 4, 2010, Ms. Shortridge wrote, "Dr. DeHaan came. Sicko." *Id.* Ms. Shortridge said she wrote that because he was sick because of what he was doing to her during visits. *Id.* On November 18, 2010, Ms. Shortridge wrote, "Dr. DeHaan came. Best doctor" with a sad face. Ms. Shortridge said she wrote that because defendant was supposed to be her best doctor but instead he hurt her. *Id.* In the 2011 calendar, Ms. Shortridge wrote, "I wish I could tell somebody what he does."

### 10. *Detective Jennifer DePastors*

After the video was played, Des Plaines Detective Jennifer DePastors testified. S. Tr. 188. Detective DePastors testified that she interviewed Joan Ann Shortridge at her house. *Id.* at 190. Detective DePastors also interviewed defendant. *Id.* Defendant admitted to Detective DePastors that he had scar on his lower abdomen that defendant described as long and visible above his belt line. *Id.* at 191. Detective DePastors testified that she obtained a search warrant to take photographs of defendant's genital area. *Id.* Detective DePastors testified that defendant had a

25

scar in his pelvic area starting about his right hip going diagonally up to the base of his penis.  *Id.*  Detective DePastors also said that the scar was not above his beltline; rather, it was two inches below his navel.  *Id.* at 192.  Detective DePastors also testified that she was not aware of Ms. Shortridge's calendars.  *Id.* at 195.

### 11.  *Investigator Joseph Jones*

Investigator Joseph Jones with the Illinois Department of Financial and Professional Regulation testified that he interviewed defendant on January 14 and 16, 2014.  S. Tr. 205.  During the interview, defendant said he was not aware of several reports that were made to the Rockford Police Department alleging he acted inappropriately.  *Id.* at 206.  Defendant said a lot of his patients are elderly and have dementia or some other problem.  *Id.*  With regard to patient Marcie Holliman, defendant said Ms. Holliman had mental problems and was a drug seeker.  *Id.* at 207.  Defendant said he never had sex with Ms. Holliman and that once defendant found out Ms. Holliman was a drug seeker he quit prescribing her medications.  *Id.* at 207-208.  Defendant also said he rarely performs breast examinations (said less than 2% of the time) and did not know why that the complaining patients all alleged that defendant groped their breasts.  *Id.* at 208.  Defendant also said that he established a policy for a nurse to accompany him to see patients at Rockford Supportive Living because it is good practice.  *Id.*[2]  With regard to billing, defendant said he supplied the billing codes.  *Id.* at 210.  Defendant also said that he had been audited by Medicare a couple of times and that the auditors gave him advice on which codes to use.  *Id.*

---

[2] This directly contradicts Ms. Kempel's testimony.  S. Tr. 128.  Ms. Kempel said that after she received numerous complaints about defendant, she implemented a policy that defendant had to be accompanied by a nurse during all resident visits.  *Id.*  Defendant's statement is also contradicted by the evidence; defendant primarily visited patients alone, without a nurse.

### 12.    *Marla Toner*

Agent Payne testified that patient Marla Toner described defendant's visits with her as five minute conversations that were not medical in nature.  S. Tr. 269.  Ms. Toner also said that the longest she ever saw defendant was approximately five minutes and that defendant never provided her any medical services.  *Id.*  A September 30, 2013 electronic visit note, however, indicates that Ms. Toner reported during the visit exercise intolerance, difficulty hearing, teeth abnormalities, chest pain on exertion and shortness of breath when walking, abdominal pain and vomiting, increased urinary frequency, muscle weakness, arthralgia/joint pain, and back pain, weakness and frequent or severe headaches, depression and sleep disturbances.  Ex. 3A.  The visit note also indicates defendant did a physical examination of Ms. Toner during the visit that consisted of checking her head, eyes, ears, nose, mouth, throat, neck, lungs, heart, abdomen, skin, back, strength, tone, and reflexes.  *Id.*  According to the claims data, defendant billed Medicare $2,176.04 at CPT codes 99344, 99349, and 99350 for visits with Ms. Toner.  Ex. 81C.

### 13.    *Scarlett Jefferson*

Defendant admitted in his plea agreement that defendant billed Scarlett Jefferson for a sixty-minute in-home visit on December 12, 2013, using CPT code 99344 even though defendant never saw Ms. Jefferson.  R. 93.  Although defendant admitted he never saw Ms. Jefferson on December 12, 2013, defendant created an electronic note for the purported visit.  Ex. 6A.  Specifically, the December 12, 2013 electronic visit note indicates that Ms. Jefferson reported during the visit exercise intolerance, irritation and vision change, difficulty hearing, nose/sinus problems, teeth abnormalities, shortness of breath when walking, muscle weakness, arthralgia/joint pain, and back pain, weakness depression, and fatigue.  S. Tr. 276; Ex. 6A.  The visit note also indicates defendant did a physical examination of Ms. Jefferson during the visit that

27

consisted of checking her head, eyes, ears, nose, mouth, throat, neck, lungs, heart, abdomen, skin, back, strength, tone, and reflexes. *Id.* The note also reflects "counseling and patient education greater than 50% of visit. 60-minute encounter." *Id.* at 278. Defendant also admitted that the claimed visit did not qualify for billing under CPT code 99344. R. 93. Defendant also admitted that he signed a Medicare Form 485 certifying Ms. Jefferson as homebound even though defendant knew he had no basis to certify Ms. Jefferson as homebound. According to the claims data, defendant billed Medicare $346 at CPT code 99344. *Id.*

### 14. *Guy Hatcher*

Agent Payne testified that Guy Hatcher said that defendant's visits lasted approximately five minutes and that defendant wrote him prescriptions when needed. S. Tr. 283. A December 9, 2013 electronic visit note, however, indicates that Mr. Hatcher reported during the visit exercise intolerance, irritation and vision change, difficulty hearing, nose/sinus problems, teeth abnormalities, chest pain on exertion and shortness of breath when walking, increased urinary frequency, muscle weakness, arthralgia/joint pain, rash and itching, weakness and frequent or severe headaches, alcohol abuse and fatigue. *Id.*; Ex. 8A. The visit note also indicates defendant did a physical examination of Mr. Hatcher during the visit that consisted of checking his head, eyes, ears, nose, mouth, throat, neck, lungs, heart, abdomen, skin, back, strength, tone, and reflexes. The note also reflected "counseling and patient education greater than 50% of visit. 60-minute encounter." *Id.* According to the claims data, defendant billed Medicare $5,901.62 at CPT codes 99349 and 99350 for visits with Mr. Hatcher. Ex. 81C. Defendant also certified Mr. Hatcher as homebound and billed Medicare for the certifications even though Mr. Hatcher said that he bathes himself, cooks for himself, gets food from a nearby restaurant and used to have a cane but no longer needs it. Ex. 81C.

### 15. *Rodney Fair*

Agent Payne testified that Rodney Fair said defendant visited him in October 2013 and checked Mr. Fair's blood pressure and talked with him. S. Tr. 287. Mr. Fair said the visit lasted no more than twenty minutes. *Id.* According to Mr. Fair, during the visit he told defendant he can do almost everything himself. *Id.* Mr. Fair also said he is not confined to the home and does not need assistance. *Id.* On September 4, 2013, defendant billed Medicare $346.56 for a sixty-minute visit under CPT code 99344. Ex. 81C.

Defendant also certified Mr. Fair for home health from August 20, 2013 through October 18, 2013 and October 19, 2013 through December 17, 2013 and billed Medicare $100. S. Tr. 288; Ex. 81C. In doing so, defendant certified that "this patient is confined to his/her home and needs intermittent skilled nursing care, physical therapy, and/or speech therapy or continue to need occupational therapy. The patient is under my care, and I have authorized the services on this plan of care and will periodically review the plan." S. Tr. 289. On November 18, 2013, defendant certified that he had a face-to-face encounter with Mr. Fair and that Mr. Fair was homebound because of a "taxing effort to safely leave home." *Id.*; Ex. 9D. Three days later, a nurse discharged Mr. Fair because "Patient centered goals achieved." S. Tr. 290; Ex. 9E. A month later, defendant again certified Mr. Fair for home health from December 23, 2013 through February 20, 2014. S. Tr. 290; Ex. 9F.

### 16. *Jim Beaumont*

Agent Payne testified that Jim Beaumont said that defendant visited him in late 2013. S. Tr. 294. During the visit, defendant never came in the door nor did defendant provide any medical services. *Id.* An October 18, 2013 electronic visit note for Mr. Beaumont indicates that he reported during the visit exercise intolerance, vision change, difficulty hearing, nose/sinus problems, teeth

abnormalities, chest pain on exertion, shortness of breath, abdominal pain, increased urinary frequency, muscle weakness, arthralgia/joint pain, and back pain, weakness and frequent or severe headaches, sleep disturbance, restless sleep, alcohol abuse, and fatigue. S. Tr. 294-297; Ex. 26A. The visit note also indicates defendant did a physical examination of Mr. Beaumont during the visit that consisted of checking his head, eyes, ears, nose, mouth, throat, neck, lungs, heart, abdomen, skin, back, strength, tone, and reflexes. Ex. 26A.

