**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 14-CR-50005 |
| | ) | |
| | ) | |
| CHARLES S. DEHAAN, | ) | Judge Frederick J. Kapala |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S POST-HEARING BRIEF IN SUPPORT OF
SENTENCING GUIDELINES ENHANCEMENTS**

Respectfully Submitted,

By:  */s/ Debra D. Schafer*
DEBRA D. SCHAFER,
321 West State Street, Suite 700
Rockford, IL 61101
(815) 962-5490
dschafer@sreenan-cain.com

# Table of Contents

Procedural Background…………………………………………………………………………1

Factual Background……………………………………………………………………………1

    A.  Sue Lapin……………………………………………………………………………2
    B.  Linda Schultz………………………………………………………………………2
    C.  Jeff Rowlands………………………………………………………………………2
    D.  Kathryn Rowlands…………………………………………………………………3
    E.  Gaynatia Johnson……………………………………………………………………3
    F.  Jane Kempel…………………………………………………………………………3
    G.  Debra Gash…………………………………………………………………………4
    H.  Marla Toner…………………………………………………………………………4
    I.   Guy Hatcher…………………………………………………………………………4
    J.   Rodney Fair…………………………………………………………………………5
    K.  Brenda Nelson………………………………………………………………………5
    L.  Linda Beebe…………………………………………………………………………5
    M.  Gertrude Glaspie……………………………………………………………………5
    N.  Carol Johnson………………………………………………………………………5
    O.  Machelle Kiolbassa…………………………………………………………………5
    P.   Yvonne Vasquez……………………………………………………………………6
    Q.  Donald Edwards……………………………………………………………………6
    R.  Louise Franks………………………………………………………………………6
    S.  Chris Sweetman……………………………………………………………………6
    T.  Frances Trenholm……………………………………………………………………7
    U.  Sue Beesley…………………………………………………………………………7

Argument………………………………………………………………………………………7

    A.  Loss…………………………………………………………………………………7

    B.  Ten or More victims……………………………………………………………..…21

    C.  Vulnerable victim/Large number of vulnerable victims……………………...…………21

**Table of Cases**

*United States v. Adeolu*, 836 F.3d 330 (3rd Cir. 2016)…………………………………………...22

*United States v. Grimes*, 173 F.3d 634 (7th Cir. 1999)…………………………………...…22

*United States v. Hebron*, 684 F.3d 554 (5th Cir. 2012)……………………………………14,15

*United States v. Nachamie*, 28 Fed.Appx.13 (2001)……………………………….…………22

*United States v. St. John*, 625 Fed. Appx. 661 (5th Cir. 2015)…………………….………14,15

**Rules and Statutes**

42 C.F.R. § 424.22(a)………………………………………………………………21

42 C.F.R. § 424.22(a)(1)(v)(A)………………………………………………....……………21

U.S.S.G. § 1B1.3……………….…………………………………………………...20,22

U.S.S.G. § 1B1.3(b)…………….………………………………………………………20

U.S.S.G § 2B1.1(b)(2)(A)…………………………………………...…………..…………21

U.S.S.G § 3A1.1(b)………….………………………………………………………21

U.S.S.G § 3A1.1(b) cmt. n.2…………………………………….……...……….……..……22

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 14-CR-50005 |
| | ) | |
| | ) | |
| CHARLES S. DEHAAN, | ) | Judge Frederick J. Kapala |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S POST-HEARING BRIEF IN SUPPORT OF
SENTENCING GUIDELINES ENHANCEMENTS**

NOW COMES the Defendant, CHARLES S. DEHAAN, by and through his attorney,

DEBRA D. SCHAFER, of Sreenan & Cain, P.C. and in support of his sentencing memorandum

as to loss, states as follows:

## I.     PROCEDURAL BACKGROUND

Defendant is in agreement with the procedural background of the case as set forth by the

Government.

## II.     FACTUAL BACKGROUND

Defendant does not intend to rehash the entire factual background of the case, but only seeks

to supplement that which is set forth by the Government where deemed appropriate.

3

### A. Sue Lapin

Back at the time of her treatment with Defendant, Ms. Lapin suffered from osteoarthritis, spinal stenosis and a bad hip.  S. Tr. 33-34.

