UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 14 CR 50005 |
| vs. | ) | |
| | ) | Judge Frederick J. Kapala |
| CHARLES DEHAAN | ) | |

**<u>UNITED STATES' REPLY TO DEFENDANT'S POST-HEARING RESPONSE BRIEF</u>**

The UNITED STATES OF AMERICA, by ZACHARY T. FARDON, United States Attorney for the Northern District of Illinois, respectfully submits the following reply to defendant's post-hearing response brief:

**A.     Defendant Admitted to Engaging in a Five-Year Scheme to Defraud**.

Defendant admitted in his plea agreement to engaging in a broad, multifaceted scheme that lasted from January 2009 through January 24, 2014. Defendant argues that "the loss to him should be the amounts for Carol Haugen ($482.42) and Scarlett Jefferson ($346.00). However, because the Government has presented evidence of what it considers to be relevant conduct,[1] defendant must address it." Def.'s Resp. at 9. It is inconceivable that the loss caused by defendant's five-year scheme is as slight as $828.42. *United States v. Sriram*, 482 F.3d 956, 959 (7th Cir. 2007). Defendant admitted in his plea agreement to engaging in a five-year scheme to bill Medicare for medical services purportedly provided to patients when defendant knew he did not provide reimbursable medical services. This included defendant billing Medicare at the highest payment levels for routine, non-complex visits with new *and* established patients even

---

[1] The evidence the government introduced during defendant's sentencing hearing is evidence of defendant's scheme and not relevant conduct.

1

though defendant knew the visit did not qualify for the highest levels of payment and defendant billing Medicare at the highest levels of payment for visits where defendant did not actually provide any medical services or treatment because defendant never actually saw the patient on the alleged date of service. In executing his scheme, defendant created fraudulent records to make it appear visits occurred and were more complex in order to justify the highest payment levels; defendant did so even if the visit never occurred.

Defendant's admissions, on their own, rebut defendant's $828.42 loss argument. Defendant admitted to billing Medicare at the highest payment level for an alleged new patient visit with Scarlett Jefferson that did not occur. Yet, defendant admitted in his plea agreement that in addition to billing Medicare at the highest levels of payment for visits where he never actually saw the patient on the alleged date of service, defendant also billed Medicare at the highest payment levels for routine, non-complex visits with new *and* established patients. Ms. Jefferson's visit wasn't routine or non-complex; it never happened. The government, however, provided this Court with evidence regarding numerous five-minute routine, non-complex patient visits; the type of visits defendant admitted to in his plea agreement. S. Tr. 82, 96, 131, 269, 283, 294, 299. Moreover, defendant's $828.42 loss argument completely disregards the loss amounts included in his email admissions to billing Medicare at the highest payment levels for visits with Debra Porter, (S. Tr. 394), Michael Mattingly, (S. Tr. 388-389), and Debra Drajin. (S. Tr. 390) that did not occur.

    **B.    Defendant Has Presented No Evidence to Rebut the Government's Evidence on Loss.**

Defendant also argues that "part of the loss does not account for the possibility that some or all [patients] were billed in error," (Def.'s Resp. at 1), and that "[t]alking to the patient about any issue and the nature of that issue would easily justify billing Medicare at one of the higher

2

rates." (Def.'s Resp. at 13). This Court should reject as insufficient defendant's unsubstantiated arguments. Once the government has met its burden of proving loss, as it has here,[2] the defendant must provide substantiated evidence to counter the loss calculation. *Durham*, 766 F.3d at 686 (citing *United States v. Gordon*, 495 F.3d 427, 432 (7th Cir. 2007)); *see also United States v. Love,* 680 F.3d 994, 999 (7th Cir. 2012)("[Defendant] has the burden of producing evidence tending to show that the loss estimates are inaccurate or unreliable, but he has not done so here. His mere assertions of inaccuracy are insufficient . . . .")(internal citations omitted); *United States v. Sriram*, 482 F.3d 956, 960 (7th Cir. 2007)("the extensive admissions that the defendant made in connection with his plea of guilty to the charge of fraud made his false claims prima facie evidence of the amount of loss that the fraud inflicted, and placed on him the burden of producing evidence on how many of the false claims were innocent.").

