**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| United States, | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | |
| v. | ) | Case No: 14 CR 50005 |
| | ) | |
| Charles DeHaan, | ) | |
| | ) | |
| *Defendant*. | ) | Judge Frederick J. Kapala |

**ORDER**

Enter order on the parties' objections to the presentence investigation report. The remainder of the sentencing hearing is set for April 27, 2017 at 9:30 a.m.

**STATEMENT**

This case comes before the court for a determination of several issues related to the calculation of the defendant's offense level under the Sentencing Guidelines. The court has thoroughly reviewed the presentence investigation report, the parties' written objections to the guidelines calculations, the transcript of the two-day sentencing hearing and the exhibits presented at that hearing, and the parties' post-hearing briefs.

**Amount of Loss – § 2B1.1(b)(1)**

The primary dispute in this case centers on the amount of loss attributable to the defendant based on his scheme to defraud Medicare. Given the sheer volume of claims the defendant submitted to Medicare during the relevant time period from January 2009 until January 24, 2014, the numerous types of fraudulent billing alleged by the government, and the difficulty in distinguishing between fraudulent claims and legitimate ones, determining the amount of loss in this case has been a complex task. Indeed, the presentence investigation report did not even attempt to calculate a loss amount under § 2B1.1(b)(1), noting instead that the total loss was "unknown" and that the government intended to introduce evidence on the issue at the time of sentencing.

After taking extensive evidence on the amount of loss at the sentencing hearing and reviewing the parties' thorough post-hearing briefs, one conclusion is clear: it is not possible to determine with precision the actual amount of loss in this case. Fortunately, the guidelines only require the court to "make a reasonable estimate of the loss," U.S.S.G. § 2B1.1 cmt. n.3(C); see also United States v. Durham, 766 F.3d 672, 686 (7th Cir. 2014) ("A district court need only make a reasonable estimate of the loss, not one rendered with scientific precision."), which is a task that the court has been able to accomplish. Before turning to that calculation, however, the court first explains why it did not follow the wildly divergent approaches to resolving this issue that were

advocated by the parties.

The defendant's proposed approach to calculating loss amount, which he first set out in his pre-hearing sentencing memorandum as to loss and has continued to adhere to throughout these proceedings, would be simple to apply, but it is inadequate. The defendant believes that the loss amount should be $828.42 based only on the specific billing for the two patients listed in Counts Nine and Twenty-One of the superseding indictment to which the defendant plead guilty. This argument, however, ignores the fact that the entire scheme to defraud that was alleged in paragraphs 1 through 14 of Count One was incorporated by reference into those counts. Moreover, the Guidelines Manual instructs the court to calculate the amount of loss based on relevant conduct, which includes "all acts . . . that were part of the same course of conduct or common scheme or plan as the offense of conviction." U.S.S.G. § 1B1.3(a)(2). Accordingly, for purposes of calculating the guidelines range, the defendant will be held accountable for all fraudulent billing that was part of his scheme to defraud Medicare, not just the two executions of that scheme that were detailed in those specific counts.

The government's proposed approach to calculating the loss amount is drastically different and starts with the assumption that all of the defendant's billing was fraudulent. This approach obviously yields a much higher loss amount, but it also misses the mark. In particular, in its pre-hearing sentencing memorandum on loss calculation, the government detailed five different ways in which it believed that the defendant caused a loss to Medicare: (1) billing for in-home visits with a patient that did not occur; (2) billing for in-home visits with a patient after that patient had already died; (3) billing at the highest payment levels for routine, non-complex visits with new and established patients; (4) billing at the highest payment levels for visits in which the defendant made inappropriate sexual contact with the patient; and (5) fraudulently certifying patients as homebound which allowed other home health agencies to bill Medicare for additional home health services. The government then argued, based on the Fifth Circuit's opinion in United States v. Hebron, 684 F.3d 554 (5th Cir. 2012), that because the defendant's fraud in this case was "so extensive and pervasive that separating legitimate benefits from fraudulent ones is not reasonably practicable," the burden should shift to the defendant to show which, if any, particular amounts are legitimate. In other words, the government argued that the court should assume that everything the defendant billed—"over 14,000 claims to Medicare for thousands of patients totaling more than $4.8 million"—was fraudulent unless the defendant can prove otherwise.