Mr. Beaumont also said that he didn't see defendant in December 2013 but that defendant left a business card in his door. *Id.* A December 27, 2013 electronic visit note for Mr. Beaumont indicates that he reported during the visit exercise intolerance, vision change, difficulty hearing, nose/sinus problems, teeth abnormalities, chest pain on exertion, shortness of breath, abdominal pain, increased urinary frequency, muscle weakness, arthralgia/joint pain, and back pain, weakness and frequent or severe headaches, sleep disturbance, restless sleep, alcohol abuse, and fatigue. Ex. 26D. The visit note also indicates defendant did a physical examination of Mr. Beaumont during the visit that consisted of checking his head, eyes, ears, nose, mouth, throat, neck, lungs, heart, abdomen, skin, back, strength, tone, and reflexes. *Id.* The note also reflects "counseling and patient education greater than 50% of visit." *Id.* According to the claims data, defendant billed Medicare $416 for a seventy-five-minute visit at CPT code 99345 for the October 18, 2013 visit with Mr. Beaumont and $241 at CPT code 99349 for a forty-minute visit on December 27, 2013 with Mr. Beaumont. S. Tr. 298; Ex. 81C.

### 17. *Paul Bryant*

Agent Payne testified that Paul Bryant said that defendant's typical visits lasted five minutes. S. Tr. 299. Defendant asked Mr. Bryant how he was doing and whether Mr. Bryant needed any medications. *Id.* Mr. Bryant said defendant never conducted an exam or performed

any procedures on him.  *Id.*  Mr. Bryant said he called Medicare to complain about defendant's billing as he did not believe defendant accurately billed for visits.  *Id.* at 300.

A November 20, 2013 electronic visit note for Mr. Bryant indicates that he reported during the visit exercise intolerance, irritation, difficulty hearing, nose/sinus problems, teeth abnormalities, shortness of breath, abdominal pain, muscle weakness, arthralgia/joint pain, and back pain, frequent or severe headaches, depression, alcohol abuse, and fatigue.  Ex. 27A.  The visit note also indicates defendant did a physical examination of Mr. Bryant during the visit that consisted of checking his head, eyes, ears, nose, mouth, throat, neck, lungs, heart, abdomen, skin, back, strength, tone, and reflexes.  *Id.*  The visit note also indicates "counseling and patient education greater than 50% of visit."  *Id.*  According to the claims data, defendant billed Medicare $4,544.48 at CPT codes 99344, 99349, and 99350 for visits with Mr. Bryant.  S. Tr. 302; Ex. 81C.

### 18.    *Sebastian Costa*

Agent Payne testified that Sebastian Costa said he and his girlfriend, Vicki Jacobs, received in-home visits from defendant.  S. Tr. 325.  According to Mr. Costa, defendant usually stayed twenty minutes and treated Ms. Jacobs and him together during a visit.  *Id.*  Mr. Costa said defendant never performed any procedures or examined him; rather, defendant only spoke to him and Ms. Jacobs and asked if either needed refills of their medication.  *Id.* at 326.

A December 30, 2013 electronic visit note for Mr. Costa indicates that he reported during the visit exercise intolerance, irritation, difficulty hearing, nose/sinus problems, teeth abnormalities, shortness of breath, abdominal pain, muscle weakness, arthralgia/joint pain, and back pain, weakness, depression, sleep disturbances, and fatigue.  Ex. 28A.  The visit note also indicates defendant did a physical examination of Mr. Costa during the visit that consisted of

checking his head, eyes, ears, nose, mouth, throat, neck, lungs, heart, abdomen, skin, back, strength, tone, and reflexes. *Id.*

A December 30, 2013 electronic visit note for Ms. Jacobs indicates that Ms. Jacobs reported during the visit exercise intolerance, oral abnormalities, shortness of breath, abdominal pain, muscle weakness, arthralgia/joint pain, and back pain, weakness, depression, sleep disturbances, restless sleep, feeling unsafe in relationship, and fatigue. Ex. 28B. The visit note also indicates defendant did a physical examination of Ms. Jacobs during the visit that consisted of checking her head, eyes, ears, nose, mouth, throat, neck, lungs, heart, abdomen, skin, back, strength, tone, and reflexes. *Id.* The note also reflects "counseling and patient education greater than 50% of visit." *Id.* According to the claims data, defendant billed Medicare $3,284.56 at CPT codes 99344, 99349, and 99350 for visits with Mr. Costa. S. Tr. 329; Ex. 81C. Defendant billed Medicare $3,218.32 at CPT codes 99345, 99349, and 99350 for visits with Ms. Jacobs. *Id.*

### 19. *Leonard Shimmin*

Agent Payne testified that Leonard Shimmin said that defendant came to his apartment, unannounced, and offered medical services. S. Tr. 332. Mr. Shimmin said he declined and defendant left. *Id.* Defendant did not conduct an examination and Mr. Shimmin did not discuss his medical history. *Id.* Defendant subsequently billed Medicare $346.56 for a sixty-minute visit with Mr. Shimmin on October 20, 2011. *Id.* at 334; Ex. 81C. Mr. Shimmin received a bill for a co-pay and complained to Medicare. *Id.* at 331. Medicare ultimately recouped the money from defendant. *Id.* at 334.

### 20. *Jerrie Travis*

Agent Payne testified that Jerrie Travis said she has never met defendant. S. Tr. 334. Ms. Travis further said she has never received a house visit from any doctor. *Id.* On January 15, 2010,

defendant billed Medicare $406 at CPT code 99345 for a sixty-minute visit with Ms. Travis. Exs. 31D and 81C. Defendant subsequently billed Medicare $189 on February 23 and March 3, 2010, at CPT code 99349 for two forty minute visits with Ms. Travis. *Id.* Ms. Travis sent Medicare back its summary of charges document with "Never had no calls" written next to the charges. S. Tr. 336. Medicare ultimately recouped the money from defendant. S. Tr. 337.

### 21. *Richard Williams*

Agent Payne testified that Richard Williams said he had seen defendant in his building but never received any medical services from defendant. S. Tr. 338. In April 2013, defendant billed Medicare $346.56 at CPT code 99344 for a sixty-minute visit with Mr. Williams. Ex. 81C. Mr. Williams received a bill that indicated defendant provided him medical services on April 8, 2013. S. Tr. 338. Mr. Williams complained to Medicare. *Id.* at 339. After he complained, Mr. Williams saw defendant and confronted defendant about why defendant was billing him for medical services that did not occur. *Id.*

### 22. *Brenda Nelson*

Agent Payne testified that Brenda Nelson said that she first became aware of defendant after she started receiving repeated calls from nursing agencies asking that she allow defendant to conduct a medical visit in her home. S. Tr. 341. Ms. Nelson declined at first because her primary care physician said that she did not need a home physician. *Id.* Ms. Nelson ultimately relented and allowed defendant to visit. *Id.* Defendant came to the visit alone. *Id.* Defendant wore light blue medical scrubs and flip flops. *Id.* Defendant examined Ms. Nelson's knee and said he would order a physical therapist; Ms. Nelson does not recall a physical therapist every coming to her home. *Id.* Defendant also asked if anyone else was home. *Id.* The visit lasted less than twenty minutes. *Id.*

33

During the last visit, defendant began rubbing Ms. Nelson's leg in a sexual manner and said that her skin was soft and asked if the rest of her skin was also that soft. *Id.* Ms. Nelson said defendant was not wearing any underwear and that she could tell defendant had an erection. *Id.* Defendant straddled Ms. Nelson's knee and rubbed his penis against her leg. *Id.* at 341-342. Ms. Nelson screamed for her son who was sleeping in another room. *Id.* According to the claims data, defendant billed Medicare $974.66 at CPT codes 99349 and 99350 for visits with Ms. Nelson. S. Tr. 343.

### 23. *Linda Beebe*

Agent Payne testified that Linda Beebe said defendant starting visiting her in September 2013. S. Tr. 354. Ms. Beebe said defendant's visits lasted approximately 10 to 15 minutes during which defendant asked Ms. Beebe about her pain, took her blood pressure and listened to her heart. *Id.* According to the claims data, defendant billed Medicare $27,085.86 at CPT codes 99345, 99349, and 99350 for visits with Ms. Beebe. S. Tr. 355.

### 24. *William Furseth*

Agent Payne testified that William Furseth said he saw defendant three or four times and the visits lasted approximately 10 to 20 minutes. S. Tr. 359. Mr. Furseth said defendant spoke to him during the visits but not really about his medical issues. *Id.* Mr. Furseth also said defendant never performed any ear wax removal procedures. *Id.* Mr. Furseth said his last visit with defendant, which defendant showed up for unscheduled, lasted 10-15 minutes, during which Mr. Furseth told defendant about his shoulder and arm pain and defendant prescribed medication. *Id.* at 360. Mr. Furseth recalls receiving a $400 or $500 bill for the visit, which Mr. Furseth said was strange because defendant really did not do anything during the visit to warrant such an amount.

*Id.* According to the claims data, defendant billed Medicare $2,915 at CPT codes 99345, 99349, and 69210 (ear wax removal) for visits with Mr. Furseth. *Id.*; Ex. 81C.

### 25  *Susan Dames*

Agent Payne testified that Susan Dames is a hospice social worker and has known defendant since 1993. S. Tr. 357. Ms. Dames said that in the early 2000s, a 27-year-old wheelchair bound patient suffering from depression with a rare genetic condition said she was dating defendant. *Id.* The patient further told Ms. Dames that defendant was going to leave his wife because the patient and defendant were having a sexual relationship. *Id.* Ms. Dames said she confronted defendant about the allegation; defendant denied it. *Id.* Ms. Dames also recalled a patient who in 2007 said defendant fondled her breast on several occasions and that she was afraid of defendant because defendant would show up at unscheduled times of the day. *Id.* at 357-358. Ms. Dames contacted the Illinois Department of Financial and Professional Regulation to report the incident but was told the victim had to report the crime. *Id.* at 358. Ms. Dames said the patient declined to do so. *Id.* Ms. Dames said defendant has a reputation for never saying no to orders for home health, refills on prescriptions, or other medical orders. *Id.* Ms. Dames said defendant has treated many patients that she has worked with over the years and based on descriptions from those patients, she believed a typical home visit from defendant would last approximately 15 minutes. *Id.*

### 26.  *Gertrude Glaspie*

Agent Payne testified that Gertrude Glaspie told an officer with the Rockford Police Department that defendant became her doctor in November 2012. S. Tr. 362. Ms. Glaspie said defendant visited her in her home and always came alone. *Id.* According to Ms. Glaspie, defendant always wore surgical scrubs with no under clothes beneath his scrubs. *Id.* During one visit, Ms.