### B. Linda Schultz

Defendant was Ms. Schultz's doctor from 2009 through 2013.  S. Tr. 55, 61.  Prior to Defendant becoming her doctor, she was receiving home health services and those services continued after he took over her care.  S. Tr. 68.  She suffered from ruptured disks, seizures, congestive heart failure, anxiety and, in 2009, a stroke.  S. Tr. 65-66.  For these conditions, among the medications she took were Xanax and Hydrocodone.  S. Tr. 65-66.  A prior doctor told her it was not safe for her to drive or cook.  S. Tr. 67.

### C. Jeff Rowlands

Mr. Rowlands suffers from hypertension, arthritis and anxiety in addition to diabetes and Bipolar Disorder.  S. Tr. 83-84.  He is prescribed a cane but does not use it at all times.  S. Tr. 84.  Due to his mental health diagnoses, he has difficulty leaving the house and believes that he "probably would be institutionalized" but for his wife.  S. Tr. 85.  Back when Defendant saw him, he was taking approximately 20 medications.  S. Tr. 88.  He lives in an assisted living facility for low income people with disabilities and he has had home health care of some sort from 2007 to sometime in 2016.  S. Tr. 91.

Mr. Rowlands said it was possible that Defendant was at his home for longer than 15 minutes, but not for an hour.  S. Tr. 92.

### D. Kathryn Rowlands

When she and her husband met with Defendant back in 2013, she recalled telling him that they both suffer from Bipolar Disorder. S. Tr. 99. Ms. Rowlands acknowledged that they might have told him that sometimes they are anxious about leaving their home and feel more comfortable at home. *Id*. At some point after seeing Defendant, Ms. Rowlands was hospitalized and her mental health issues were addressed and improved through a change in medication. S. Tr. 100. Ms. Rowlands has been prescribed a cane for "several years" due to osteoarthritis. S. Tr. 100-101. Ms. Rowland and her husband had in-home nursing case from approximately 2008 until sometime in 2016 when the Rowlands discontinued it. S. Tr. 108. Ms. Rowlands acknowledged that one doctor still comes to her home. S. Tr. 97.

### E. Gaynatia Johnson

In addition to the medical conditions listed by the Government, Ms. Johnson suffered from chronic bronchitis, had a history of falling and was prescribed approximately nine to ten different medications. S. Tr. 115-116. Defendant became her doctor soon after she had been diagnosed with diabetes. S. Tr. 122. She has had a motorized scooter for five to six years, uses it whenever she leaves her apartment and does not leave her apartment in the winter time due to her health conditions. S. Tr. 110, 115-116.

### F. Jane Kempel

When Ms. Kempel became the executive director at Rockford Supportive Living in 2010, Defendant was already the medical director for the facility. S. Tr. 124, 126. Ms. Kempel told Defendant about the complaints that had been made against him and that she had to contact the

police. Defendant was "fine" with that and with the new requirement that a nurse accompany him seeing patients in the future. S. Tr. 133.

### G. Debra Gash

Ms. Gash testified that she was a patient of Defendant's from 2009 through 2012. S. Tr. 144-145. Defendant resumed her treatment at the request of Ms. Gash after approximately six months with another doctor. S. Tr. 148. In addition to the conditions listed by the Government, Ms. Gash suffered from osteoarthritis, chronic airway obstruction, a history of falling and was prescribed approximately twenty medications. S. Tr. 143-145. Defendant was her doctor for all of these conditions. S. Tr. 148-149. As far as her ambulation, she required the use of a motorized scooter to leave her apartment. S. Tr. 136. She had home health care back when Defendant took care of her and continues to have home health care now. S. Tr. 137.

Ms. Gash testified on the fourth or fifth visit back in 2009, he accidently touched her breast during an exam. S. Tr. 147, 139.

### H. Marla Toner

Ms. Toner did identify Defendant as her family physician and primary care physician in October 2013. S. Tr. 430-431.

### I. Guy Hatcher

Mr. Hatcher suffered from a variety of medical conditions including essential hypertension, congestive heart failure, chronic obstructive pulmonary disease, osteoarthritis, hyperlipidemia and coronary arteriosclerosis. Ex. 8B. He apparently was prescribed seven medications. *Id*.