The government introduced credible evidence of loss. The evidence included defendant's plea agreement in which defendant admitted that he billed Medicare at the highest payment levels for routine, non-complex visits, (R. 93), that he billed Medicare for some patient visits at the highest payment levels but did not actually see the patient on that date because the patient was deceased, (*Id.*), and that he certified patients as homebound that were not actually homebound.

---

2 Generally, the government bears the burden to prove loss by a preponderance of the evidence. *United States v. Durham*, 766 F.3d 672, 686 (7th Cir. 2014). "The preponderance standard requires 'that the fact-finder believe that the existence of a fact is more probable than the non-existence of that fact.'" *United States v. Littrice*, 666 F.3d 1053, 1060 (7th Cir. 2012)(quoting *United States v. Schroeder*, 536 F.3d 746, 752 (7th Cir. 2008)). "[A]lthough the government generally bears the burden of showing that the alleged intended loss was garnered by fraudulent means, where the government has shown that the fraud was so extensive and pervasive that separating legitimate benefits from fraudulent ones is not reasonably practicable, the burden shifts to the defendant to make a showing that particular amounts are legitimate. Otherwise, the district court may reasonably treat the entire claim for benefits as intended loss." *United States v. Hebron*, 684 F.3d 554, 563 (5th Cir. 2012). The government believes, as discussed on pages 45-48 of its post-hearing brief, (R. 114), that defendant's fraud is so extensive and pervasive that separating legitimate benefits from fraudulent ones is not reasonably practicable and the burden should shift to defendant to make a showing that particular amounts are legitimate.

3

*Id*. The government's evidence corroborated defendant's own admissions and provided this Court with the scope of defendant's broad, multifaceted five-year scheme.

Defendant argues his patients had a variety of health issues. Def's Resp. at 12. Health issues alone, however, do not permit defendant to bill the highest Medicare payment levels for routine, non-complex visits. Every Medicare patient needing a home visit assumedly has some health issues yet there are five Current Procedure Terminology ("CPT") codes for new patients, not one, and four CPT codes for established patients, not one. Numerous patients told law enforcement that defendant stayed for five minutes, asked how they were doing, prescribed medications, and left. (Gov.'s Brief at 54-56). These patients had no reason to lie to law enforcement about defendant's minimal medical care.[3] Even if these patients had health issues, the highest payment level requires that the patient is unstable or has developed a significant new problem requiring immediate attention. Defendant saw the patients on a routine basis, not an emergency basis, and the evidence does not support an argument that during each visit, usually occurring monthly, the patient had developed a significant new problem that warranted the highest Medicare payment level.

Defendant argues that it is a "matter of common knowledge, few doctors do house calls any longer." Def.'s Resp. at 16. Assuming that is the case, even though defendant cites no

---

[3] Defendant argues that this Court should not find credible Special Agent Alex Payne's testimony regarding interviews with Marla Toner, Guy Hatcher, Rodney Fair, Jim Beaumont, Paul Bryant, Donald Edwards, Louis Franks, Joseph Garcia, Donald Johnson, Jon Roen, Sue Beesely, and Linda Beebe. Def.'s Resp. at 16. Defendant argues that Special Agent Payne's testimony was hearsay and "[n]o meaningful cross examination could be conducted . . . ." *Id*. As this Court knows, the Federal Rules of Evidence don't apply to sentencing hearings and hearsay is permitted. Fed. R. Evid. 1101; *United States v. White*, 639 F.3d 331, 338 (7th Cir. 2011)("But the Federal Rules of Evidence do not apply at sentencing hearings – the only question is whether the evidence was 'reasonably reliable.'"). With regard to cross examination, this Court gave defendant numerous opportunities to submit evidence to rebut the government's evidence; defendant failed to do so. S. Tr. 184, 232, 467, 477.