The government elaborated on its Hebron approach in its post-hearing brief and provided some actual calculations. After detailing all of the evidence it had presented at the hearing concerning at least fifty patient files that involved some form of fraudulent billing, the government continued to argue that the defendant's fraud was extensive and pervasive, that even the known fraudulent claims were supported by the defendant's notes or other records in the patients' files, and that it was therefore not reasonably practicable to separate legitimate claims from fraudulent ones such that the burden should shift to the defendant under those circumstances. The government also set out what it deemed a "very conservative" calculation of loss amount that was based on (1) the difference between what the defendant billed for in-home visits under the highest CPT codes (99344 or 99345 for new patients; 99349 or 99350 for established patients) and what he could have billed under the lowest CPT codes (99341 and 99347, respectively); and (2) the total amount that was

billed to Medicare for home health services based on the defendant's fraudulent home health certifications. The government comes up with a loss amount of $3,159,712.04 for the first category of loss based on the defendant's billing for in-home visits and an additional $2,787,054.58 for the second category of loss based on the fraudulent home health certifications. Although these two loss amounts total well over the next threshold amount of $3.5 million, the government nevertheless argues for only a 16-level increase under § 2B1.1(b)(1)(I) for a loss amount of more than $1.5 million.

The court agrees that the government has presented extensive, credible, and compelling evidence showing the multitude of ways in which the defendant executed his scheme to defraud Medicare. As a result, the court has no doubt that the actual loss amount caused by the defendant was significantly greater than what the defendant has proposed. At the same time, however, the court does not believe that every single claim the defendant ever submitted was fraudulent. His scheme to defraud may have been extensive, but it was not that extensive.

In addition, the court does not believe that the approach taken in the Hebron case would be appropriate to apply under the circumstances of this case, as there are several distinctions between the loss at issue in Hebron and the facts of this case. In Hebron, the defendant submitted fraudulent requests for reimbursement from FEMA relating to his town's cleanup efforts following two hurricanes that hit the area. 684 F.3d at 556. In contrast, this case involves over 14,000 bills submitted to Medicare for numerous patients over a 5-year period. In other words, the fraudulent conduct in the Hebron case involved a much smaller universe of claims. Likewise, the total loss amount advocated by the government in Hebron was only $320,000, which is small in comparison to the loss amount suggested by the government in this case. Id. at 557. Moreover, in Hebron it appears that there were discrepancies found "in practically every employee/contractor claim," such that the defendant's fraudulent conduct included "fabrication of nearly every relevant town record." Id. at 556, 564. In this case, although the government has presented evidence on at least fifty patients who were over-billed or fraudulently billed for medical services they did not receive, that is still a very small percentage of the total number of claims and does not lead to the conclusion that every bill submitted by the defendant was fraudulent. In light of these differences, the court declines to follow the approach of Hebron and will not shift the burden to the defendant to prove which claims are legitimate.[1] Indeed, if the government is correct that there is no reasonably practicable way to

---

[1] The government's reliance on United States v. St. John, 625 F. App'x 661 (5th Cir. 2015), in its post-hearing brief does not change the court's analysis, as that case, which was also out of the Fifth Circuit, simply followed Hebron. The government also cites a Seventh Circuit opinion, United States v. Sriram, 482 F.3d 956 (7th Cir. 2007), vacated on other grounds, 552 U.S. 1163 (2008), that involved calculating a loss amount in a complex Medicare fraud case. That case has language that, at least on the surface, sounds similar to Hebron. See id. at 960 ("[T]he extensive admissions that the defendant made in connection with his plea of guilty to the charge of fraud made his false claims prima facie evidence of the amount of loss that the fraud inflicted, and placed on him the burden of producing evidence on how many of the false claims were innocent."). However, the cases cited in support of that statement stand for the proposition that the loss amount can be determined from the face value of fraudulent checks. See, e.g., United States v. Grant, 431 F.3d 760, 765 (11th Cir. 2005) ("[W]e hold when an individual possesses a stolen check, or a photocopy of a stolen check, for the purpose of counterfeiting, the district court does not clearly err when it uses the full face value of that stolen check in making a reasonable calculation of the intended loss."). Accordingly, the court does not believe that Sriram, which was subsequently vacated by the Supreme Court on other grounds, requires the burden to be shifted to the defendant

3

determine which claims are fraudulent and which ones are legitimate, then the court would be placing an impossible burden on the defendant that he would never be able to meet. The court does not believe that this would yield a fair result, or even a particularly accurate one.