Glaspie asked defendant to look at her shoulder. *Id.* at 362-363. Defendant massaged her back and moaned while doing so. *Id.* at 363. After defendant finished massaging her back, Ms. Glaspie said defendant stepped in front of her and she noticed that defendant had an erection. *Id.* Ms. Glaspie said during some visits defendant would tell her how he wanted to be with her and how he desired her. *Id.* Ms. Glaspie also mentioned that during every visit defendant would reach under her shirt while massaging her back and fondle her breasts. *Id.* Ms. Glaspie said that defendant performed oral sex on her and she performed oral sex on him. *Id.* at 363-364. Ms. Glaspie said she fired defendant in November 2013. *Id.* at 365. Ms. Glaspie also said she asked to borrow $200 from defendant but he did not bring the money during her next visit. *Id.* According to the claims data, defendant billed Medicare $10,962.38 at CPT codes 99345, 99349, 99350, 69210 (ear wax removal), and 11042 (removal of skin) for visits with Ms. Glaspie. S. Tr. 366; Ex. 81C.

### 27. *Carol Johnson*

Agent Payne testified that Carol Johnson said defendant visited her at her home for two years. S. Tr. 367. Ms. Johnson said defendant visited her once per month and took her temperature, checked her heart and examined her breathing. *Id.* During his third visit, defendant checked her with a stethoscope and she felt defendant moved his hand towards her breast. Ms. Johnson asked, "Are we done here?" *Id.* at 367-368. Defendant answered yes and left. *Id.* at 368. During the next visit, defendant made a sexual comment towards Ms. Johnson. *Id.* According to the claims data, defendant billed Medicare $4,186.86 at CPT codes 99345, 99349, and 99350 for visits with Ms. Johnson. *Id.* at 368; Ex. 81C.

### 28.   *Daniel Guyer*

Agent Payne testified that Daniel Guyer said he never saw or talked to defendant.  S. Tr. 369.  Mr. Guyer also said he was never examined by defendant.  *Id.*  According to the claims data, defendant billed Medicare $790 at CPT codes 99344 and 99349 for visits with Mr. Guyer. *Id.* at 369-370; Ex. 81C.

### 29.   *Marcie Holliman*

In December 2013, Marcie Holliman told Investigator Joseph Jones with the Illinois Department of Financial and Professional Regulation that she met defendant three years ago in one of the buildings where defendant saw patients.  S. Tr. 198.  Ms. Holliman said she asked defendant if he was a doctor and he said that he was.  *Id.*  Ms. Holliman told defendant she needed a doctor and defendant said they should go to her apartment.  *Id.*  In her apartment, defendant asked Ms. Holliman how long it had been since she had a breast exam.  *Id.*  Defendant then placed his hand under her shirt and began to feel around.  *Id.*  Ms. Holliman said she told defendant he could do whatever he wanted at which point defendant removed her shirt.  *Id.* at 198-199.  Ms. Holliman told defendant she needed a prescription for certain medication and defendant said he would give her whatever she wanted.  *Id.*  Ms. Holliman said she had sex with defendant the first day they met.  *Id.*[3]  According to the claims data, defendant billed Medicare $2,442.48 at CPT codes 99349, 99350, and 69210(ear wax removal) for visits with Ms. Holliman.  S. Tr. 371; Ex. 81C.

### 30.   *Machelle Kiolbassa*

Agent Payne testified that Machelle Kiolbassa said defendant would visit her once per month and stay for approximately 10 to 20 minutes.  S. Tr. 372.  During the period where defendant was treating her, Ms. Kiolbassa said she called defendant's office to complain about pain in her

---

[3] Donna Walls said Ms. Holliman told her that defendant and Ms. Holliman were having an ongoing sexual relationship.  S. Tr. 370.

breasts, chest and stomach. *Id.* When defendant came for the visit, Ms. Kiolbassa said defendant told her to pull up her shirt and her bra and defendant placed his mouth on her breasts, including her nipples. *Id.* at 372-373. During subsequent visits, defendant would ask her about her pain, take her temperature and blood pressure. *Id.* at 373. Ms. Kiolbassa said defendant never removed any of her skin or ear wax. *Id.* at 374-375. According to the claims data, defendant billed Medicare $60,777.74 at CPT codes 99345, 99349, 99350, 11042 (skin removal) and 69210 (ear wax removal) for visits with Ms. Kiolbassa. S. Tr. 375; Ex. 81C.

### 31. *Shirley Lee*

Agent Payne testified that Shirley Lee said she briefly met defendant when she first moved into her building. S. Tr. 376. Ms. Lee said defendant has never been in her apartment and defendant never provided her any medical services. *Id.* Ms. Lee said she wouldn't recognize defendant if she saw him. *Id.* According to the claims data, defendant billed Medicare $7,004.30 at CPT codes 99349 and 99350 for visits with Ms. Lee. S. Tr. 377; Ex. 81C.

### 32. *Barbara Mally*

Agent Payne testified that Barbara Mally said defendant spent less than five minutes in her apartment and never examined her. S. Tr. 377-378. Ms. Mally said during the second visit defendant said, "Well, you look fine." *Id.* at 378. During the third visit, defendant did not even sit down and did not have any medical equipment. *Id.* at 378-379. During the visit, defendant told Ms. Mally she is a good looking woman and shouldn't have trouble finding a man. *Id.* at 379. During the fourth visit, defendant did not even enter the apartment. *Id.* According to the claims data, defendant billed Medicare $2,181.42 at CPT codes 99345 and 99349 for visits with Ms. Mally. *Id.*; Ex. 81C.

### 33. *Yvonne Vazquez*

Agent Payne testified that Yvonne Vazquez told agents that defendant visited her at home. S. Tr. 382. During the first two visits, defendant had a nurse with him. *Id.* Ms. Vazquez said the first visit was very short. *Id.* Ms. Vazquez also said defendant did not check her blood pressure or check her heart. *Id.*

On the third visit, defendant approached Ms. Vazquez while she was sitting at a table. S. Tr. 382. Defendant asked her to lift her shirt so he could listen to her heart. *Id.* After Ms. Vazquez put her shirt down defendant put his hand inside his scrub pants and appeared to fondle himself. *Id.* The following month, defendant arrived unannounced. *Id.* at 383. Ms. Vazquez's daughter let defendant in. *Id.* Defendant entered her bedroom while she was sitting at her computer desk. *Id.* Defendant sat down on the edge of Ms. Vazquez's bed with his legs spread and placed his hands in his pants. *Id.* Defendant performed no medical services. *Id.* at 384. According to the claims data, defendant billed Medicare $2,534.46 at CPT codes 99345 and 99350 for visits with Ms. Vazquez. S. Tr. 385; Ex. 81C.

### 34. *Elaine Zimmerman*

Agent Payne testified that Elaine Zimmerman said she met defendant once in the hallway of Rockford Supportive Living. S. Tr. 385. Ms. Zimmerman said she asked defendant about nausea she was experiencing and defendant told her to see a GI specialist. *Id.* at 386. According to Ms. Zimmerman, the conversation lasted between 10 and 15 minutes. *Id.* Defendant never discussed home health services with Ms. Zimmerman and she received no medical services from defendant. *Id.* According to the claims data, defendant billed Medicare $683.76 at CPT codes 99344 and 99350 for visits with Ms. Zimmerman. Ex. 81C.

### 35. *Donald Edwards*

Agent Payne testified that Donald Edwards, who only communicated by saying "yes" or "no," indicated he started seeing defendant in the summer of 2009. S. Tr. 309. Mr. Edwards said defendant never checked Mr. Edwards' vitals, cut or scrapped his skin, and never clipped his nails. *Id.* Mr. Edwards said defendant talked to him and usually stayed less than 10 minutes. *Id.* According to the claims data, defendant billed Medicare $25,001.90 at CPT codes 99349, 99350, and 11042 (skin removal) for visits with Mr. Edwards. S. Tr. 306; Ex. 81C.

### 36. *Louise Franks*

Agent Payne testified that Louise Franks said defendant came to her residence once. Defendant checked Ms. Franks' vitals and stayed for about 30 minutes. S. Tr. 307. During the visit, Ms. Franks told defendant she already had a primary care physician but defendant did not reply. *Id.* According to the claims data, defendant billed Medicare $1,435.48 for three visits at CPT codes 99344, 99349, and 99350 with Ms. Franks. S. Tr. 311; Ex. 81C.

### 37. *Joseph Garcia*

Agent Payne testified that Joseph Garcia said he fired defendant because he did not feel defendant was doing anything as his doctor. S. Tr. 312. Mr. Garcia said defendant often would not show up on time and would normally stay for 30 to 35 to check his vitals. *Id.* Once, Mr. Garcia said he got tired of waiting for defendant so he walked down to the lobby and when he returned he found defendant's business card in his door stating that Mr. Garcia had missed defendant. *Id.* at. 312-313. According to the claims data, defendant billed Medicare $1,933.28 at CPT codes 99345 and 99350 for visits with Mr. Garcia. *Id.* at 313; Ex. 81C.