6

**J. Rodney Fair**

According to the records admitted, Mr. Fair suffered from Type II diabetes, osteoarthritis, hypertensive heart disease, low vision and depressive disorder. Ex. 9B. He was prescribed five medications for daily use. Ex. 9B.

**K. Brenda Nelson**

Ms. Nelson's complaint against Defendant related to something alleged to have happened on her last visit with him. S. Tr. 444. Ms. Nelson has a pending civil suit against Defendant. *Id.*

**L. Linda Beebe**

Ms. Beebe suffered a stroke back in 1986 and did not drive as a result. S. Tr. 446. More recently, Ms. Beebe had a heart attack and she suffered from diabetes. *Id.* As part of his treatment for these conditions, Defendant prescribed a walker for her. S. Tr. 446-447.

**M. Gertrude Glaspie**

Ms. Glaspie came forward with an allegation of abuse after seeing Defendant on the news. S. Tr. 448. She claims she was abused and then fired Defendant as her doctor, but asked him to be her doctor again two months later. S. Tr. 447-448.

**N. Carol Johnson**

Ms. Johnson suffered from arthritis and a degenerative spine condition. S. Tr. 448. She had been on disability since 1993 or 1994. *Id.* She also had a hard time walking and pain in her knees. *Id.*

**O. Machelle Kiolbassa**

Ms. Kiolbassa's complaint about Defendant concerned her last visit with Defendant. S. Tr. 450. Prior to that, Defendant has been her doctor for a number of years. S. Tr. 450-451.

7

**P.  Yvonne Vasquez**

Ms. Vasquez made a police report after stories aired about Defendant.  S. Tr. 451.  Ms. Vasquez told the officer about her various medical issues (neuropathy in her leg, cellulitis in her foot, hypertension, emphysema, chronic obstructive pulmonary disease, diabetes and a serious blood infection) and her prescribed medical equipment (bath chair, scale, blood pressure cuff and glucose meter). S. Tr. 452.  Based on Ms. Vasquez' description, Agent Payne agreed the first two visits with Defendant were legitimate and the last two were not.  S. Tr. 452.

**Q.  Donald Edwards**

Mr. Edwards is an invalid and can only communicate by saying 'yes' or 'no'.  S. Tr. 304-305.  Mr. Edwards was in a wheelchair at the time of the interview.  S. Tr. 305.  Defendant was Mr. Edwards' doctor from the summer of 2009 until the fall of 2012, and, according to Mr. Edwards, saw Mr. Edwards two to three times per year.  S. Tr. 305.

**R.  Louise Franks**

As of February 2014, Ms. Franks had received skilled nursing at home for approximately three years.  S. Tr. 306.  Ms. Franks only saw Defendant in 2013.  During the visit, Defendant checked her vitals and stayed approximately 30 minutes.  S. Tr. 307.  No information was presented concerning Ms. Franks' physical and mental health conditions.

**S.  Chris Sweetman**

Mr. Sweetman suffered from Hepatitis C and chronic obstructive pulmonary disease. S. Tr. 442.  He uses both a walker and a wheelchair for distance walking.  *Id.*

**T. Frances Trenholm**

Ms. Trenholm suffers from high blood pressure, diabetes, a bad back and chronic obstructive pulmonary disease. S. Tr. 443. She also uses a cane. S. Tr. 443.

**U. Sue Beesley**

Ms. Beesley did not contact the police concerning an alleged incident with Defendant until after seeing media reports about Defendant being sexually inappropriate with patients. S. Tr. 347. Ms. Beesley has filed a civil suit against Defendant. S. Tr. 445.

## ARGUMENT

**A. Loss**

Defendant maintains that the only loss attributable to him should be the amounts for Carol Haugen ($482.42) and Scarlett Jefferson ($346.00). Ex. 81D. However, because the Government has presented evidence of what it considers to be relevant conduct, defendant must address it.

**1. Deceased patients**

The Government has presented evidence that in addition to Scarlett Jefferson, there were other patients for whom Defendant billed after they had died. The amount for all of the deceased patients is $3,514.02. Inclusion as part of the loss does not account for the possibility that some or all were billed in error, but, if the Court is persuaded that to the extent they are similar in nature to one of the counts Defendant admitted guilt, the Court may find that amount to be part of the loss.