4

evidence to support his argument, that would mean defendant was one of the few health care providers for patients needing house calls in the Chicagoland area. Defendant's argument that "his patient population was typically a medically complex population from whom even relatively minor health issues can have dramatic effect on their sometimes fragile health," (Def.'s Resp. at 15), would therefore seem to infer that patients in the Chicagoland area needing a home visit are a more medically complex population than patients needing home visits located throughout the rest of the country. Defendant presented no evidence to support his argument because no such evidence exists. Defendant's argument is nothing more than an unsubstantiated attempt to justify the fact that defendant billed the two highest established patient CPT codes 99% of the time and the two highest new patient CPT codes 99% of the time.

Defendant also argues that the key components for determining the level of service are history, examination and medical decision making. Def.'s Resp. at 12. To bill at the highest Medicare level, however, requires a ***comprehensive*** history, a ***comprehensive*** examination, and medical decision making of ***high complexity***. S. Tr. 175-179. Spending five minutes with a patient, asking how they are doing and writing a prescription does not entail a compressive examination or medical decision making of high complexity. Further, many patients, including Ms. Lapin, (S. Tr. 28-89), Ms. Schultz, (S. Tr. 55-59), and Ms. Shortridge, (Ex. 34F), testified defendant provided no medical services much less medical services requiring any medical decision making. Defendant also fails to mention that his patient files include alleged history, examination, and medical decision making notes for visits that did not occur. Exs. 40B, 40D, 43B.

Defendant also argues "[t]ime is an easy question for law enforcement to ask a patient, but

5

it should only be the beginning of the inquiry." Def.'s Resp. at 12. Defendant, however, fails to address the numerous instances where time was the deciding factor because defendant identified in the patient file that the visit included counseling or coordination of care more than 50% of the visit but the visit did not occur, (S. Tr. 278), or it lasted five minutes and included minimal, if any, medical treatment. S. Tr. 283.

With regard to patients that defendant provided minimal or no medical services but instead made sexual contact with the patient and then billed Medicare for the visit, defendant argues that this Court should "exclude from its consideration the testimony of Sue Lapin, Linda Schultz and Joan Ann Shortridge" as each is a witness in one of defendant's pending criminal cases. Def.'s Resp. at 20. Defendant further argues that because of his pending criminal cases, he "is not in a position to defend himself fully at this sentencing hearing." *Id*. Defendant, however, does not explain what he means by "defend himself fully." Regardless, defendant's argument is foreclosed by *United States v. Watts*, 519 U.S. 148, 156 (1997). In *Watts*, the Supreme Court held conduct for which an individual was charged but acquitted may be considered at sentencing. 519 U.S. at 157. "It would therefore be a strange anomaly if a judge could consider additional criminal activity in every instance except when the government had decided to bring separate charges and those charges remain pending." *United States v. Conley*, 541 Fed. Appx. 699, 702 (7th Cir. 2013)(affirming the district court's consideration at sentencing of defendant's pending escape charge).

Defendant has provided no evidence to rebut Ms. Lapin's testimony, Ms. Schultz's testimony or Ms. Shortridge's testimony.[4] Rather, defendant questions how Ms. Schultz or Ms.

---

4 Defendant, without any evidence, argues that Ms. Shortridge "obviously did not make entries into the calendars

6

Shortridge could not tell another person about defendant's conduct. Defendant, however, fails to mention that he threatened Ms. Shortridge not to tell anyone because no one would believe her. Ex. 34F. Defendant also fails to mention that Ms. Lapin did indeed tell numerous people without any recourse. S. Tr. 24-25; S. Tr. 126. The testimony of Ms. Lapin, Ms. Schultz, and Ms. Shortridge is consistent with other women who complained about defendant's behavior, that being, for some female patients, defendant provided minimal or no medical services and instead sexually abused them and then billed Medicare at the highest payment levels for the visit.