Because the court has rejected both parties' proposed calculations of loss amount, the court had to construct its own approach in order to achieve a more reasonable calculation. Similar to the approach advocated by the government, the court finds it best to separate the calculations into two categories: (1) loss caused by the defendant's misuse of the highest CPT codes, and (2) loss caused by the defendant's fraudulent home health certifications.

*Loss amount based on over-billing*

As to the first category of loss, the court's calculations are based primarily on the raw data contained in Government Exhibit 81C, which is a massive spreadsheet listing every claim that was submitted by the defendant to Medicare during the relevant time period. To be even more precise, the court used only the data from the "Universe 1" sheet,[2] which is the same data set that was used by the government in footnote 5 of its post-hearing brief. There are some key differences in the ultimate calculation of loss amount, as detailed below, but the court agrees that there are "4,888 claims to Medicare under CPT code 99350," "4,306 claims to Medicare under CPT code 99349," and so on based on the court's own review of the raw data contained in Exhibit 81C.

One key difference between the court's calculation and the government's proposed calculation is the starting point. The government starts its calculation with the amounts listed under the "Total Claim Billed" column in Exhibit 81C (Column CE), which, for example, yields a total of $3,096,038.29 billed to Medicare for claims that contained CPT codes 99349 or 99350. There is some support for this approach in Application Note 3(F)(viii) to § 2B1.1, which provides that "the aggregate dollar amount of fraudulent bills submitted to the Government health care program shall constitute prima facie evidence of the amount of the intended loss . . . if not rebutted." However, the court finds several problems with this approach. First, the government's calculation is based on the assumption, which the court rejected above, that all of the claims submitted were fraudulent. Second, even if the court were to assume that there was fraud inherent in every claim that included CPT codes 99341-99350, the "Total Claim Billed" column also includes amounts that were billed under different codes. By way of example, Claim Number 620211084293660, which is #5155 in the "Seq-Num" column, includes a charge of $300.00 under CPT code 99344 for a new patient home visit as well as a charge of $843.00 under CPT code 93965, which reflects an "[u]ltrasound study of veins of both arms or legs," resulting in a "Total Claim Billed" amount of $1,143.00. The government's evidence in this case has focused primarily on the defendant's use of billing codes 99341-99350; there has been no evidence presented to suggest that his billing under code 93965 was also fraudulent. Accordingly, the court finds that it is inappropriate to use the "Total Claim Billed" column, but instead any calculation should be based on the actual amounts that were billed and/or

---

under the circumstances of this case and the court declines to do so.

[2]The claims listed in the "Universe 2" sheet were not used in the court's calculation because there was no payment made for any of those claims, which had been either denied or rejected for unspecified reasons. Accordingly, these claims could not have contributed to the actual loss.

paid for the particular line item that includes the relevant CPT codes 99341-99350 (i.e. Columns CI-CK). Finally, despite the guidance from the application notes, the court does not believe that, under the circumstances of this case, it would be appropriate to use the amount that was billed to Medicare as the starting point when it is well-known and expected that every single claim submitted will be reduced to a lower amount based on Medicare's authorized fee schedule.[3] Accordingly, the court's calculations herein will be based on the "Line Amount Allowed" (Column CJ), as the court believes that this provides the most accurate starting point for estimating the actual loss.[4]