### 38.  *Donald Johnson*

Agent Payne testified that Donald Johnson said that while he lived at Rockford Supportive Living Senior Housing, defendant never treated him for any medical issues.  S. Tr. 314.  Mr. Johnson also said that he did not receive any home health services and did not have nurses visiting him at his apartment.  *Id.*  According to the claims data, defendant billed Medicare $336.38 for visits with Mr. Johnson.  *Id.*

### 39.  *Joe Roen*

Agent Payne testified that Joe Roen said his parents, Orville Roen and Virginia Roen, and his brother, David Roen, all were seen by defendant.  S. Tr. 318.  Mr. Roen said defendant performed a 15 minute "consultation" on his father but billed the insurance company for a 60-minute visits for each of his mother, father, and brother.  *Id.*

### 40.  *Chris Sweetman*

Agent Payne testified that Chris Sweetman said defendant visited him at his home one to two times per month and the visits lasted 15 to 20 minutes.  S. Tr. 319.  Mr. Sweetman said defendant conducted a basic examination and ordered tests, labs, and refilled Mr. Sweetman's medications.  *Id.*  According to the claims data, defendant billed Medicare $4,802.82 at CPT codes 99345, 99349, and 99350 for visits with Mr. Sweetman.  *Id.*; Ex. 81C.

### 41.  *Frances Trenholm*

Agent Payne testified that Frances Trenholm said defendant visited her at home monthly for approximately one and one-half years.  S. Tr. 321.  During his visits, defendant asked Ms. Trenholm questions about her health and provided her with three-month supplies of her medication.  *Id.*  Ms. Trenholm said defendant's visits lasted 30 minutes.  *Id.*  According to the

claims data, defendant billed Medicare $13,310.84 at CPT codes 99345, 99349, and 99350 for visits with Ms. Trenholm. *Id.* at 322; Ex. 81C.

### 42. *Angela Weber*

Agent Payne testified that Angela Weber said defendant visited her twice at her home. S. Tr. 323. Ms. Weber said there was not really a need for defendant to visit because she already had a regular doctor. *Id.* Ms. Weber's husband, James Weber, was present during each of defendant's visits and defendant treated both of them at the same time, usually for a total of 30 minutes. *Id.* Ms. Weber said defendant asked her questions and prescribed her medication. *Id.* Mr. Weber said defendant checked his blood pressure. *Id.* According to the claims data, defendant billed Medicare $826 at CPT code 99349 for visits with Ms. Weber and $705 at CPT codes 99345 and 99349 for visits with Mr. Weber. *Id.* at 324; Ex. 81C.

### 43. *Starlene Petrus*

Agent Payne testified that Starlene Petrus told Joseph Jones with the Illinois Department of Financial and Professional Regulation that defendant, wearing scrubs, came to see her because she had lower leg pain. Ms. Petrus said she was sitting in a blue chair and defendant began to rub higher and higher up her leg. Ms. Petrus said she tried to push defendant's hand away and told him to stop but he kept rubbing her leg and then started to rub her breasts. Defendant then stood up and Ms. Petrus noticed that defendant had an erection. According to the claims data, defendant billed Medicare $14,926 at CPT codes 99345, 99349, and 99350 for visits with Ms. Petrus.

### 44. *Sue Beesley*

Agent Payne testified that Sue Beesley filed a report with the Rockford Police Department. S. Tr. 347. Ms. Beesley told the officer that defendant visited her and her sister. *Id.* at 348. During one visit, Ms. Beesley was sitting in a chair across from defendant. *Id.* Defendant pulled Ms.

42

Beesley closer and listened to her heart with a stethoscope. *Id.* He then moved the stethoscope across Ms. Beesley's left breast and around her back. *Id.* While bringing his hand around to her front, defendant grabbed Ms. Beesley's left breast and pulled her closer. *Id.* Defendant then placed Ms. Beesley's knee in between his legs and was rubbing his leg against her leg. *Id.* Defendant said, "you're beautiful" and "I cannot believe how beautiful you are." *Id.* Ms. Beesley pushed away from defendant and believes defendant thought he was treating her sister who has mental issues. *Id.* at 348-349. According to the claims data, defendant billed Medicare $4,582.52 for visits with Beesley. S. Tr. 349; Ex. 81C.

### H. Billing and Loss Analysis

Special Agent Payne also testified about defendant's billing as compared to other doctors in Illinois. S. Tr. 397; Ex. 81B. Specifically, between January 1, 2012 and December 31, 2013, "for code 99345, if you compare [defendant] to all other providers in the State of Illinois who use that code, he received the fifth most money – the fifth highest amount of reimbursement for that code." *Id.* at 398-399. Defendant also received the fifth highest amount of reimbursement for CPT code 99350. *Id.*; Ex. 81B.

With regard to the use of certain CPT codes, Agent Payne testified that between January 1, 2012 and December 31, 2013, defendant billed the lowest CPT code for a new patient, 99341, one time, or .14% of the time for new patients, compared to a state average of 4.41%. S. Tr. 400. Defendant also billed 99342 one time, or .14% of the time for new patients, compared to a state average of 14.51%. *Id.* Defendant billed 99343 four times, or .56% of the time for new patients, compared to a state average of 29.28%. *Id.* at 400-401. Defendant billed 99344 two hundred twenty times, or 30.90% of the time for new patients, compared to a state average of 30.68%. *Id.*

at 401.  Defendant billed 99345 four hundred eighty-six times, or 68.26% of the time, for new patients compared to a state average of 21.13%.

For established patients, defendant never billed 99347.  S. Tr. 401; Ex. 81B.  Defendant billed 99348 three times, or .07% of the time, for established patients as compared to a state average of 21.03%.  *Id*. at 401-402.  Defendant billed 99349 one thousand one hundred ninety-nine times, or 26.12% of the time, compared to a state average of 47.51%.  *Id*. at 402.  Defendant billed 99350, the highest code for established patients, two thousand six hundred seventy-seven times, or 58.31% of the time, compared to a state average of 14.52%.  *Id*.

Special Agent Payne also testified that defendant certified numerous patients for home health services that were not under defendant's care.  S. Tr. 405.  For these patients, defendant billed only for the certification and no CPT visit codes such as 99349 or 99350.  *Id*.  Specifically, according to the claims data, defendant submitted claims for home health certification or recertification for 417 patients that had no other services billed by defendant.  Id.  As a result of defendant's certifications and re-certifications, various home health agencies billed Medicare $2,787,054.58.  S. Tr. 412; Ex. 94C.

### III.    ARGUMENT

### A.    Defendant Caused More than $1.5 Million in Losses to Medicare[4]

Defendant fraudulently created patient records to support Medicare claims for patients that were deceased on the alleged date of the visit, for patients defendant admitted he never saw, and for patients defendant did see but did not provide medical services.  Defendant also fraudulently certified patients as homebound that were not under his care.

---

[4] Because the loss amount caused by defendant exceeds $1 million, U.S.S.G. § 2B1.1(b)(7) also applies.

The evidence establishes that the CPT code requirements for certifying patients as homebound and for in-home patient visits do not matter to defendant. Defendant choose the highest CPT codes regardless of whether he saw the patient or not, whether the patient was alive or not, and whether he provided any medical services or not. Even when defendant did provide medical services, the evidence establishes that those visits warrant, at most, the lowest reimbursement codes.

Defendant caused $3,159,712.04 in loss for in-home visits. The loss amount is the total of the difference between $3,096,038.29 (total for 99349 and 99350 claims) and $541,894.36 (99347) and $699,881.91 (total 99344 and 99345 claims) and $94,313 (99341).[5] This calculation is very conservative as it gives defendant the benefit of the doubt that every visit satisfies CPT codes 99341 or 99347, even though the evidence shows that not to be the case.

In calculating loss, the "court need only make a reasonable estimate of the loss." U.S.S.G. § 2B1.1, comment., (n. 3(C)); *United States v. Sriram*, 482 F.3d 956, 960 (7th Cir. 2007)(stating "for when precision in calculating the loss inflicted by a crime is unattainable, a reasonable estimate is all that the law requires."). In the case of a defendant convicted of Medicare fraud, "the aggregate dollar amount of fraudulent bills submitted to the Government health care program shall constitute prima facie evidence of the amount of the intended loss, . . . if not rebutted." U.S.S.G. § 2B1.1, comment., (n.3(F)(viii)). "[A]lthough the government generally bears the burden of showing that the alleged intended loss was garnered by fraudulent means, where the

---

[5] With regard to established patients, between 2009 and January 2014, defendant submitted 4,888 claims to Medicare under CPT code 99350 totaling $1,952,359.99 and 4,306 claims to Medicare under CPT code 99349 totaling $1,143,678.30. Defendant submitted no claims under 99347 and only 1 claim under 99348. If defendant had submitted to Medicare the 9,194 claims under 99347 instead of 99349 and 99350, defendant would have submitted claims totaling $541,894.36. With regard to new patients, defendant submitted 1610 claims to Medicare at CPT codes 99344 and 99345 and only 1 claim under 99341. If defendant had submitted to Medicare the 1610 claims under 99341 instead of 99344 and 99345, defendant would have submitted claims totaling $94,313.80, or a difference of $605,568.11.

government has shown that the fraud was so extensive and pervasive that separating legitimate benefits from fraudulent ones is not reasonably practicable, the burden shifts to the defendant to make a showing that particular amounts are legitimate. Otherwise, the district court may reasonably treat the entire claim for benefits as intended loss." *United States v. Hebron*, 684 F.3d 554, 563 (5th Cir. 2012).