### 2. Homebound patients

With respect to the allegation that Defendant certified patients as homebound, Defendant urges the Court to find that allegation has not been proven by a preponderance of the evidence. Section 30.1.1 of Chapter 7 of the Medicare Benefit Policy Manual discusses what being confined to the home means. It notes that being bedridden is not required, but instead "a normal inability to leave home and, consequently, leaving home would require a considerable and taxing effort." Ex. 53. This state can be as a result of physical or mental issues and can be temporary or long-term. The manual indicates that:

> "Generally speaking, a patient will be considered to be homebound if they have a condition due to an illness or injury that restricts their ability to leave their place of residence except with the aid of: supportive devices such as crutches, canes, wheelchairs and walkers; the use of special transportation; or the assistance of another person; or if leaving home is medically contraindicated." Ex. 53.

Jeff Rowlands is prescribed a cane but does not use it at all times. Due to his mental health diagnoses, he has difficulty leaving the house and believes that he "probably would be institutionalized" but for his wife. S. Tr. 85. His wife, Kathryn, who also suffers from Bipolar Disorder, also acknowledged that she and her husband may have they may discussed with Defendant their diagnoses and discomfort with leaving home when he visited them. S. Tr. 99. Ms. Rowlands acknowledged being prescribed a cane for "several years" due to osteoarthritis. S. Tr. 100-101.

The Court will recall Sue Lapin, Debra Gash and Gaynatia Johnson all appeared in court by way of motorized scooters.

The manual also discusses that:

"occasional absences from the home for nonmedical purposes, e.g. an occasional trip to the barber, a walk around the block or a drive, attendance at a family reunion, funeral, graduation, or other infrequent or unique event would not necessitate a finding that the patient is not homebound if the absences are undertaken on an infrequent basis or are of relatively short duration and do not indicate that the patient has the capacity to obtain the health care provided outside rather than in the house." Ex. 53.

These definitions, as described in the Medicare manual, seem fairly common sense. The Court heard testimony about law enforcement officials questioning Defendant's patients about their ability to care for themselves and leave their homes. Based on that information, they apparently made a judgement that Defendant must be fraudulently certifying people who can go to the store or go the bathroom unassisted as homebound. Determinations as to what constitutes "a considerable and taxing effort" are not left up to common sense or to law enforcement. That decision must be made by a medical professional and no medical professional appeared to second guess Defendant's judgment and testify that Jeff or Kathryn Rowland or Debra Gash or Gaynatia Johnson or any of the others were not homebound.

### 3.  Overbilling

Another area where law enforcement was investigating Defendant's practice was in the area of overbilling. As is evident from the Government's brief, it asserts that every billing by Defendant at the highest levels was inappropriate and fraudulent. That assertion seems to be based on law enforcement interviews of patients and a review of the CPT manuals. Ex. 55-59. Problems exist with both approaches.

Patients were interviewed by law enforcement and asked to give estimates as to the amount of time Defendant spent with them during visits. Some of the patients have been seen by Defendant within recent months while others it had been years or at least years since visits began. The accuracy of those estimates is hard to test since few of the patients who claim five minute visits actually testified. However, the significance of the time actually spent with a given patient has been dramatically over emphasized. As the CPT manuals make clear, "It should be recognized that the specific times expressed in the visit code descriptors are averages and, therefore, represent a range of times that may be higher or lower depending on actual clinical circumstances." Ex. 55 at 4. "Time may be considered the key or controlling factor" when "more than 50%" of the encounter involves "counseling and/or coordination of care." Ex. 55 at 8. Time is an easy question for law enforcement to ask a patient, but it should only be the beginning of the inquiry.

The "key" components for determining the level of service are history, examination and medical decision making. Ex. 55 at 3. "Contributory factors" are counseling, coordination of care and the nature of the presenting problem. *Id*. The appropriate level of service and corresponding CPT code to use depends more heavily on those components which most law enforcement officers cannot assess.

Defendant's patients had a variety of health problems.

- Linda Schultz acknowledged suffering from ruptured disks, seizures, congestive heart failure, and anxiety and, in 2009, a stroke. S. Tr. 65-66. For these conditions, among the medications she took were Xanax and Hydrocodone. S. Tr. 65-66.