With regard to homebound patients, defendant argues that the government has not proven by a preponderance of the evidence that the loss amount should include patients Jeff Rowland, Kathryn Rowland, Sue Lapin, Debra Gash, and Gaynatia Johnson. Def.'s Resp. at 10. The government agrees. The $3,159,712.04 in loss proven by the government includes those patients that defendant fraudulently billed Medicare for: home visits that did not happen because the patient was deceased, not home, or refused the visit; home visits where defendant provided minimal medical services, left, and billed Medicare at the highest payment levels; and home visits where defendant provided minimal or no medical services and sexually abused the patient and billed Medicare at the highest payment levels.[5] The more than $3.1 million loss figure does not include

---

contemporaneously with an event," that she used "different pens," that words crossed out on the calendar "were something positive about Defendant she could not explain," and that if the "'sicko' comments and sad face drawing were actually contemporaneous with abuse, Defendant submits that Ms. Shortridge would simply have written 'Sicko name' and would not have starred his name so many times . . . ." Def.'s Resp. at 19-20. This Court gave defendant ample time to depose Ms. Shortridge, (S. Tr. 184); defendant did not. Instead, defendant now speculates about Ms. Shortridge's intent in an attempt to rebut Ms. Shortridge's extremely damaging credible testimony. Defendant's attempt is not enough to overcome the government's evidence.

5 Defendant argues that a medical professional must determine whether an individual is homebound and "no medical professional appeared to second guess Defendant's judgment and testify that Jeff or Kathryn Rowland . . . were not homebound." Def.'s Resp. at 11. Special Agent Payne testified that he interviewed Dr. Arthur Rone, Jeff and Kathryn Rowland's primary care physician for approximately 20 years. S. Tr. 104. Dr. Rone told Special Agent Payne that the Rowlands did not need skilled nursing in their home or have mobility problems that would prevent

7

patients that defendant certified for home health and also billed Medicare for a home visit. For example, the $3,159,712.04 in loss includes the $657 defendant fraudulently billed to Medicare for two home visits with Kathryn Rowland but does not include any amounts billed to Medicare by home health agencies due to defendant's fraudulent home health certification for Ms. Rowland.

The additional $2,787,054.58 in loss proven by the government represents patients that defendant certified for home health but were not under defendant's care. 42 C.F.R. § 424.22(a). The amount does not include amounts billed by home health agencies due to defendant's certification for home health for the Rowlands, Ms. Lapin, Ms. Gash, or Ms. Johnson as defendant billed home visits for them. Rather, the $2,787,054.58 encompasses only those patients who were solely certified by defendant but not under defendant's care and on whose behalf home health care agencies submitted claims to Medicare based on defendant's fraudulent certifications and re-certifications. The government identified 417 such patients. S. Tr. 405. Defendant's fraudulent certifications and re-certifications resulted in more than $2.7 million in claims submitted to Medicare by home health agencies.

Defendant argues that "42 C.F.R. § 424.22(a)(1)(v)(A), however, shows the various ways in which that face-to-face may be accomplished. Sub-paragraphs 2-5 set forth various people who, other than the certifying doctor, can perform this task including a nurse practitioner, a physician assistant or certified mid-wife." Def.'s Resp. at 21. Even though this Court gave him an opportunity to do so, (S. Tr. 467-477), defendant has presented no evidence either through a

---

them from leaving their home. *Id*. While the amounts billed to Medicare by home health agencies due to the Rowlands certifications for home health are not included in the government's loss calculation, Dr. Rone's testimony further corroborates defendant's admission in his plea agreement that he certified patients as homebound that were not actually homebound. The evidence also further supports the government's argument that it is seeking a conservative loss amount.

8

nurse practitioner, physician assistant or certified mid-wife, that the more than $2.7 million includes certifications where the face-to-face was done by a nurse practitioner working in collaboration with defendant or a physician assistant or certified mid-wife under the supervision of defendant. 42 C.F.R. § 424.22(a)(1)(v)(A).

The government presented reliable evidence that defendant choose the highest billing codes regardless of whether he saw the patient or not, whether the patient was alive or not, and whether he provided any medical services or not. Even when defendant did provide medical services, the evidence establishes that those visits warrant, at most, the lowest payment levels. The government has satisfied its burden with regard to loss. The case law is clear – once the government has met its burden of proving loss, defendant must provide substantiated evidence to counter the loss calculation. *Durham*, 766 F.3d at 686. Defendant has not done so and this Court should find defendant caused loss of at least $1,500,000.