The next difference in the court's calculation is based on what the court finds to be an unsupported assumption made by the government that all of the defendant's claims should be recalculated as if they had been billed under the lowest CPT codes (99341 and 99347). In fact, the government's own evidence contradicts this assumption and shows why this approach is unfair. Government Exhibit 81B is a comparison of the defendant's billing frequency for CPT codes 99341-99350 with the billing frequency for those same codes for all Illinois doctors who had submitted those types of claims to Medicare. For example, the second chart in that exhibit shows that code 99341 was billed, on average, 4.41% of the time for new patients, and that code 99347 was billed, on average, 4.76% of the time for established patients. The defendant, on the other hand, billed only one new patient under code 99341, or a mere 0.14% of his total billing for new patients during the two-year period covered by Exhibit 81B, and he never billed any established patients under code 99347 during that same time period. On the other end of the spectrum, the defendant billed code 99345 for new patients 68.26% of the time, compared to an average of 21.13%, and he billed code 99350 for established patients 69.01% of the time, compared to an average of 16.65%. These wide discrepancies clearly show that the defendant's billing practices deviated from the norm, which is further proof of his scheme to defraud Medicare. But the government's proposed approach of assuming that all patient visits should have been billed under the lowest CPT codes would also result in an abnormal distribution of claims. The statewide average for billing the lowest CPT codes is between 4-5%, and it would have been expected for the defendant's billing to be similar, had it not been tainted with fraud. Accordingly, there is no basis to assume that 100% of the defendant's bills should have been submitted under the lowest CPT codes. Instead, in order to achieve the most accurate estimation of loss, the court has redistributed the defendant's billing to be consistent with the statewide averages.

Before turning to the actual calculations, the court first notes that it has used Government Exhibit 81E to obtain the most accurate average billing frequencies for the relevant time period (and

---

[3]At the hearing, Agent Payne testified that "a physician is required to bill what's called their customary rate to Medicare, so that they should bill Medicare, they should bill private insurance, and self-pay patients the same rate, and then the amount they receive back is the negotiated rate that . . . Medicare . . . has agreed to pay." He also explained that "if you agree to see Medicare patients and you bill those codes, you're agreeing to the negotiated rate." Given this evidence, the court finds that an experienced doctor, such as the defendant, would be well aware that the amount allowed by Medicare would routinely be less than the amount billed.

[4]It is worth noting that this column is the total amount allowed for a particular claim, which includes both the amount that Medicare actually paid to the defendant plus any amounts of coinsurance or deductible payments that were provided by the patient. By over-billing claims, the defendant caused a loss to both Medicare and his patients, who were required to make higher coinsurance payments as a result.

the average amount authorized per CPT code during that time period). The court requested this exhibit, or something like it, after the conclusion of the evidentiary hearing because Exhibit 81B, which was discussed above, only covered a two-year time period. After having the opportunity to review these exhibits, the court has determined that the differences between Exhibits 81B and 81E are slight, and that the calculation of the guidelines range is the same regardless of which exhibit is used.[5] It should also be noted, however, that the court used the raw data from Exhibit 81C to determine the actual number of claims submitted by the defendant, because Exhibit 81E did not cover the entire time period from January 2009 until January 24, 2014, that was part of the defendant's scheme to defraud.[6]

Based on the foregoing, the court makes the following calculations to estimate the loss amount in this case, all of which are reflected on the attached chart. For new patients, the defendant billed a total of 1,617 claims under CPT codes 99341 [1 claim], 99342 [1 claim], 99343 [5 claims], 99344 [372 claims], and 99345 [1,238 claims], which had a total allowed amount of $327,443.37. If the defendant's billing had been consistent with the state average, he would have made the same 1,617 claims, but it would have been distributed differently under codes 99341 [82 claims], 99342 [277 claims], 99343 [401 claims], 99344 [528 claims], and 99345 [329 claims], for a total allowed amount of $202,700.00.[7] The difference between these two amounts, or $124,743.37, is the estimated loss amount based on the defendant's over-billing of new patients.