The Fifth Circuit has applied *Hebron* to a Medicare fraud case. In *United States v. St. John*, Dale St. John founded A Medical, a physician house call company. 625 Fed. Appx. 661, 663 (5th Cir. 2015). St. John was charged with Medicare fraud for fraudulently billing Medicare for care plan oversight for homebound patients that did not satisfy Medicare's requirements. *Id.* As part of the scheme, A Medical certified patients as homebound even though many were not. *Id.* at 664. As sentencing, the district court calculated the loss amount by, among other things, adding all the bills submitted to Medicare by home health agencies for patients A Medical certified as homebound. *Id.*

On appeal, St. John argued that "the district court should have reduced the amount of any loss by the value of legitimate services provided." *St. John*, 625 Fed. App. at 667. In affirming the district court's loss calculation, the Fifth Circuit stated, "that where the fraud is so pervasive that separating legitimate from fraudulent conduct 'is not reasonably practicable, the burden shifts to the defendant' to prove any legitimate amounts." *Id.* at 668. Ultimately, the Fifth Circuit found that "the fraud is so pervasive that the district court did not plainly err in failing to subtract any amounts from the actual loss calculation in the absence of evidence from the defendant as to specific legitimate services." *Id.*

Here, like *St. John*, defendant's fraud is so pervasive that it is not reasonably practicable to separate legitimate conduct from fraudulent conduct. Defendant submitted thousands of claims to

Medicare totaling more than $4.8 million. As described above, the government has identified fraudulent claims for at least fifty patients that defendant submitted to Medicare. The evidence establishes that defendant billed Medicare for missed visits, billed Medicare for patient visits that occurred after the patient's date of death, billed Medicare for visits defendant never actually performed, and billed Medicare the highest CPT codes for routine visits that likely would not even satisfy the requirements of the lowest CPT code. For example, as described above, defendant billed 99345 68.26% of the time for new patients and 99350 58.31% of the time for established patients. Code 99345 requires that the patient is unstable or has developed a significant new problem requiring immediate physician attention whereas Code 99350 requires that the patient's problems are moderate to high severity and the patient may be unstable or may have developed a significant new problem requiring immediate physician attention. S. Tr. 175-179. The evidence, however, does not support the use of these code and instead proves, as defendant admitted to, that defendant billed Medicare at the highest payment levels for routine, non-complex, visits. R. 93.

The problem is that defendant's Medicare claims are supported by defendant's notes (either handwritten or computer generated) and other records in the patients' files. As such, it is not reasonably practicable for the government to separate legitimate claims from fraudulent ones and the burden should shift to defendant to make a showing that particular amounts are legitimate. Defendant has not shown that any particular claims are legitimate; this Court should therefore conclude all defendant's claims are fraudulent in calculating the loss amount.

Even if this court does not follow *Hebron* and *St. John*, the government has provided enough evidence for this Court to make a reasonable estimate of defendant's loss. *Sriram*, 482 F.3d. at 960. In *Sriram*, Sriram, a cardiologist who billed Medicare $17 million over a five-year period, pleaded guilty to health care fraud and tax fraud. 482 F.3d at 958. Sriram admitted to

receiving "substantial payments" for fraudulent claims. *Id.* "After a 13-day sentencing hearing, the district judge threw up his hands and imposed an absurdly light sentence of five years' probation for both the health care fraud and the tax fraud . . . ." *Id.* The government appealed and Sriram cross-appealed. *Id.*[6]

While the district court judge found that the only loss the government had proved was the face amount of the two checks that Sriram admitted having received for medical services he hadn't performed, the Seventh Circuit noted that Sriram had admitted in his plea agreement much more. 482 F.3d at 959. Specifically, Sriram admitted, among other things, that he "created fraudulent records, billed insurers for tests and other medical procedures that were not performed, and received insurance payments for services to patients who had died before the services allegedly had been rendered . . . ." *Id.* Sriram did not, however, admit to a specific amount of loss. *Id.* At Sriram's sentencing hearing, numerous patients for whose treatment Sriram had billed insurers testified that Sriram "hadn't treated them at all or had treated them much less frequently than the bills claimed." *Id.* Both Sriram and the government had experts testify, but the government's expert committed errors in calculating the fraudulent payments. *Id.* at 960. "Because of the errors committed by the government's expert, the judge found himself unable to calculate the exact amount of fraudulent payments that [Sriram] had received." *Id.*

On appeal, Sriram argued that the district court judge's estimate was correct because several patients were unsure of the number of house calls Sriram had made. 482 F.3d at 960. The Seventh Circuit noted that "the resulting uncertainty as to whether [Sriram] had billed for 11 or 12 fictitious visits made it impossible to quantify his overbilling. But while such evidence could not

---

[6] The Seventh Circuit found Sriram's cross-appeal frivolous. *Id.*

support a point estimate of the loss inflicted by [Sriram's] fraud, it could support a minimum estimate. *Id.*

In reversing the district court judge, the Seventh Circuit noted that "when precision in calculating the loss inflicted by a crime is unattainable, a reasonable estimate is all that the law requires." *Id.* at 960. Sriram's argument that sloppy records could generate unintentional false billing is not enough to overcome the evidence of the fraud. *Id.* at 960. The Seventh Circuit stated that "the extensive admissions that [Sriram] made in connection with his plea of guilty to the charge of fraud made his false claims prima facie evidence of the amount of loss that the fraud inflicted, and ***placed on him the burden of producing evidence on how many of the false claims were innocent***." *Id.* (Emphasis added). To allow otherwise would, according to the Seventh Circuit, "create a perverse incentive." *Id.* Ultimately, the Seventh Circuit reversed and remanded the district court's loss calculation noting that Sriram committed fraud on a large scale and should be punished accordingly. *Id.* at 962.

Similar to *Sriram*, here, defendant admitted in his plea agreement to billing Medicare for medical services purportedly provided to patients when defendant knew he did not provide any reimbursable service. R. 93. Defendant also admitted that his fraudulent billing included billing Medicare at the highest payment levels for routine, non-complex, visits with new and established patients even though defendant knew the visit did not qualify for the highest levels of payment. *Id*. Defendant also admitted that some of the patients he billed at the highest levels but did not actually see were deceased on the date of the alleged visit resulting in defendant billing Medicare for a visit after the patient's death. *Id*. Defendant also admitted that as part of his scheme, he certified patients as homebound that were not actually homebound. *Id*. Defendant admitted that as a result of his false certifications, home health agencies were able to bill Medicare for claims

for the patients' care. *Id*. Defendant's extensive admissions made in connection with his plea of guilty to the charge of fraud make his false claims prima facie evidence of the amount of loss that the fraud inflicted, and this Court should place on defendant, like in *Sriram*, the burden of producing evidence of how many of the false claims were innocent. 482 F.3d. at 960.

Moreover, like in *Sriram*, the evidence here establishes that defendant created fraudulent records and submitted claims to Medicare for visits and procedures that did not occur, including claims for patients who were not homebound and claims for patients who had died before the date of the alleged visit. 482 F.3d at 959. Also like *Sriram*, the government here presented evidence regarding a number of patients (more than fifty) for whose treatment defendant billed Medicare. That evidence shows a loss amount of $337,582.11 with regard to just those more than fifty patients. The evidence, however, also proves that the CPT code requirements do not matter to defendant.

The evidence presented establishes that defendant chose the CPT code regardless of whether defendant saw the patient or not and regardless of the level of medical decision making necessary and ultimately submitted claims to Medicare at the highest codes. Nicole Ranz said that defendant instructed her to bill most of her visits at CPT code 99350 and to bill CPT code 99349 if she quickly treated the patient. S. Tr. 244-245. These instructions were provided to Ms. Ranz before she saw a patient. Ms. Ranz's statement is corroborated by an analysis of the claims defendant submitted to Medicare and the evidence.

According to the Medicare claims data, between January 1, 2012 and December 31, 2013, defendant billed 99% of his 3879 established patient visits at CPT codes 99349 (30.91%) or 99350 (69.01%) and 99% of his 712 new patient visits at CPT codes 99344 (30.9%) or 99345 (68.2%). Ex. 81B. Defendant billed no 99347 visits and three (.07%) 99348 visits. *Id*. Defendant billed

50

one 99341(.02%) visit, one 99342 (.02%) visit and four 99343 (.09%) visit.  *Id.*  The Medicare claims data also shows that on 87 different days, defendant submitted claims to Medicare for 12 or more hours of established patient visits, including three days when defendant billed more than 20 hours of established-patient visits.  Ex. 81C.

Defendant billed thirteen patients that were dead on the alleged date of the visit.  S. Tr. 247-266.  Defendant submitted thirteen claims (two deceased patients were billed twice) to Medicare under CPT codes 99349 and one claim under CPT code 99345 and one under CPT code 99306.  *Id.*; Ex. 81C.  Defendant could have billed these fraudulent visits at the lowest CPT codes but defendant did not; defendant billed the visits at the highest CPT codes.

Additionally, even where defendant admitted in his own words that he didn't see the patient, defendant still billed at the highest CPT codes.  On June 12, 2012, defendant submitted a claim to Medicare for $261.94 under CPT code 99349 for an alleged forty-minute visit with Debra Porter.  Ex. 81C.  Defendant wrote a visit note that included problems that Ms. Porter allegedly reported to defendant.  Ex. 43B.  After Ms. Porter complained about not being seen on the billed date, defendant wrote Matt Turman, "Deb Porter/I called and went to apartment twice and did not get a response.  Bill but reschedule."  S. Tr. 394; Ex. 43A.