12

- Gaynatia Johnson suffered from diabetes, asthma, high blood pressure, chronic bronchitis, had a history of falling and was prescribed approximately nine to ten different medications. S. Tr. 109, 115-116.

- Debra Gash suffered from diabetes, high blood pressure, high cholesterol, stomach issues, anxiety, bipolar disorder, osteoarthritis and chronic airway obstruction. She had a history of falling and was prescribed approximately twenty medications. S. Tr. 135, 143-145.

- Joan Shortridge suffers from severe agoraphobia, panic attacks, ulcerative colitis, high blood pressure, high cholesterol, leg contractions and hypothyroidism. Ex. 34F.

These patients, and the others, have significant medical conditions for which treatment of any particular issue must be evaluated for its potential effect on another condition or medication. As far as the complexity of medical decision making, one can easily imagine most any decision to be of moderate or high complexity. For most of these patients, since Defendant's treatment was on-going in nature, the time that needed to be spent on a patient's history would be reduced. Talking to the patient about any issue and the nature of that issue would easily justify billing Medicare at one of the higher rates.

Nevertheless, the Government is asking the Court to assume that all billings under the higher CPT codes are not legitimate. The Government maintains that, with respect to established patients, all billings under CPT codes 99349 and 99350 be reduced by the amounts that should have been billed under the lowest CPT code for established patients,

99347.  For new patients, all billings under CPT codes 99344 and 99345 should be reduced by the amounts that should have been billed under the lowest CPT code for new patients, 99341.  Based on their calculations, that amount would be $3,159,712.04.  There is no basis for the assumption that all of the billings are fraudulent.

The defendant disagrees with this figure as well, but a more reasonable approach than that suggested by the Government, if the Court were to believe every allegation made by the Government and its witnesses, would be to take the total amount billed for the patients about whom the Court received evidence, $337,582.11 according to Ex. 81D, and reduce it by the amount if billed under the lowest CPT code.[1]  That figure, at least, would be based on evidence received in Court.

### 4.  Burden of Proof

As far as who should have the burden of proof concerning the loss, Defendant urges the Court to keep that burden with the Government.  The Government has cited *United States v. Hebron*, 684 F.3d 554 (5th Cir. 2012) and *United States v. St. John*, 625 Fed. Appx. 661 (5th Cir. 2015) and asks the Court to find, as those courts did, that the fraud is "so pervasive that it thwarts the government's ability to [prove loss]".  *Hebron* at 562.

In *Hebron*, the fraud related to FEMA reimbursements following two hurricanes.  The investigation showed that in the case of overtime hours, nearly all employees' records were falsified and many of the records were non-existent or destroyed.  *Id*. at 560.

In the instant case, there are over 4000 patients and over 14,000 claims to Medicare.  No defendant, under those circumstances, would have the ability or resources to track down so many people and so many claims.  The scope of the investigation in Hebron appears to have been

---

[1] Defendant would insert a figure here but is unaware of the billing rates for 99341 and 99347.

smaller in nature, but there was evidence that the fraud touched everything involved. Here, it is just a theory.

The court in *St. John* followed *Hebron* and it was, in fact, a healthcare fraud case. There the defendant certified an unknown number of people as homebound. The primary discussion concerned the loss calculation and restitution, and the court cited in a conclusory fashion that it would follow *Hebron*. *St. John* at 668.

Here, the Government, based on its investigation, alleges that there was fraud committed as to 50 or more patients and asserts that because Defendant pleaded guilty to the existence of a scheme, that he must bear the burden of proof against an assumption that those particular patients were proof of a scheme involving Defendant's entire practice. Under that theory, any set of circumstances could be imagined to be existing on a grander scale and force a defendant to bear the burden of proving his innocence.

In the event the Court sees fit to grant the Government's request to shift the burden of proof to the defendant on this subject, Defendant will seek to reopen the loss portion of the case.

Concerning Ms. Ranz, a witness who was not called to testify, the Government holds her up as a witness to Defendant's intent to defraud. However, the instructions to bill at the highest levels, assuming that Ms. Ranz would so testify under oath, could also be explained as a recognition that his patient population was typically a medically complex population for whom even relatively minor health issues can have dramatic effect on their sometimes fragile health, thereby justifying the high levels of care and billing.