    **C.**    **Defendant's Scheme Involved Ten or More Victims.**

Defendant argues that "[u]nder no circumstances should the deceased patients, if found to be relevant conduct,[6] be considered to be a victim." Def.'s Resp. at 21. Defendant, however, cites no support for his argument and does not address *United States v. Roy*, 819 F.3d 998, 1002 (7th Cir. 2016). The Guidelines define a "means of identification" as "an actual (*i.e.* not fictitious) individual, . . . ." U.S.S.G. § 2B1.1, comment., (n.1). The fact that a patient was deceased at the time defendant unlawfully used the patient's means of identification is of no consequence as the deceased patient is an actual individual whose identification was unlawfully

---

6 The fact that defendant used a deceased patient's identification to submit a claim to Medicare is not relevant conduct, it is part of the scheme defendant admitted to in his plea agreement.

9

used by defendant.

Even if this Court were to exclude the deceased patients, the evidence more than supports the enhancement as defendant fraudulently billed Medicare for, among other things, visits that did not occur and the patient was alive (*i.e.* Debra Porter, Debra Drajin, Michael Mattingly, Jim Beaumont, Leonard Shimmin, Jerrie Travis, Daniel Guyer, Elaine Zimmerman, Donald Johnson and Scarlett Jefferson). Furthermore, defendant does not address the fact that many of his patients were Medicare recipients subject to co-pays and that it was reasonably foreseeable to defendant that the patients he defrauded would pay inflated co-pays for visits that did not occur or for visits fraudulently billed at the highest levels of service.

### D. Defendant's Victims Were Vulnerable.

Defendant argues there is no nexus between the victim's vulnerability and the crime's ultimate success. Def.'s Resp. at 22. Defendant argues "any vulnerability a particular patient might have had did not facilitate the offense of health care fraud. A patient's characteristics did not make the offense more possible or likely to succeed." *Id*. Defendant is incorrect; a causal connection does exist between defendant's victims' vulnerability and the crime's ultimate success.

Defendant inappropriately touched older female patients that suffered from physical and mental limitations. When confronted with his behavior by law enforcement or personnel working in the various facilities, defendant claimed the women were older, suffered from dementia or had other problems. S. Tr. 128, 205. Defendant also made the same argument when confronted about allegations that defendant submitted claims to Medicare for visits that did not occur. S. Tr. 391-392. The patients' particular vulnerabilities made it much more likely that defendant's

10

Medicare fraud scheme would succeed.[7]

The government has satisfied it burden and proven that defendant's scheme resulted in a loss of at least $1.5 million. Defendant has failed to provide substantiated evidence to counter the loss calculation. The government has also proven by a preponderance of the evidence that defendant's scheme included ten or more victims and included a large number of vulnerable victims.

Respectfully submitted,

ZACHARY T. FARDON
United States Attorney

By: /s/ *Scott R. Paccagnini*
SCOTT R. PACCAGNINI
Assistant United States Attorney
327 South Church Street - Room 3300
Rockford, Illinois 61101
(815) 987-444

---

[7] Defendant did not address the government's argument that the presentence investigation report correctly calculated the enhancement for a large number of vulnerable victims.

## **CERTIFICATE OF FILING AND SERVICE**

The undersigned Assistant United States Attorney hereby certifies that the following document:

**UNITED STATES' REPLY TO DEFENDANT'S POST-HEARING RESPONSE BRIEF**

was served on February 13, 2017, in accordance with FED. R. CRIM. P. 49, FED. R. CIV. P. 5, LR 5.5, and the General Order on Electronic Case Filing (ECF) pursuant to the district court's system as to ECF filers.

/s/ *Scott R. Paccagnini*
SCOTT R. PACCAGNINI
Assistant United States Attorney
327 South Church Street - Ste. 3300
Rockford, Illinois 61101
(815) 987-4444