For established patients, the defendant billed a total of 9,199 claims under CPT codes 99347 [0 claims], 99348 [5 claims], 99349 [4,306 claims], and 99350 [4,888 claims], which had a total

---

[5] Given the similarities between Exhibit 81B and Exhibit 81E, the defendant's objection to Exhibit 81E is inconsequential. In any event, the objection is overruled as the defendant has not cited any basis for concluding that Exhibit 81E is not authentic or that it would otherwise not be appropriate to consider for purposes of sentencing. Indeed, the defendant's argument that Exhibit 81E is "skewed" goes to the weight of that exhibit, not its admissibility. The court also rejects the defendant's premise that somehow his billing percentages are inflated because his practice consisted entirely of medical care for homebound patients. The averages in Exhibit 81E are based on all bills that were submitted to Medicare under the relevant CPT codes for homebound patients, such that a particular provider's practice or frequency of billing for homebound patients does not affect the calculations.

[6] Furthermore, even though Exhibit 81E covers a slightly shorter time period, it actually lists a larger number of claims submitted by the defendant under most of the CPT codes compared with the raw data from Exhibit 81C. For example, as noted earlier, Exhibit 81C shows a total of 4,888 claims under code 99350, which is the same number of claims noted by the government in footnote 5 of its post-hearing brief. Exhibit 81E, however, lists a total of 5,177 claims under code 99350, and there has been no explanation for this discrepancy. Because the court has no basis to attribute these additional claims to the defendant, the court will continue to use Exhibit 81C to determine the number of claims submitted, and Exhibit 81E only for the purpose of determining the statewide averages.

[7] The number of claims that the defendant would have billed, if he had been consistent with the statewide average, was calculated based on the total number of claims (1,617 for new patients) times the average percentages for those CPT codes in Exhibit 81E. Thus, for code 99341 which had an average of 5.06%, the defendant would have billed approximately 82 patients (1,617 x .0506 = 81.8202, rounded to nearest whole number of 82). The average amount allowed per claim was also derived from Exhibit 81E by taking the figure from the "Sum of Amount Allowed" for Illinois doctors for each CPT code and dividing by the "Sum of Quantity Billed" for the same code. Thus, for code 99341, the average amount allowed per claim was approximately $45.66 (554,344 ÷ 12,142 = 45.66 when rounded to the nearest cent).

allowed amount of $1,350,506.25. If the defendant's billing had been consistent with the state average, he would have made the same 9,199 claims, but it would have been distributed differently under codes 99347 [462 claims], 99348 [2,347 claims], 99349 [4,833 claims], and 99350 [1,557 claims], for a total allowed amount of $996,729.33. The difference between these two amounts, or $353,776.92, is the estimated loss amount based on the defendant's over-billing of established patients.

Therefore, based on the entire universe of claims submitted by the defendant under CPT codes 99341-99350, the estimated loss amount is $478,520.29 based on over-billing.[8] The court recognizes that this number is not a precise calculation, which would have been impossible, but the court finds it to be a reasonable estimate of the amount of loss for the first category of loss caused by the defendant's misuse of the highest CPT codes.

---

[8] If the court had used Exhibit 81B and extrapolated the averages from that two-year period over the entire time period covered by the defendant's scheme to defraud, the total estimated loss amount would have been $456,579.40. This minor difference can be explained by the slight variation in the average percentages and the fact that the average amount allowed per claim was typically higher in the later two-year period covered by Exhibit 81B compared to the average over the full five-year period. In any event, the difference between these two exhibits did not affect the determination of the applicable enhancement under § 2B1.1(b)(1), and therefore, had no bearing on the final guidelines range.