On September 20, 2012, defendant submitted a claim to Medicare for $366.62 under CPT code 99350 for an alleged sixty-minute visit with Michael Mattingly on September 20, 2012.  Ex. 81C.  After it was determined that defendant did not actually see Mr. Mattingly, Lou Pavelchik, an employee at MD at Home, sent defendant an email with the Subject "Michael Mattingly and billing" stating, "Dr. DeHaan, I spoke to Mariana, who had already billed the visit since it looked as if you have seen Mr. Mattingly."  S. Tr. 388.  In response, defendant wrote, "I do not want to remove billing for Mattingly.  I confirmed by phone call that I would be there at 4-5pm.  I arrived

51

on time. I knocked and even opened the door and called for a response. This took up my time and I could have seen another patient in his time slot. I do not want to remove the billing charge. Let me know if you disagree." *Id.*

On November 28, 2012, defendant submitted a claim to Medicare for $366.62 under CPT code 99350 for an alleged sixty-minute visit with Debra Drajin on November 26, 2012. Ex. 81C. On December 3, 2012, Mr. Pavelchik sent defendant an email with the Subject "Debra Drajin" stating, "Dr. DeHaan, Patient called and stated that she was not seen on 11/26 when scheduled. Patient is scheduled for 12/5/12. There was a visit that was billed to Medicare that we will have to refund. Please advise." S. Tr. 390; Ex. 40C. In response, defendant wrote, "She was seen that day. I spoke with her at the apartment but swhe [sic] did not need the visit. She asked for an order for home health which I ordered." *Id.* While defendant could have billed these fraudulent visits at the lowest levels, defendant did not; the visits were billed at the highest levels – 99349 and 99350.

On October 20, 2012, defendant wrote a letter to Dana Robinson, President of MD at Home. S. Tr. 391-392; Ex. 42. In the letter, defendant wrote:

We recently had a meeting and discussed billing issues for patients. Three patients were presented who claimed no visit had been made yet they were billed. A policy was discussed. One of those patients admitted that she was wrong about her claim that I had not been to her home. She has cognitive impairment and stated she would call the office to apologize. The other 2 patients had confirmed appointments through the office and in addition had agreed to my visit when I called in the morning to give an ETA regarding the visit. On arriving as agreed, they were not available for the visit. We had communicated and I followed through on expectations. I physically showed up at the homes and left a card or document regarding my visit. I billed those visits according to our prior discussions. As you recall, we discussed these situations in the past. I explained what I do and why. We agreed to this approach with billing. As I now understand this prior practice is changed and you do not want billing unless I physically engage with the patient. Since our discussion this week, I will comply. We discussed some possible solutions to the expected effect this will have on our productivity.

S. Tr. 392-393. Interestingly, in 2013, after defendant left MD at Home, defendant continued his practice of leaving his business card and billing for the visit. Jim Beaumont said he never saw defendant in December 2013 but that defendant left a business card in his door. S. Tr. 294. Defendant fraudulently billed Medicare $241 at CPT code 99349 for a forty-minute visit on December 27, 2013 with Beaumont. Ex. 81C.

Similarly, Leonard Shimmin said that defendant came to his apartment unannounced and offered medical services. S. Tr. 332. Mr. Shimmin declined. *Id*. Defendant subsequently billed Medicare $346.56 for an alleged sixty-minute visit. Ex. 81C. Jerrie Travis said she never met defendant and doesn't receive house visits. S. Tr. 334. Yet, defendant billed Medicare $406 at CPT codes 99345 for a sixty-minute visit with Ms. Travis. Ex. 81C. Defendant subsequently billed Medicare $189 twice for two alleged forty-minute visits with Travis. *Id*. Richard Williams said he never received any medical services from defendant. S. Tr. 338. Yet, defendant billed Medicare $346.56 at CPT code 99344 for an alleged sixty-minute visit with Mr. Williams. Ex. 81C. Daniel Guyer said defendant never examined him. S. Tr. 369. Yet, defendant billed Medicare $790 at CPT codes 99344 and 99349 for visits with Mr. Guyer. Ex. 81C. Shirley Lee said she briefly met defendant when she moved into her building. S. Tr. 376. Ms. Lee said defendant has never been in her apartment and never provided her any medical services. *Id*. Yet, defendant billed Medicare $7,004.30 at CPT codes 99349 and 99350 for visits with Ms. Lee. Ex. 81C. Donald Johnson said that he never received medical services from defendant. S. Tr. 314. Yet, defendant billed Medicare $336.38 for visits with Ms. Johnson. Defendant admitted in his plea agreement that he billed Medicare for a sixty-minute visit with Scarlet Jefferson under CPT code 99344 even though he never saw Ms. Jefferson. R. 93. While defendant could have billed Medicare at the lowest rates for these fraudulent visits where defendant did not see the patient,

defendant did not; defendant billed the visits at the highest rate because defendant decided the CPT code prior to the visit.

Furthermore, even where defendant saw the patient, many patients said defendant stayed for 5 to 10 minutes and provided little to no medical services. Former employee Natalia Parivan said she received calls from patients complaining that defendant was not at the residence for the length of time indicated on the bill or that defendant was not at the residence at all for the date billed. S. Tr. 315-316. Nicole Ranz said many patients told her that defendant normally spent 5 to 10 minutes with them and that he sometimes just stood in the doorway and never came into their home. S. Tr. 246. This is consistent with Jeff and Kathy Rowland's testimony and what Jim Beaumont told law enforcement agents. The Rowlands testified that defendant visited twice; the second visit defendant stood in the hallway and never entered their apartment. S. Tr. 82, 97. Jim Beaumont said defendant never came in to his apartment and did not provide medical services. S. Tr. 294.

Furthermore, Marla Toner said that the longest she ever saw defendant was approximately five minutes and that defendant never provided her any medical services. S. Tr. 269. Yet, defendant billed Medicare $2,176.04 at CPT codes 99344, 99349, and 99350 for visits with Ms. Toner. Ex. 81C. Guy Hatcher said that defendant's visits lasted approximately five minutes even though defendant's electronic visit notes contain indications of a physical examination and "counseling and patient education greater than 50% of visit. 60-minute encounter." S. Tr. 283. Defendant billed Medicare $5,901.62 at CPT codes 99349 and 99350 for visits with Mr. Hatcher. Ex. 81C. Paul Bryant said that defendant's typical visits lasted five minutes. S. Tr. 299. Defendant asked Mr. Bryant how he was doing and whether Mr. Bryant needed any medications; not moderate to complex medical decision making for CPT codes 99349 and 99350. *Id*. Yet,

defendant billed Medicare $4,544.48 at CPT codes 99344, 99349, and 99350 for visits with Mr. Bryant. Ex. 81C. Sebastian Costa said he and his girlfriend, Vicki Jacobs, received in home visits from defendant. S. Tr. 325. According to Mr. Costa, defendant usually stayed twenty minutes and treated both Ms. Jacobs and him together during a visit. *Id*. Mr. Costa said defendant never performed any procedures or examined him; rather, defendant only spoke to him and Ms. Jacobs and asked if either needed refills of their medication. *Id*. Like Mr. Bryant, defendant's visits with Mr. Costa and Ms. Jacobs did not involve moderate to complex medical decision making required for CPT codes 99349 and 99350. Yet, defendant billed Medicare $3,284.56 at CPT codes 99344, 99349, and 99350 for visits with Mr. Costa and $3,218.32 at CPT codes 99345, 99349, and 99350 for visits with Ms. Jacobs. Ex. 81C.

Linda Beebe said defendant's visits lasted 10 to 15 minutes and defendant asked Ms. Beebe about her pain, took her blood pressure and listened to her heart. S. Tr. 354. While Ms. Beebe said defendant asked about her pain, took her blood pressure and listened to heart, defendant billed Medicare $27,085.85 at CPT codes 99345, 99349, and 99350 for visits that would have required medical decision making of moderate to high complexity due to Ms. Beebe being unstable or having developed a significant new problem. William Furseth said defendant's visits lasted 10 to 20 minutes during which defendant spoke to him but not about medical issues. S. Tr. 359. Mr. Furseth also said defendant never performed any ear wax removal procedures. *Id*. Yet, defendant billed Medicare $2,915 at CPT codes 99345, 99349 and 69210 (ear wax removal) for visits with Mr. Furseth. Ex. 81C. Barbara Mally said defendant spent less than five minutes in her apartment and never examined her. S. Tr. 377-378. Yet, defendant billed Medicare $2,181.42 at CPT codes 99345 and 99349 for alleged visits with Ms. Mally. Ex. 81C. Donald Edwards said defendant never checked his vitals, cut or scrapped his skin, or clipped his nails. S. Tr. 309. Mr. Edwards

said defendant's visits lasted less than 10 minutes. *Id*. Yet, defendant billed Medicare $25,001.90 at CPT codes 99349, 99350, and 11042 (skin removal) for visits with Mr. Edwards. Ex. 81C. Angela Weber said defendant visited her even though she already had a primary doctor. S. Tr. 323. Ms. Weber's husband, James Weber, said defendant treated both of them and the visits to treat both of them lasted 30 minutes. *Id*. Ms. Weber said defendant asked questions and prescribed her medication. *Id*. Mr. Weber said defendant checked his blood pressure. *Id*. Defendant billed Medicare $826 at CPT code 99349 for visits with Ms. Weber and $705 at CPT codes 99345 and 99349 for visits with Mr. Weber. Ex. 81C.

For some patients, defendant billed Medicare the highest CPT codes even though defendant provided minimal or no medical services but instead made sexual contact with the patient. Sue Lapin testified defendant visited her apartment. S. Tr. 24-29. During the visits defendant never provided any medical services other than to fit her for a wheelchair and check her blood pressure. *Id*. Instead, defendant touched Ms. Lapin's breasts and told her he did so to make sure her breasts would fit in her wheelchair. *Id*. at 25. Defendant also became aroused during one visit and exposed himself during another visit. *Id*. at 24-29. Defendant submitted claims to Medicare totaling $1704.52 for visits with Ms. Lapin under CPT codes 99345, 99349, and 99350 even though defendant provided Ms. Lapin minimal to no medical services and instead inappropriately touched her. Linda Schultz testified that defendant "played with me every time he come visit." S. Tr. 57. Ms. Schultz said she touched defendant's penis during every visit and that defendant "didn't much medical exam me. All he did is he come there, and he was always—he would always pull his pants down and pull it out. He had me playing with it, . . . ." *Id*. Defendant submitted claims to Medicare totaling $48,067.14 for visits with Ms. Schultz under CPT codes 99349 and 99350 even

though defendant provided Ms. Schultz no medical services and instead inappropriately touched her.