The Government also cites their statistics about the frequency of billing at given rates as compared to all other doctors. The problem with those statistics is that, as a matter of common

knowledge, few doctors do house calls any longer. Therefore, those who do, when compared in a doctor population that does very few house calls, will have higher percentages than if compared to their peers, other home health care physicians.

**5.  Absence of Credible Evidence**

The Court did not receive credible testimony to support the claims it is making concerning loss. It was primarily Agent Payne who testified as to interviews conducted with patients by other agents or other law enforcement personnel, including but not limited to Marla Toner, Guy Hatcher, Rodney Fair, Jim Beaumont, Paul Bryant, Donald Edwards, Louise Franks, Joseph Garcia, Donald Johnson, Jon Roen (possibly triple hearsay), Sue Beesley and Linda Beebe. The information provided concerning each person's interview and perspective on his or her interaction with Defendant is double hearsay and should carry little weight with the Court on that basis. Agent Payne also presented quadruple hearsay concerning several women who had filed police reports concerning Defendant. No meaningful cross examination could be conducted of Agent Payne under those circumstances.

Agent Payne's testimony concerning Susan Dames is not at all reliable. Agent Payne spoke to Ms. Dames who relayed conversations with patients from many years before concerning Defendant. S. Tr. 357. Agent Payne testifying about these conversations with anonymous patients is multiple levels of hearsay and further undermined by Ms. Dames' inability to identify the patients by name.

Concerning Donald Edwards, the "invalid" who could only communicate with yes and no answers, there can be little doubt that Mr. Edwards was in fact homebound. S. Tr. 305. However, no medical records were marked as evidence and the agents did not determine the

16

various health issues that Mr. Edwards had. Based on the information presented, there is no way to determine the amounts billed by Defendant were not valid.

### 6. Allegations of sexual misconduct

On a very limited basis on cross examination, Defendant attempted to address the allegations by patients of sexual misconduct.

Sue Lapin repeatedly changed her story about the details of what she claims happened to her.

Linda Schultz would have the Court believe that she was sexually abused from the first visit from Defendant and that it continued every time he would come to her home for the next several years. S. Tr. 60, 57. She alleges she told her sister-in-law who advised to ignore it. She had access to family, a landlord who was a nurse, to a weekly home health nurse and a DORS caretaker. S. Tr. 68. She had no difficulty calling Defendant's office when she had an issue but did not call the police until she saw a story about Defendant on the news. She does not allege she kept quiet because she was enamored of Defendant ("He kept on talking like he tried to get me to take up with him, but I didn't go for it." S. Tr. 57), so it is simply incredible to believe that an adult would put up with the behavior as alleged without complaint for the length of time alleged. She was willing to complain to her landlord, Bonnie, about her low oxygen, but she would not tell her about being serially sexually abused for four years until she heard stories on the news first. S. Tr. 62, 69. Ms. Schultz also acknowledged her DORS caregiver being present "most of the time" Defendant would visit. S. Tr. 77.

She has filed a lawsuit against Defendant.

Despite maintaining that Defendant never examined her, on cross she acknowledged some of the doctor-related services he performed for her including medication management, referrals for additional medical care (mammogram, ultrasound and sonogram), consultation about medical issues and treatment for her ear problems.  S. Tr. 70-74

Gaynatia Johnson claims Defendant touched her inappropriately on one occasion.  Both before and after that alleged occasion, Defendant provided medical care for Ms. Johnson's many medical conditions and managed her many medications.  Nevertheless, Defendant's treatment of Ms. Johnson is called into question.  While Defendant did not "remove any skin lesions", Ms. Johnson does recall him treating the ulcers or sores on her legs. S. Tr. 111, 119; Ex. 7C. Defendant billed Medicare $33,777.12 for his treatment of Ms. Johnson and there is no evidence that this highly complex patient did not receive the treatment for which Medicare was billed.

Joan Ann Shortridge is another patient that Defendant treated who is accusing him of sexually inappropriate behavior from February 2009 until July 2012.  Ex. 34A and Ex. 34F 36. There are charges pending against Defendant in Cook County for allegations made by Ms. Shortridge and she has filed a civil suit again Defendant.  Ex. 34A and Ex. 34F 55-56.