DeHaan Loss Amount Chart

| CPT Code | # Claims (actual) | $ Allowed (actual) | % Claims (avg) | # Claims (avg) | $ Allowed / claim (avg) | Total $ Allowed (avg) | Loss Amount |
|---|---|---|---|---|---|---|---|
| 99341 | 1 | $ 53.32 | 5.06 | 82 | $ 45.66 | $ 3,744.12 | $ (3,690.80) |
| 99342 | 1 | $ 77.78 | 17.15 | 277 | $ 69.18 | $ 19,162.86 | $ (19,085.08) |
| 99343 | 5 | $ 673.27 | 24.77 | 401 | $ 112.11 | $ 44,956.11 | $ (44,282.84) |
| 99344 | 372 | $ 66,044.73 | 32.65 | 528 | $ 148.18 | $ 78,239.04 | $ (12,194.31) |
| 99345 | 1238 | $ 260,594.27 | 20.37 | 329 | $ 172.03 | $ 56,597.87 | $ 203,996.40 |
| Sub-total new patients | 1617 | $ 327,443.37 | 100 | 1617 | | $ 202,700.00 | $ 124,743.37 |
| | | | | | | | |
| 99347 | 0 | $ - | 5.02 | 462 | $ 50.13 | $ 23,160.06 | $ (23,160.06) |
| 99348 | 5 | $ 422.22 | 25.51 | 2347 | $ 76.17 | $ 178,770.99 | $ (178,348.77) |
| 99349 | 4306 | $ 522,033.76 | 52.54 | 4833 | $ 113.87 | $ 550,333.71 | $ (28,299.95) |
| 99350 | 4888 | $ 828,050.27 | 16.93 | 1557 | $ 157.01 | $ 244,464.57 | $ 583,585.70 |
| Sub-total est. patients | 9199 | $ 1,350,506.25 | 100 | 9199 | | $ 996,729.33 | $ 353,776.92 |
| | | | | | | | |
| **TOTAL CLAIMS** | 10816 | $ 1,677,949.62 | 100 | 10816 | | $ 1,199,429.33 | **$ 478,520.29** |

*Loss amount based on fraudulent certifications*

The next category of loss is based on the amounts that were billed to Medicare by home health agencies based on the fraudulent home health certifications (or re-certifications) that were provided by the defendant. Defendant specifically admitted in his plea agreement that, as part of his scheme to defraud, he "certified patients as homebound that were not actually homebound," and the government presented sufficient evidence at the sentencing hearing in order to estimate the loss that was caused by this fraudulent conduct. Before turning to these calculations, however, it is helpful to understand the defendant's conduct by looking to a specific execution of this scheme with respect to Scarlett Jefferson ("SJ"), which is the conduct that the defendant admitted to as part of his plea agreement.

As reflected in the defendant's plea agreement, and as shown by Government Exhibits 6C and 6D, the defendant documented a face-to-face encounter with Jefferson and signed a "Home Health Certification and Plan of Care" form (Medicare Form 485) for Jefferson. These forms required the defendant to certify that Jefferson was his patient, that she was "under [his] care," and that she was homebound. The defendant signed these forms, thereby making these certifications, even though he never saw Jefferson on the date alleged on the forms and had no basis to certify her as homebound.

At the sentencing hearing, the government presented Government Exhibits 94A, 94B, and 94C, as well as the testimony of Agent Payne to explain these exhibits, in order to show the total loss caused by the defendant's fraudulent home health certifications. The government's approach to this calculation, which the court finds to be reasonable, well-designed, and conservative, started with all of the home health certifications that were provided by the defendant during the relevant time period and systematically narrowed down that list in order to find the total payments provided to home health agencies that were necessarily the result of the defendant's fraudulent certifications.

The first exhibit, 94A, is a list of "471 patients that the defendant . . . certified in which there is no record of any visits with those individuals." This exhibit eliminates any certifications that were done for patients that were under the defendant's care and provides the court with only those patients for whom the defendant did not bill any in-home visits under CPT codes 99341-99350. Because there is no evidence that the defendant was providing any care to these patients, any home health certifications in which the defendant certified that these patients were under his care would have been fraudulent.[9]

From there, the government narrowed down the list even further to 411 patients in Exhibit 94B by eliminating any patients that had been certified by the defendant, but for which there was never any subsequent billing by home health agencies for that patient under Medicare Part A. These certifications, although fraudulent, did not result in any actual loss.

Finally, in Exhibit 94C, the government further reduced the list to 305 patients by eliminating any patients that had more home health episodes billed than the number of certifications that had

---

[9] Notably, the defendant's fraudulent home health certification for Jefferson is not included in Exhibit 94A, or any of the subsequent exhibits on this issue, because the defendant also billed Medicare under CPT code 99344 for his "visit" with Jefferson.