Similar to Ms. Schultz, Joan Ann Shortridge said under oath that after her hip surgery defendant provided no medical services and instead inappropriately touched her. Ex. 34F. Ms. Shortridge said defendant acted in a sexual manner during every visit from February 2009 through 2012. *Id*. Defendant exposed himself and attempted to have Ms. Shortridge touch him. *Id*. Defendant also masturbated in front of Ms. Shortridge. During one visit, Ms. Shortridge noticed a scar near defendant's genitals that Ms. Shortridge described on the lower right-side of his abdomen with very little pubic hair. *Id*. Detective DePastors corroborated the location of defendant's scar and testified that defendant's scar was two inches below his navel below his beltline. S. Tr. 192. While Ms. Shortridge said the scar was about an inch and Detective DePastors described it as long, the location of the scar is what is important as Ms. Shortridge accurately described the location of defendant's scar relative to his genitals. Since 2009, Defendant submitted claims to Medicare totaling $20,663.51 for visits under CPT codes 99349 and 99350 for the visits with Ms. Shortridge even though defendant provided Ms. Shortridge no medical services and instead inappropriately touched her.

Gertrude Glaspie said that during every visit defendant reached under shirt while massaging her back and fondled her breast. S. Tr. 363. Ms. Glaspie also said she performed oral sex on defendant and he performed oral sex on her. *Id*. at 363-364. Defendant billed Medicare $10,962.38 at CPT code 99345, 99349, 99350, 69210 (ear wax removal) and 11042 (skin removal) for visits with Ms. Glaspie. *Id*. at 366; Ex. 81C. Marcie Holliman said she had sex with defendant in exchange for prescriptions for certain medications. S. Tr. 198-199. Defendant billed Medicare $2,442.48 at CPT codes 99349, 99350, and 69210 (ear was removal) for visits with Ms. Holliman.

*Id*. at 371; Ex. 81C.[7]  Machelle Kiolbassa said defendant visited once per month and stayed approximately 10 to 20 minutes.  S. Tr. 372.  During one visit, after Ms. Kiolbassa complained about pain in her breast, defendant told her to pull up her shirt and her bra and defendant placed his mouth on her breasts and nipples.  *Id*. at 372-373.  During subsequent visits, defendant asked about her pain, took her temperature and her blood pressure.  *Id*. at 373.  Ms. Kiolbassa also said defendant never removed any skin or ear wax.  *Id*. at 374-375.  Defendant billed Medicare $60,777.74 at CPT codes 99345, 99349, 99350, 11042 (skin removal) and 69210 (ear wax removal) for visits with Ms. Kiolbassa.  *Id*. at 375; Ex. 81C.  Yvonne Vazquez said defendant's first visit was very short; defendant did not check her blood pressure or heart.  S. Tr. 382.  During the third visit, defendant placed his hand inside his scrub pants and appeared to fondle himself after asking Ms. Vazquez to lift her shirt.  *Id*. at 383.  During the final visit, defendant sat down on the edge of Ms. Vazquez's bed with his legs spread and placed his hands in his pants.  *Id*. Defendant billed Medicare $2,534.46 at CPT codes 99345 and 99350 for visits with Ms. Vazquez. *Id*. at 385; Ex. 81C.  Starlene Petrus said defendant rubbed her leg and then her breast.  S. Tr. 345. Ms. Petrus also noticed when defendant stood up he had an erection.  *Id*.  Defendant billed Medicare $14,926 at CPT codes 99345, 99349, and 99350 for visits with Ms. Petrus.  Ex. 81C.

Defendant also fraudulently certified patients as homebound even though defendant either never saw or examined the patient or defendant knew the patient wasn't homebound but certified the patient as homebound.  Defendant told agents he rarely turns down a patient for home health care and that some of the patients he certified for home health services were not homebound, but the all the patients wanted the service.  S. Tr. 221.  Defendant's statement to agents is consistent

---

[7] Interestingly, with regard to Ms. Holliman, defendant told Investigator Jones that he quit prescribing Ms. Holliman medications once he found out that she was a drug seeker, (S. Tr. 207), but subsequently told Agent Woodill that he kicked Ms. Holliman out of his practice because she was stealing money from her mom and threatened to tell people they had sex if defendant did not prescribe Ms. Holliman medication.  S. Tr. 226.

with his email regarding Debra Drajin where in response to Ms. Drajin's complaint that she was billed for a visit that did not occur defendant wrote, "She was seen that day. I spoke with her at the apartment but swhe [sic] did not need the visit. *She asked for an order for home health which I ordered*." *Id*. at 390. Defendant also admitted in his plea agreement that he certified Scarlett Jefferson for home health care even though he never saw her. R. 93. Defendant certified Rodney Fair as homebound even though Mr. Fair told agents he can do almost everything himself. S. Tr. 287. Defendant certified that on November 18, 2013, he had a face-to-face encounter with Mr. Fair and that Mr. Fair was homebound because of a "taxing effort to safely leave the home." *Id*. Three days later, however, a nurse discharged Mr. Fair because his home health goals were achieved. *Id*. at 290. What happened in three days for Mr. Fair to have a taxing effort to leave the home to goals achieved is unknown, but a month later defendant again certified Mr. Fair for home health. *Id*.

The Code of Federal Regulations require that "[a]s *a condition for payment of home health services* under Medicare Part A or Medicare Part B," a physician must certify that the patient needs home health services and the "services were furnished while the individual was under the care of a physician who is a doctor . . . ." 42 C.F.R. § 424.22(a). The government has identified numerous patients that defendant certified that were not under defendant's care. Defendant never submitted claims to Medicare for any visits with these patients except for certifications and re-certifications for home health care. The fact that the individuals defendant certified may or may not have been homebound does not matter; the regulations require as a condition for payment a non-fraudulent certification.

The Sentencing Guidelines provide that loss "shall be reduced" by the "fair market value of the property returned and the services rendered, by the defendant or other persons acting jointly

with the defendant, to the victim before the offense was detected." U.S.S.G. § 2B1.1(n. 3(E)(i)). In this case, if any services were provided as a result of defendant's false certifications, those services would have been done by a home health agency, not defendant or other persons acting jointly with defendant. Moreover, defendant has presented no evidence that the individuals he falsely certified were, in fact, homebound and one of the victims here, the government, received no benefit from defendant's false certifications as defendant disregarded Medicare standards.

In *United States v. Triana*, Triana was a convicted felon excluded from participating in Medicare. 468 F.3d 308, 311 (6th Cir. 2006). Triana, nevertheless, created two companies that hired licensed physicians to bill services to Medicare. *Id.* At sentencing, Triana argued that all the services provided were legitimate services to Medicare-eligible patients so the loss amount should be zero. *Id.* at 314. The district court disagreed. On appeal, Triana made the same argument pertaining to the loss amount. In affirming the district court, the Sixth Circuit stated that Triana's participation with his company made the company ineligible for participation in Medicare. *Id.* at 322. As such, "Triana's attempt to divert Medicare funds to Footcare caused a loss to Medicare regardless of whether Footcare hired legitimate podiatrists or provided services to legitimate Medicare beneficiaries." *Id.* at 323; *see also United States v. Jones*, 664 F.3d 966, 984 (5th Cir. 2011)(finding the district court did not err in not crediting loss for services actually provided because "Medicare pays for treatments that meet its standards, and the Appellants' treatments using unlicensed KTs did not meet these standards.").

Similarly, in *United States v. Echols*, Echols "defrauded Medicare by signing hundreds of plans of care authorizing home health care for patients he had not seen or treated." 574 Fed. Appx. 350, 351 (5th Cir. 2014). The district court determined Echols loss by adding the claims submitted by the home health agency that listed Echols as the listed physician. *Id.* at 354 n. 2. On appeal,

Echols argued that the district court incorrectly calculated loss where it failed to require the government to prove that the home health care services provided by the home health agency were not medically necessary. *Id.* In affirming the district court, the Fifth Circuit noted that Echols "admitted he had not seen patients for whom he signed [plans of care], and that he did not know whether they needed [services] or not." *Id.* at 360. Further, the Fifth Circuit noted that Echols claims "that the government must prove the services billed were not medically necessary erroneously assumes that the covered services were actually provided . . . ." *Id.* "There was no evidence that Dr. Echols provided legitimate medical services to either the home healthcare companies or to the people on whose behalf fraudulent Medicare claims were submitted by the home healthcare companies." *Id.*

Here, like *Triana*, *Jones*, and *Echols*, the fact that some of the home health agencies' patients may have actually been homebound does not matter for loss calculation because Medicare, one of the victims under U.S.S.G. § 2B1.1, did not receive a benefit where its standards were not followed. Furthermore, there has been no evidence that defendant provided legitimate medical services to any of the home health care companies or to the people on whose behalf fraudulent Medicare claims were submitted by the home health care companies.