Defendant would note the following concerning the testimony of Ms. Shortridge:  During the time of the alleged abuse, Ms. Shortridge lived with her brother and cousin and had a boyfriend. Ex. 34F at 6 and 11.  Ms. Shortridge claims she was sexually abused by Defendant for more than two years while her boyfriend or brother and/or cousin were just outside the door without ever making a sound to draw their attention. Ex. 34F at 33-34.  She was not isolated by her mental and physical limitations such that she was not in a position to make a complaint to someone (i.e. family, friend, nurse or police).  She was tended to by at least one physical

therapist and nurse. Ex. 34A and Ex. 34F 57. When meeting with Detective Jennifer DePastores of the Des Plaines Police Department who spoke to Ms. Shortridge "maybe three times", she did not mention or provide them with a copy of the calendar on which she claims she made notes. S. Tr. 194, Ex. 34B-E.

Ms. Shortridge obviously did not make entries into the calendars contemporaneously with an event as evidenced by the entry for her 2009 surgery in 2010. Ex. 34F. Presumably, Ms. Shortridge did keep track of Defendant's visits like she did many other events. However, in reviewing even copies of those calendars, every "sicko" comment and frown/cry face she made could easily have been added after her complaint to the police. In fact, it is apparent from the handwriting that certain entries were made with different pens (e.g. Ex. 33B: June 10th entry; Ex. 34C. March upper right corner, July 6th, August 3rd and August 24th entries). Ms. Shortridge frequently put stars by Defendant's name (e.g. Ex. 34B May 4th, May 25th, June 10th, July 29th, September 16th entries; Ex. 34C: April 7th, July 6th, August 3rd, September 28th entries; Ex. 34D: January 17th entry) and it is not hard to imagine that the words crossed out near Defendant's name (Ex. 34C: February 11th, March upper left corner, May upper left corner; Ex. 34E: March 1st) were something positive about Defendant she could not explain. The best example is the entry for November 18, 2010, in which she identified Defendant as "Best Dr." Ex. 34B. She tried to explain that while she used to believe he was her best doctor, she wrote that entry that day feeling "hurt and angry" because of his alleged abuse. Ex. 34A and Ex. 34F 68-70. Ms. Shortridge did not tell anyone about the alleged abuse until after she read an article about Defendant being arrested for sexual assault to someone else. Ex. 34A and Ex. 34F 47.

Ms. Shortridge is a woman with significant mental health issues. If those "sicko" comments and sad face drawings were actually contemporaneous with abuse, Defendant submits that Ms. Shortridge would simply have written "Sicko came" and would not have starred his name so many times like she sometimes did with birthdays and Valentine's Day. Ex. 34B August 5th; Ex. 34C February 14th.

With respect to the assertion that loss should be assessed based on these and other allegations of sexual misconduct, Defendant urges the Court to reject the Government's attempts to include these allegations in the loss calculation. As the Court noted, "the defendant is not being prosecuted in this court for sexual misbehavior. That's not what he's pled guilty to, that's not the crime that he's pled guilty to, and he's not going to be sentenced for sexual misbehavior." S. Tr. 53. Nevertheless, the Government presented Ms. Lapin, Ms. Schultz, Ms. Johnson, Ms. Gash and Ms. Shortridge, all of whom allege sexual misconduct by Defendant. Further, through agent testimony, evidence concerning additional sexual misconduct was presented to the Court for its consideration. Such evidence is not relevant conduct within the meaning of U.S.S.G. § 1B1.3(b) for an allegation health care fraud.

Defendant urges the Court to exclude from its consideration the testimony of Sue Lapin, Linda Schultz and Joan Ann Shortridge. Each woman is the complaining witness in a pending criminal case. PSR 12-23. Because of those pending cases, Defendant is not in a position to defend himself fully at this sentencing hearing. The allegations are unrelated to the offense of health care fraud and should not be considered relevant conduct under U.S.S.G. § 1B1.3. Despite the fact that Defendant did not plead guilty to an act of sexual misconduct, the Government went to great pains to present the testimony of and additional testimony about

20

women, including but not limited to the women listed above, who allege sexual misconduct on the part of Defendant. Defendant urges the Court to allow him to have his day in court when he may fully present his case for consideration by a trier of fact.