9

been provided by the defendant. As Agent Payne explained at the hearing, this eliminated patients that had one or more certifications provided by someone other than the defendant. These patients were properly eliminated from consideration because the total payments to home health agencies for those patients could not be attributed entirely to the defendant. The court finds that Exhibit 94C provides an accurate computation of the total loss caused by the defendant's fraudulent home health certifications. That exhibit reflects a total of $2,787,054.58 that was paid to home health agencies under Medicare Part A based on the defendant's fraudulent certifications.

In his post-hearing brief, the defendant does not provide the court with any basis to reject the government's calculation in Exhibit 94C. In fact, the defendant's primary argument is that the government is misapplying the definition of homebound, and that there has been no evidence presented to contradict the defendant's medical determination that his patients, such as Jeff or Kathryn Rowland, Debra Gash, or Gaynatia Johnson, were homebound. This argument misses the mark, however, as none of these patients identified by the defendant are included in the government's calculation under Exhibit 94C. Indeed, the government specifically excluded from its calculation regarding the loss attributable to fraudulent home health certifications any patients that were actually under the defendant's care.[10]

Therefore, based on the foregoing, the court has determined that the defendant caused an estimated loss of $478,520.29 based on over-billing and $2,787,054.58 based on fraudulent certifications, resulting in a total loss amount of $3,265,574.87. The court finds this amount to be a fair and reasonable estimate of the actual loss caused by the defendant's scheme to defraud. Accordingly, the court will sustain the government's objection and apply a 16-level enhancement under § 2B1.1(b)(1)(I) based on a loss of more than $1.5 million. In addition, the court will also apply a 2-level enhancement under § 2B1.1(b)(7) because the loss to Medicare was more than $1,000,000.

### Number of Victims – § 2B1.1(b)(2)(A)

The next issue in dispute is the recommendation in the presentence investigation report that the court apply a 2-level enhancement under § 2B1.1(b)(2)(A) because the defendant's offense involved 10 or more victims. Because this enhancement is amply supported by the evidence in this case, the court overrules the defendant's objection and will apply the enhancement.

Under § 2B1.1, the term "victim" includes "any person who sustained any part of the actual loss determined under subsection (b)(1)." U.S.S.G. § 2B1.1 cmt. n.1. "Actual loss" is defined as "the reasonably foreseeable pecuniary harm that resulted from the offense." U.S.S.G. § 2B1.1 cmt. n.3(A)(i). In this case, as the court noted above, the defendant caused a loss to both Medicare and

---

[10] The defendant also briefly argues that, pursuant to 42 C.F.R. § 424.22(a)(1)(v)(A), the required face-to-face encounter can be performed by someone other than the certifying physician, such as a nurse practitioner or physician assistant. It is not clear to the court how this is relevant, but in any event, that does not change the fact that the defendant certified that the patients listed in Exhibit 94C were under his care, as required by 42 C.F.R. § 424.22(a)(1)(iv) ("The services will be or were furnished while the individual was under the care of a physician who is a doctor of medicine, osteopathy, or podiatric medicine."), even though there is no record of him providing any medical care to those patients. Accordingly, this undeveloped argument does not persuade the court that the government's loss calculation on this issue is incorrect, or that the government is somehow "attempting to pile on."

to his patients, who were required to make higher coinsurance payments as a result of his over-billing. The higher coinsurance payments to the defendant's patients were reasonably foreseeable at the time the defendant billed Medicare using a higher CPT code than was authorized for the care he had provided. Accordingly, each of these patients who had to pay a higher coinsurance payment are considered victims for purposes of § 2B1.1(b)(2)(A), there were significantly more than 10 victims of the defendant's offense, and the enhancement under § 2B1.1(b)(2)(A) is appropriate.[11]

### Vulnerable Victims – § 3A1.1(b)

In a somewhat related issue, the defendant also objects to the recommendation in the presentence investigation report that the court apply a 2-level enhancement under § 3A1.1(b)(1), which applies "[i]f the defendant knew or should have known that a victim of the offense was a vulnerable victim," and an additional 2-level enhancement under § 3A1.1(b)(2), which applies if "the offense involved a large number of vulnerable victims." This objection is overruled.