Based on the above analysis and evidence, it is clear that the CPT code requirements for certifying patients as homebound and for in-home patient visits do not matter to defendant. Defendant choose the highest CPT codes regardless of whether he saw the patient or not and whether he provided any medical services at all. It is the government's position that defendant's loss is $3,159,712.04. This calculation is very conservative as it gives defendant the benefit of the doubt that every visit satisfies CPT codes 99341 and 99347, even though the evidence shows that not to be the case. As the Seventh Circuit stated in *Sriram*, "[w]hen guilt beyond a reasonable

doubt is duly determined, picking a sentence within the statutory range to punish the defendant for his crime does not require as much precision as the initial determination that he in fact committed the crime."  482 F.3d at 960.

With regard to defendant's fraudulent home health certifications, conservatively, home health care agencies submitted $2,787,054.58 in claims to Medicare that were based on defendant's fraudulent certifications.  The $2.7 million encompasses only those patients who were solely certified by defendant but not under defendant's care and who home health care agencies submitted claims to Medicare based on defendant's fraudulent certifications and re-certifications.

### B.      The PSR Correctly Applied an Enhancement for Ten or More Victims

Application Note 1 defines "victim" as "(A) any person who sustained any part of the actual loss determined under subsection (b)(1); or (B) any individual who sustained bodily injury as a result of the loss.  U.S.S.G. § 2B1.1, comment. (n.1).  Actual loss is defined as "the reasonably forseeable pecuniary harm that resulted from the offense."  U.S.S.G. § 2B1.1, comment. (n. 3(A)(i)).  Here, all of defendant's patients were Medicare recipients subject to co-pays.  It was therefore reasonably foreseeable to defendant that the patients he defrauded would pay inflated co-pays for visits that did not occur or for visits fraudulently billed at the highest levels of service.

Moreover, Application Note 4(E) provides, "[f]or purposes of subsection (b)(2), in a case involving means of identification 'victim' means (i) any victim as identified in Application Note 1; or (ii) any individual whose means of identification was used unlawfully or without authority."  U.S.S.G. § 2B1.1, comment. (n.4(E)).  A "means of identification" is a name or number to identify an actual specific individual such as a social security number. *See* 18 U.S.C. § 1028(d)(7); U.S.S.G. § 2B1.1, comment., (n.1).

In this case, the government has provided evidence that defendant used unlawfully more than fifty patients' means of identification. Specifically, defendant submitted claims to Medicare using the patients' HIC number, or Medicare identification number, for, among other things, visits that did not occur. *See United States v. Roy*, 819 F.3d 998, 1002 (7th Cir. 2016)(finding that 168 patients billed during defendant's Medicare fraud scheme were victims because their Medicare numbers were used and Medicare numbers are a means of identification).

### C. The PSR Correctly Applied an Enhancement for Vulnerable Victims and Large Number of Vulnerable Victims

A vulnerable victim means "a person (A) who is a victim of the offense of conviction and any conduct for which the defendant is accountable under § 1B1.3 (Relevant Conduct), and (B) who is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct." U.S.S.G. § 3A1.1, comment. (n.2). The vulnerable victim enhancement is "intended to reflect the fact that some potential crime victims have a lower than average ability to protect themselves from the criminal." *United States v. Grimes*, 173 F.3d 634, 637 (7th Cir. 1999). "The government needs only establish that a single victim was vulnerable in order for the enhancement to apply." *United States v. Sims*, 329 F.3d 937, 944 (7th Cir. 2003).

Victims under the Guidelines aren't limited to victims of the offense of conviction; rather, victims of defendant's relevant conduct also fall under U.S.S.G. § 3A1.1. *United States v. Callaway*, 762 F.3d 754, 760 (8th Cir. 2014)( "The Sentencing Commission has eliminated the nexus requirement . . . by amending § 3A1.1 and striking a note requiring that the defendant have targeted his victim because of vulnerability."). The government does not need to prove that defendant targeted his victims. *United States v. Callaway*, 762 F.3d 754, 760 (8th Cir. 2014)(stating that the Sentencing Commission "eliminated the nexus requirement . . . by amending

§ 3A1.1 and striking a note requiring that the defendant have targeted his victim because of her vulnerability.").

Defendant's patients are victims under § 3A1.1. *United States v. Sidhu*, 130 F.3d 644, 655 (5th Cir. 1997)("[A] physician's patients can be victimized by a fraudulent billing scheme directed at insurers or other health care providers."). Unlike some health care fraud cases where the victims benefitted from the scheme, here, defendant's patients did not benefit from defendant's medical care. *See United States v. Gieger*, 190 F.3d 661, 664 (5th Cir. 1999)(finding patients were not victims where scheme to submit false claims for ambulance services provided patients with free ride to the hospital). Some of defendant's patients, Medicare recipients many of whom suffer from physical and mental ailments, received no medical care from defendant and instead suffered harm from a lack of treatment. Ms. Schultz testified that for about two years she complained about her oxygen but defendant did nothing because "he was too busy playing hisself and didn't care nothing about me, I guess." S. Tr. 63. Ms. Shortridge testified that after her hip surgery, defendant provided no medical care and instead inappropriately touched her and threatened her not to tell. Ex. 34F. *United States v. Moon*, 513 F.3d 527, 541 (7th Cir. 2008)("Defendant's act of depriving her patients of the opportunity to receive the full benefit of their treatment through her failure to administer the recommended dosage of medication certainly qualifies as 'harm' within the meaning of the vulnerable victims enhancement. Significantly, this 'harm' occurred during the course of Defendant's scheme to defraud a number of healthcare benefit programs. Accordingly, we see no error in the district court's application of the vulnerable victim enhancement on the basis of Defendant's conduct with respect to her patients, despite the fact that her offenses of conviction were wire fraud.")

Defendant's victims were also vulnerable. As stated above, victims can be vulnerable due to age, physical or mental condition, or simply because the victim is "otherwise particularly susceptible to the criminal conduct." U.S.S.G. § 3A1.1, comment. (n. 2).

Here, many of defendant's patients had physical or mental conditions. Ms. Lapin needed a wheelchair to get around and defendant inappropriately touched Ms. Lapin, exposed himself, and submitted a claim to Medicare for the visits. S. Tr. 25. Ms. Schultz suffered from physical and mental issues but defendant performed no medical services and instead inappropriately touched her and submitted claims to Medicare of the visits. S. Tr. 55-63. The Rowlands also suffered from physical and mental limitations. Mr. Rowland had issues with leaving his apartment and suffered from various mental conditions. Defendant submitted a claim to Medicare for a visit with Mr. Rowland where defendant stood in the hallway and did not examine Mr. Rowland. S. Tr. 93. Ms. Shortridge suffered from agoraphobia and was bed bound after her hip surgery. Defendant took advantage of her physical vulnerability. Ex. 34F.

Further, a causal connection exists between defendant's victims' vulnerability and the crime's ultimate success. Defendant inappropriately touched older female patients that suffered from physical and mental limitations. When confronted with his behavior, defendant claimed the women were older, suffered from dementia or had other problems. S. Tr. 128, 205. Defendant also made the same argument when confronted about allegations that defendant submitted claims to Medicare for visits that did not occur. S. Tr. 391-392. The patients' particular vulnerabilities made it much more likely that defendant's Medicare fraud scheme would succeed.

Additionally, the PSR correctly calculated the enhancement for a large number of vulnerable victims. The Guidelines do not define what constitutes a large number. *United States v. Anderson*, 349 F.3d 568, 573 (8th Cir. 2003). The Tenth Circuit has looked to the commentary

in U.S.S.G. § 2H4.1 to find that ten is a large number. *United States v. Kaufman*, 546 F.3d 1242, 1268-69 (10th Cir. 2008)(stating that the "commentary suggests that in the context of involuntary servitude and forced labor, ten victims is a large number. We see no reason not to apply that same standard to the 'large number' inquiry under U.S.S.G. § 3A1.1(b)(2)"); *but see United States v. Mooty*, 25 Fed. App'x 501, 501 (8th Cir. 2002)(unpublished)(holding that seven is not, as a matter of law, a large number within the meaning of § 3A1.1(b)(2)).

Here, defendant's practice focused on individuals who needed in-home visits due to age or mental/physical limitation. As identified above, the government has identified substantially more than ten patients whose information defendant used to submit claims to Medicare at the highest payment levels for routine, non-complex visits that did not qualify for the highest levels of payment. The government has also identified at least ten female patients whose information defendant used to submit claims to Medicare for alleged in-home visits when, in fact, defendant provided no medical services and instead made sexual contact, or attempted sexual contact, with the patients. Defendant took advantage of these patients' physical and mental vulnerabilities to fraudulently obtain monies from Medicare believing no one would believe them because, according to defendant, all of them suffered from dementia, were old, or had other problems.

For the foregoing reasons, the government respectfully requests that this Court find defendant's offenses and relevant conduct resulted in a loss of more than $1.5 million and apply the additional enhancements identified in the PSR.

Respectfully submitted,

ZACHARY T. FARDON
United States Attorney

By: /s/ *Scott R. Paccagnini*
SCOTT R. PACCAGNINI
Assistant United States Attorney
327 South Church Street - Room 3300
Rockford, Illinois 61101
(815) 987-4444

## CERTIFICATE OF FILING AND SERVICE

The undersigned Assistant United States Attorney hereby certifies that the following document:

### UNITED STATES' POST-HEARING BRIEF IN SUPPORT OF SENTENCING GUIDELINES ENHANCEMENTS

was served on December 5, 2016, in accordance with FED. R. CRIM. P. 49, FED. R. CIV. P. 5, LR 5.5, and the General Order on Electronic Case Filing (ECF) pursuant to the district court's system as to ECF filers.

/s/ *Scott R. Paccagnini*
SCOTT R. PACCAGNINI
Assistant United States Attorney
327 South Church Street - Ste. 3300
Rockford, Illinois 61101
(815) 987-4444