      7. Certifications or Re-certifications for Home Health Care

The Government is claiming a loss of an additional $2,787,054.58 in Medicare claims for patients Defendant certified but apparently did not see (i.e. were not under his care). Ex. 94A-C. It cites the Code of Federal Regulations which requires that the patient certified be under the case of a physician. 42 C.F.R. § 424.22(a). 42 C.F.R. § 424.22(a)(1)(v)(A), however, shows the various ways in which that face-to-face may be accomplished. Sub-paragraphs 2-5 set forth various people who, other than the certifying doctor, can perform this task including a nurse practitioner, a physician assistant or a certified mid-wife. Exhibits 94A-C are simply the Government attempting to pile on and claim, without any evidence, that each, or any, one of these claims is fraudulent.

**B. Ten or More victims**

Defendant disputes that the evidence presented supports an enhancement based on U.S.S.G § 2B1.1(b)(2)(A). Under no circumstances should the deceased patients, if found to be relevant conduct, be considered to be a victim. Defendant has set forth his arguments that the evidence has failed to demonstrate that his scheme included various patients with respect to the loss calculation. Defendant would stand on those arguments.

**C. Vulnerable victim/Large number of vulnerable victims**

The evidence presented fails to support an enhancement based on U.S.S.G § 3A1.1(b). In the application notes, a "vulnerable victim" is defined as "a person (A) who is a victim of the

offense of conviction and any conduct for which the defendant is accountable under §1B1.3 (Relevant Conduct); and (B) who is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct." U.S.S.G § 3A1.1(b) cmt. n.2.   In *United States v. Adeolu*, 836 F.3d 330 (3rd Cir. 2016), the Court cites a three-part test:

> (1)The victim was particularly susceptible or vulnerable to the criminal conduct; (2) the defendant knew or should have known of this susceptibility or vulnerability; and (3) this vulnerability or susceptibility facilitated the defendant's crime in some manner; that is, there was a 'nexus between the victim's vulnerability and the crime's ultimate success.

In the instant case, there is no such nexus.  The Court heard a great deal of testimony about the physical and/or mental condition of many of the witnesses who testified and about Defendant's patient population in general.  Despite that fact, any vulnerability a particular patient might have had did not facilitate the offense of health care fraud.  A patient's characteristics did not make the offense more possible or likely to succeed.

The 2nd Circuit did find that there was a vulnerable victim in a health care fraud case, but that was because the defendant admitted he "indoctrinated" the elderly and the poor, black community.  *United States v. Nachamie*, 28 Fed.Appx.13 (2001).  In *Grimes*, the 7th circuit found that because the defendant advertised unsecured loans in such a way as to target the unsophisticated, his victims were vulnerable.  *United States v. Grimes*, 173 F.3d 634 (1999).

This was a scheme to defraud Medicare and the success or failure of the scheme has nothing to do with the patient.  Defendant billed for a patient he did not see (Scarlett Jefferson) and billed for a patient who was deceased (Carol Haugen).  The merits of the scheme rose and fell independent of the characteristics of the patient.

**CONCLUSION**

For the foregoing reasons, the defendant respectfully request that this Court find that the defendant's offenses and relevant conduct resulted in a loss of $6500 or less and deny the Government's request for adjustments based on additional loss adjustments and calculations.

By:      */s/ Debra D. Schafer*
         DEBRA D. SCHAFER,
         321 West State Street, Suite 700
         Rockford, IL 61101
         815.962.5490
         dschafer@sreenan-cain.com

**CERTIFICATE OF FILING AND SERVICE**

The undersigned attorney hereby certifies that the following document:

**DEFENDANT'S POST-HEARING BRIEF IN SUPPORT OF
SENTENCING GUIDELINES ENHANCEMENTS**

was served on February 7, 2017, in accordance with Fed. R. Crim. P. 49, Fed. R. Civ. P. 5, LR

5.5, and the General Order on Electronic Case Filing (ECF), pursuant to the District Court's

system as to ECF filers.

> _/s/ Debra D. Schafer_
> DEBRA D. SCHAFER,
> 321 West State Street, Suite 700
> Rockford, IL 61101
> 815.962.5490
> dschafer@sreenan-cain.com