A number of the defendant's arguments on this issue can be quickly rejected. For instance, the defendant argues that the only victim in this case is the United States, which cannot be considered a vulnerable victim. However, as discussed above, a large number of the defendant's patients are also considered victims of the offense. Likewise, the defendant's argument that his patients did not suffer a financial loss is rejected for the reasons noted above. Finally, the defendant briefly contends that the enhancement should not apply because there is no evidence that he "went into that business to take advantage of his patient population or otherwise targeted persons," but the Guidelines Manual no longer contains a "targeting" requirement under § 3A1.1(b)(1). See United States v. Goldberg, 406 F.3d 891, 892-93 (7th Cir. 2005); see also United States v. Callaway, 762 F.3d 754, 760 (8th Cir. 2014) ("The Sentencing Commission has eliminated the nexus requirement, however, by amending § 3A1.1 and striking a note requiring that the defendant have targeted his victim because of her vulnerability.").

The issue, therefore, comes down to whether the defendant's patients who were over-billed should be considered vulnerable victims. The term "vulnerable victim" is defined as "a person (A) who is a victim of the offense of conviction and any conduct for which the defendant is accountable under §1B1.3 (Relevant Conduct); and (B) who is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct." U.S.S.G. § 3A1.1 cmt. n.2. "[N]o other factor need accompany age so long as the victim's vulnerability is related to the victim's age." United States v. Sims, 329 F.3d 937, 944 (7th Cir. 2003). Here, the defendant acknowledges that "many of his patients had physical limitations due to illness, and/or were elderly and many had mental health issues." Due to their age and other limitations, many of these patients were vulnerable to the defendant's over-billing and may have been unable to recognize the fraudulent billing. More importantly, the evidence also reflects that the defendant used the

---

[11] The enhancement under § 2B1.1(b)(2)(A) for 10 or more victims would also be appropriate based on Application Note 4(E), which provides that "in a case involving means of identification 'victim' means . . . any individual whose means of identification was used unlawfully or without authority." Here, the defendant unlawfully used his patients' HIC numbers, which are essentially their social security number plus a letter appended to the end, any time he submitted a claim to Medicare for a visit that did not occur or fraudulently billed at the highest CPT code for a routine visit. See United States v. Roy, 819 F.3d 998, 1002 (7th Cir. 2016).

vulnerabilities of his patients to his advantage in order to hide his fraudulent conduct, often times claiming that his patients were elderly, had dementia, or were otherwise confused when he was confronted with a complaint about his conduct or a particular billing decision. Under these circumstances, the court finds by a preponderance of the evidence that many of the defendant's patients were vulnerable victims, such that his offense involved a large number of vulnerable victims.[12] Accordingly, the enhancements under both § 3A1.1(b)(1) and (b)(2) are applicable.

## Total Offense Level and Guidelines Range

Based on the foregoing analysis and the undisputed portions of the presentence investigation report, the court finds that the defendant's total offense level is 30 based on a base offense level of 6 pursuant to § 2B1.1(a)(2); a 16-level enhancement for a loss amount of more than $1,500,000 pursuant to § 2B1.1(b)(1)(I); a 2-level enhancement for 10 or more victims pursuant to § 2B1.1(b)(2)(A)(i); a 2-level enhancement for a loss of more than $1,000,000 to a government health care program pursuant to § 2B1.1(b)(7); a 2-level enhancement because a victim of the offense was a vulnerable victim pursuant to § 3A1.1(b)(1); a 2-level enhancement because the offense involved a large number of vulnerable victims pursuant to § 3A1.1(b)(2); a 2-level enhancement for abuse of a position of trust pursuant to § 3B1.3; and a 2-level reduction for acceptance of responsibility pursuant to § 3E1.1(a). Given the defendant's criminal history category of I, this results in an advisory guidelines imprisonment range of 97 to 121 months.

Date: 4/6/2017

ENTER:

_____

FREDERICK J. KAPALA

District Judge

---

[12] The court need not resolve the parties' dispute as to whether 10 is a "large number" for purposes of § 3A1.1(b)(2) because there were significantly more than 10 vulnerable victims in this case.