```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                      WESTERN DIVISION

 3  UNITED STATES OF AMERICA,        )  Docket No. 14 CR 50005
                                     )
 4            Plaintiff,             )  Rockford, Illinois
                                     )  Thursday, April 27, 2017
 5       v.                          )  9:30 o'clock a.m.
                                     )
 6  CHARLES DEHAAN,                  )
                                     )
 7            Defendant.             )
                                     )
 8                  TRANSCRIPT OF PROCEEDINGS
           BEFORE THE HONORABLE FREDERICK J. KAPALA
 9
    APPEARANCES:
10
    For the Government:   HON. JOEL R. LEVIN
11                        United States Attorney
                          (327 S. Church Street,
12                         Rockford, IL  61101) by
                          MR. SCOTT R. PACCAGNINI
13                        Assistant U.S. Attorney

14  For the Defendant:    SREENAN & CAIN, P.C.
                          (321 W. State Street, Suite 700,
15                         Rockford, IL  61101) by
                          MS. DEBRA D. SCHAFER
16
    Also Present:         MS. TORI POWELL
17                        Probation Office

18  Court Reporter:       Heather M. Perkins-Reiva
                          327 South Church Street
19                        Rockford, Illinois  61101
                          (779) 772-8309
20

21

22

23

24

25
```

```
 1              THE CLERK:  14 CR 50005, USA vs. Charles Dehaan.

 2              MR. PACCAGNINI:  Good morning, your Honor.  Scott

 3    Paccagnini on behalf of the United States.

 4              MS. SCHAFER:  Good morning.  Debra Schafer on behalf

 5    of Dr. Charles Dehaan, who is present.

 6              THE COURT:  Good morning, everyone.  The record may

 7    reflect the presence of Tori Powell, who is the author of the

 8    presentence investigation report, on behalf of the probation

 9    department.  This case comes before the court for continued

10    sentencing in consequence of the defendant's plea of guilty to

11    two counts of health care fraud.

12              The presentence investigation report indicates that

13    the defendant is not taking medications.  Does that continue

14    to be true?

15              MS. SCHAFER:  No medications.

16              DEFENDANT DEHAAN:  No.

17              THE COURT:  Have you consumed any drugs or alcohol in

18    the past 24 hours?

19              DEFENDANT DEHAAN:  No.

20              THE COURT:  In addition to the pleadings which were

21    directed toward the guidelines calculations, the submissions

22    by the probation department in connection with the guidelines

23    calculations, and the exhibits submitted into evidence in

24    connection with the guidelines hearings, I have the following

25    sentencing materials to consider:
```

1          The presentence investigation report; the parties'

2    plea agreement; a supplemental report from the probation

3    office dated December 1st, 2016; a second supplemental report

4    from the probation department dated April 17, 2017; a

5    memorandum from the probation department dated September 16th,

6    2016; a joint submission by the parties regarding conditions

7    of supervised release; the government's motion for an

8    above-guidelines sentence, the defense response thereto; and

9    pretrial services reports dated January 27th, 2014,

10   March 25th, 2014, April 17th, 2015, and March 2nd, 2017.

11         Do the parties agree that all those materials are

12   appropriate for me to use for purposes of sentencing?

13         MR. PACCAGNINI:  Yes, your Honor.

14         MS. SCHAFER:  I'm sorry, your Honor, those last four

15   documents you listed, several of them, you said 2014?

16         THE COURT:  Right.  They were the original pretrial

17   services reports.

18         MS. SCHAFER:  Oh, I understand.  I'm sorry.  Yes, I

19   agree.

20         THE COURT:  Are there any other written materials I

21   should consider at the present time?

22         MR. PACCAGNINI:  No, your Honor.

23         MS. SCHAFER:  I do have one additional letter.  I had

24   mis-calendared the hearing for this afternoon, and there was a

25   witness who was going to be giving live testimony.  She is not

1    available to come at 9:30.  So I do have -- it is an e-mail

2    from her that I have shown to counsel and would ask the court

3    to consider as well.

4              THE COURT:  May I see it?

5              MS. SCHAFER:  Yes.

6              (Said document tendered to the court.)

7              THE COURT:  Dr. Dehaan, have you read and reviewed

8    those materials?

9              DEFENDANT DEHAAN:  Yes.

10             THE COURT:  Okay.  And you have discussed them with

11   your attorney?

12             DEFENDANT DEHAAN:  Yes.

13             THE COURT:  Specifically, have you reviewed with your

14   attorney the proposed conditions of supervised release

15   contained in the joint submission by you and the government?

16             DEFENDANT DEHAAN:  Yes.

17             THE COURT:  And you have also reviewed the

18   modifications offered by you and the government?

19             MS. SCHAFER:  I think we had done that a long time

20   ago, and I haven't recently gone over those with him, so I

21   apologize.

22             THE COURT:  Why don't you review those with him real

23   quickly.

24             DEFENDANT DEHAAN:  I recall them.

25             THE COURT:  You recall them?

1      DEFENDANT DEHAAN:  Yes.

2      MS. SCHAFER:  All right.

3      THE COURT:  Do you understand all of the proposed

4  conditions and the modifications?

5      DEFENDANT DEHAAN:  Yes.

6      THE COURT:  Any questions you want to ask me about

7  them?

8      DEFENDANT DEHAAN:  No.

9      THE COURT:  After you are released from custody,

10  these conditions will be part of your supervised release

11  order, and you will have a legal obligation to comply with

12  them.  They will have a significant effect on the way you live

13  your life.  If you violate any of these conditions, your

14  supervised release could be revoked and you could be

15  resentenced to prison.

16      Knowing all these things, do you still wish me to

17  impose these conditions of supervised release as suggested by

18  you, your attorney, and the government?

19      DEFENDANT DEHAAN:  Yes, sir.

20      THE COURT:  All right.  And do you agree that the

21  reasons suggested by you, your attorney, and the government

22  provide a sufficient basis for imposing those conditions of

23  supervised release?

24      DEFENDANT DEHAAN:  Yes, sir.

25      THE COURT:  Attorney Schafer, other than the factual

1    objections you had previously submitted in connection with

2    your objections to the guideline range, do you have any

3    dispute as to the factual findings and conclusions contained

4    in the presentence investigation report and accompanying

5    materials?

6              MS. SCHAFER:  No, sir.

7              THE COURT:  The same question of the government.

8              MR. PACCAGNINI:  No.  No, your Honor.

9              THE COURT:  I will adopt the factual findings and

10    conclusions contained in the presentence report except as

11    modified by my rulings and except -- I will except from this

12    finding the objections that the parties made in connection

13    with their varying positions in regard to the guidelines

14    calculations.

15              The presentence report, accompanying materials as

16    modified by me, and those not objected -- those parts that are

17    not objected to by the parties in connection with their

18    guidelines positions, and the transcript of these proceedings

19    will stand as my factual findings and conclusions.

20              The guideline range has been determined in my

21    previous order.  I'm using the sentencing guidelines manual

22    effective November 1st, 2016.  The base offense level is 6;

23    after the application of the enhancements and reductions, the

24    total offense level is 30; the criminal history category is 1,

25    yielding an advisory guidelines imprisonment range of 97 to

1   121 months.

2          As to the remaining 3553(a) considerations, do the

3   parties have any evidence?

4          MR. PACCAGNINI:  Your Honor, the government does not

5   have any evidence, but I do believe there is a representative

6   for one of the victims that would like to address the court.

7          THE COURT:  May I hear from that person?

8          (Brief pause.)

9          MR. DILLIE:  For the record, I got with my

10  girlfriend, Joanie Shortridge, almost ten years ago.

11  Dr. Dehaan was her doctor.  He used to come to the house.  And

12  she thought the world of him.  That's when she was up.  He

13  would come to the house.  He would check her over.  Everything

14  was fine.

15         THE COURT:  Could I interrupt you?  Could you state

16  your name, please?

17         MR. DILLIE:  David Dillie.

18         THE COURT:  And can you spell your last name for me?

19         MR. DILLIE:  D-i-l-l-i-e.

20         THE COURT:  Thank you.

21         MR. DILLIE:  So as it went along, when Joanie was up

22  and about, there was no problem with Dehaan, the greatest guy

23  in the world.

24         Once Joanie got bedridden, he changed.  He would come

25  in.  He would want the door shut.  I would be sitting.

1    Sometimes I would be home, and I would be sitting.  I would

2    get off of work, and I would be sitting in the front room.

3    Her brother would be there.  He would go in the bedroom.  He

4    would come out and right out the door.  So I would follow him

5    out and tell him "Thank you.  I really appreciate what you've

6    done.  Joanie thinks the world of you."

7            When I heard what happened, it was hard to believe.

8    I couldn't believe the man shaked my hand, with me sitting in

9    the front room, and he is in the bedroom with the love of my

10   life doing that to me, her, and the family.  It is hard to

11   believe how could a man face another man and do that.

12           And when you guys are talking about releasing him,

13   how could you do that?  How could you honestly look at

14   the -- hear what we heard and you guys are just going to

15   release him?  It don't make no sense to me.  You spend all

16   this money on the court and just smack him on the hand.  "Go

17   home.  Have a good day."  Well, that is wrong to me.  And I'm

18   sorry if I ain't phrasing nothing right.  I don't care.  He is

19   wrong.  He begrudged Joanie.

20           I'm going to tell you a little bit about Joanie.

21   Joanie lived with her parents all her life.  I was her first

22   boyfriend.  She never had a boyfriend before me.  She was very

23   sheltered.  She was a sheltered woman.  So she trusts a lot of

24   people.  That's where the fault comes in.  She never opened

25   her mouth.  She never -- she is not like -- she don't know the

1    Ps and Qs about life, about that.  That's where the sheltered

2    comes.  You know, she was sheltered.

3            And I wish to God I had something to say about his

4    sentence because he wouldn't be walking the streets a free

5    man.

6            That's all I have got to say.  Thank you.

7            THE COURT:  Any questions?

8            MS. SCHAFER:  No.  Thank you.

9            THE COURT:  Thank you, sir.

10           Anything else from the government?

11           MR. PACCAGNINI:  No, your Honor --

12           THE COURT:  From the defense?

13           MR. PACCAGNINI:  -- other than what we filed.

14           THE COURT:  Okay.

15           MS. SCHAFER:  Thank you.  I have several witnesses.

16   I'm going to start with Carol Molinari, please.

17               CAROL MOLINARI, DEFENDANT'S WITNESS, SWORN

18                           DIRECT EXAMINATION

19   BY MS. SCHAFER:

20   Q.  Would you please state your name and spell your last name?

21   A.  Carol Molinari.

22   Q.  I'm sorry, I mispronounced it.

23           Can you spell the last name, please?

24   A.  M-o-l-i-n-a-r-i.

25   Q.  And where do you live, what town?

1   A.  Muskegon, Michigan.

2   Q.  And do you know someone by the name of Charles Dehaan?

3   A.  Yes.  Chuck is my brother.

4   Q.  Can you tell us where he is in the family order?

5   A.  Chuck is -- there is four of us.  I'm the youngest.  He is

6   the second to the oldest.

7   Q.  How would you describe your relationship with him growing

8   up?

9   A.  The words that best describe my brother, as a little

10  sister growing up, are a brother with compassion.  I always

11  called him "my protector."  Out of all the family members,

12  immediate family and otherwise, he has had the single greatest

13  influence on my life in a positive way.

14  Q.  Can you describe what you mean by that, please?

15  A.  I could trust him.  As a little sister, I would watch and

16  admire him, whether he would be on the football team, whether

17  he was with his youth group or his friends.  I just looked up

18  to him.  The integrity he showed, the trust people had in him,

19  I looked up to him.  If I had questions as a little sister, he

20  would always point me in the right direction and say, "Carol,

21  just do the next right thing."  When I was afraid, he was the

22  one to be there.

23        I remember being in junior high and I was being

24  bullied, and my brother was in high school, and I got to

25  school one day, and there he was, you know, just to make sure

1    I got to my class safe.  And I will never forget that.  That's

2    an example of the kind of person he has been, both in my

3    childhood and as an adult.

4    Q.  That was going to be my next question.  You referred to

5    him in terms of he was a protector when you were a child.  Did

6    you remain close as you became an adult?

7    A.  We did.  Naturally, I followed him to the same college he

8    went to.  I went there, too.  And it just was natural.  I just

9    looked up to my brother Chuck, and I had such good experiences

10   visiting him there.  And when I got there, you know, he had

11   been a resident hall assistant, and people spoke so highly of

12   him.  And then going through difficult times in my life, he

13   was a constant, just always compassionate, caring for me,

14   somebody I could look up to and model my life after.

15           Both he and his wife, who is one of my best friends,

16   have always welcomed me in their home, welcomed my four

17   children into their home.  It is not unusual for my three sons

18   to be going through something or wondering about a decision

19   they should make and say, "I think I will call Uncle Chuck."

20   That's just common for my sons.

21           People look up to him.  He has demonstrated it in his

22   life.  The volume of time that my children and myself have

23   spent with him is evidence of the love that we have received

24   from him.

25           I remember especially when he got out of college just

1   the difficult decision he was faced with.  He went into the

2   mission field for a period of time in South America, and when

3   he came back, he really struggled as to what he would like to

4   do with his life.  As he decided to pursue medical school, I

5   remember him saying to me, "I can help the needy and the

6   brokenhearted and those that are hurting, and I have the skill

7   to go into medicine, and I'm going to make that my mission

8   field," and he has.  I have watched him have a servant's heart

9   both in his personal life and his professional life.

10  Q.  You have made reference to or alluded to the fact that

11  when he became a missionary, for example, churches had a

12  tremendous influence on his life?

13  A.  Absolutely.

14  Q.  How so?

15  A.  Chuck has always had a real authentic relationship with

16  God and church has been a part of that.  He has always been a

17  part of his youth group.  As an adult, he has always opened up

18  his home, whether it be to a pastor who needs a place to live

19  until they get settled or others who need a place to stay.

20  Every time I would visit their home, it was just never them.

21  It was always other people at the table or other families

22  living upstairs or downstairs, and it just was a house of just

23  a lot of people who felt loved and knew that Chuck was

24  welcoming them into his house.

25          As far as his church goes, he has always been

1    involved in his church.  They started their church, Harvest

2    Bible, in their home until they were able to build a building,

3    and every Sunday they just filled their backyard or wherever

4    until they were able to build a church.  I mean, he was

5    starting the Roaring 20s in Rockford that grew to hundreds of

6    kids who would just get together.

7    Q.  What was the Roaring 20s?

8    A.  Roaring 20s was a singles group, kind of an

9    after-college-type group where kids want to get together and

10   meet, but not be in the bar setting and all of that, but just

11   be in a setting where they can grow in the Lord and get to

12   know each other, and it gave them a safe place to kind of

13   build healthy relationships and volunteer.

14          Volunteerism is something Chuck has always been

15   involved with, whether it be at the Rockford Rescue Mission,

16   mission trips, giving of his time on various organizations.

17   You know, there are countless things that he has done over the

18   years, never asking for anything in return.  It is just who he

19   is.  He has never been motivated by money.  He just loves to

20   give of his heart and give his time to others.

21   Q.  Just a quick follow-up on the Roaring 20s:  Is this

22   something that he was doing when he was in his 20s or

23   something that he did as an adult?

24   A.  No, as an adult.  When they -- he and his wife, when they

25   moved here in Rockford and they were involved with their

1    church, the kids would meet at the house.  They had young kids

2    themselves, and they had a few kids meet.  Five, six became

3    ten, fifteen, kids who would want to have a bible study and

4    just have fellowship together, and it just grew and grew.  It

5    just became this large group of kids in their 20s that were

6    just doing positive things in this community, and it was

7    really an awesome thing to see.

8           You know, like, he opened his doors, and then they

9    took off with it, and it was just another example of Chuck

10   jumping in and finding out where God is already working and

11   then just allowing God to use him to bless other people.

12   Q.  Is there anything else you would like Judge Kapala to know

13   about your brother in deciding what the sentence should be

14   today?

15   A.  My brother is a man of integrity and character.  I have

16   known nothing but love from my brother.  We have been close.

17   I'm closer to my brother than anybody in my family.  Even as

18   he sits in the Winnebago Jail, he has said, "I know that God

19   has put me here to minister to those in need, and I trust God,

20   and I believe that he has a plan for my life."  And the same

21   character that I have seen in him as a little girl, as a

22   little sister, it hasn't wavered.  He is the same man today.

23           MS. SCHAFER:  Okay.  Thank you very much.

24           THE WITNESS:  You're welcome.

25           THE COURT:  Any questions?

 1              MR. PACCAGNINI:  No questions.

 2              MS. SCHAFER:  Jeffrey Wilhelm.

 3              THE COURT:  Good morning.

 4          JEFFREY WILHELM, DEFENDANT'S WITNESS, SWORN

 5                       DIRECT EXAMINATION

 6   BY MS. SCHAFER:

 7   Q.  Mr. Wilhelm, good morning.  Could you please state your

 8   name and spell your last?

 9   A.  Jeff Wilhelm, W-i-l-h-e-l-m.

10   Q.  And what town do you live, sir?

11   A.  Rockford, Illinois.

12   Q.  All right.  And do you know someone by the name of Chuck

13   Dehaan?

14   A.  Yes, I do.

15   Q.  How do you know him?

16   A.  Well, we probably go back 30 years or more.  I guess the

17   first place I met Chuck was in the emergency room when I got

18   cut on a slicer and he sewed me up.  At that point, we had

19   really never met, but our wives and our kids had met through

20   high school -- or through grade school because they were very

21   small at that time.  So we figured out we kind of knew each

22   other at that point.

23              We also attended the same church for a while, that

24   was for Covenant.  We played a lot of softball, probably 15 to

25   20 years' worth of softball, until both of us got too old that

1   we thought we'd better quit.

2           Chuck has always been a friend.  I know that I have

3   gone to him for doctor services and that type of thing at

4   different times and outpatient-type situations where he was

5   working and that type of thing.  Our wives are very good

6   friends, and the kids all grew up together, and that's where I

7   have known Chuck for, like I said, 30 years or more.

8   Q.  So for the length of time that you have known him, has

9   there been a period of time where you got to know him better?

10  A.  Yes, yes.

11  Q.  When was that?

12  A.  And I just really want to read this because I think this

13  is probably the most important.

14          Over the past two years, my wife and I joined another

15  couple with Chuck and Mary Dehaan at their home to share

16  meals, study the bible, and to pray.  During this time, I have

17  gotten to know Chuck better and to see the heart of a

18  man -- sorry -- heart of a man that clearly belongs to God.

19  Chuck has put God first in his life -- sorry.

20          THE COURT:  That's all right.  Take your time.  If

21  you need a moment to collect yourself, feel free.

22          THE WITNESS:  I watched Chuck, in his faith and trust

23  in God, go throughout this season.  Chuck knows that God goes

24  before him and that all things come through God's hands.

25  Right now Chuck's greatest concern is his wife, Mary, and

1    their family and not for himself.  His calm faith and trust in

2    God has been such an inspiration to myself and my wife as we

3    watch him go through this very difficult time.

4              MS. SCHAFER:  That's all the questions I have.  Thank

5    you.

6              The next witness is Cam Staman, please.

7              THE COURT:  Good morning, sir.

8              DAVID STAMAN, DEFENDANT'S WITNESS, SWORN

9                         DIRECT EXAMINATION

10   BY MS. SCHAFER:

11   Q.  Sir, would you please state your name and spell both your

12   first name and last name?

13   A.  My name is actually David Staman, but I go by Cam.  That's

14   my middle name.  The last name is spelled S-t-a-m-a-n.

15   Q.  And where is it that you live, sir, what town?

16   A.  Roscoe, Illinois, just east of Roscoe a little bit.

17   Q.  And do you know somebody by the name of Charles Dehaan?

18   A.  Yes, I do.

19   Q.  How do you know him?

20   A.  I first was introduced to Chuck probably 30 years ago.  I

21   was -- Carol referenced the group the Roaring 20s, and that's

22   where I met Chuck.  I participated, you know.  I was very

23   immersed in that youth group for probably about five years,

24   and I was on what we called the "leadership team" there and

25   spent a lot of time with Chuck and Mary.  And I really -- when

 1    I think back to that time, I really -- I think of

 2    Chuck -- Chuck and Mary both, really, but particularly Chuck

 3    as a mentor.  He really taught me a lot about leadership and

 4    about my faith during that time.

 5              So that was probably about five years I was involved,

 6    you know, quite a bit with Chuck in that group, and then lost

 7    touch for a number of years, and probably around 2010, I got

 8    reacquainted with Chuck again.  I began to work on and off for

 9    him for several years at his practice after that.

10    Q.  And in what capacity were you working for him?

11    A.  I guess for lack of a better term, I was kind of

12    considered the business manager, so I was involved in helping

13    to run some of the part-time staff and getting some of the

14    project management pieces going, looking at our financials and

15    just trying to keep the practice running, all the day-to-day

16    pieces of the practice.

17    Q.  Did the person you became reacquainted with or renewing

18    your friendship with in 2010, did that person differ from the

19    person that you knew years before?

20    A.  Well, you know, everybody changes a little bit as they

21    grow, but I would definitely say that it was very

22    representative of what I saw previously.  I saw a lot, when I

23    was younger and when I worked for him back in 2010 for a

24    while, a lot of the same themes of Chuck's character, very

25    generous, very giving.

1          As a matter of fact, oftentimes I would -- you know,

2    in trying to run the practice, I was always trying to make

3    sure that we were having revenue come in and watching those

4    numbers, and oftentimes Chuck would give away his services for

5    free.  If somebody called and said, "I just can't pay this

6    bill," he would say, "That's okay.  We will just write off the

7    balance."  So very generous.

8          Very generous to me individually and my wife.  He let

9    us stay at their place they had in Michigan for a while on our

10   honeymoon.  So I felt like it was -- I saw a very consistent

11   theme there of generosity and of caring and of a deep faith.

12   Q.  Why was it important for you to come here today and give

13   Judge Kapala some idea of the character of Charles Dehaan?

14   A.  You know, a lot of this seems confusing to me because the

15   man that I know is very strong in his faith and, like I said,

16   was a mentor to me.  I admired Chuck for many, many years, and

17   I know that a large piece of who I am today was shaped by

18   Chuck and Chuck's influence.  So it has been a very positive

19   influence for me, a very strong influence, and I'm grateful to

20   have known him, and I'm grateful for the impact that he has

21   had on my life and how he has helped shape who I am.

22   Q.  Is there anything else you would like to tell Judge Kapala

23   in deciding what the sentence should be?  About Chuck, I mean.

24   A.  I don't think so.  I have covered it.  I believe in Chuck,

25   and I'm grateful to have known him for sure.

 1          MS. SCHAFER:  Okay.  Thank you, sir.

 2          Rachel Carlson, please.

 3          THE COURT:  Good morning.  Would you please raise

 4     your right hand?

 5              RACHEL CARLSON, DEFENDANT'S WITNESS, SWORN

 6                       DIRECT EXAMINATION

 7     BY MS. SCHAFER:

 8     Q.  Would you please tell us your name and spell your last

 9     name?

10     A.  Yes.  It is Rachel Carlson, C-a-r-l-s-o-n.

11     Q.  Do you know Chuck Dehaan?

12     A.  Yes, Chuck is my father.

13     Q.  And how old are you, Rachel?

14     A.  I am 35.

15     Q.  Are you here speaking just on behalf of yourself?

16     A.  No, I'm speaking on behalf of my two little sisters, both

17     Alyssa and Kristen.

18     Q.  What is it that you would like Judge Kapala to know about

19     your father as a father and the influence he has had on your

20     life?

21     A.  My dad has had the greatest influence on my life.  Dad has

22     always been the one person I can go to that I know.  I get the

23     most genuine and real truth.  He has always taught me about

24     integrity and generosity.  Like everybody has said, our house

25     was constantly an open home, and sometimes it wasn't the best

Carlson - Direct

21

1    for Kristen, Alyssa, and I because we would be, like,

2    "Why are there people here all the time?"  But over time I

3    learned that was actually something that was really beneficial

4    to me, to see my family be so generous.

5            Dad never put any importance on money in our family.

6    It was always about giving back, and that's something I will

7    always take with me.  Over the years, I have grown to know all

8    these people that are sitting in this room today because they

9    have been in and out of our house, and I love every minute

10   looking back.

11           I remember with my dad, any time I faced a difficult

12   situation, he is the first person I go to for advice, and I

13   know that he knows the truth of God's word, and he gives me

14   correct answers.  In going through difficult times, he has

15   been the one person that I can count on the most.

16           His integrity has always proved real to me.  I had

17   the benefit of actually working for dad for several years, and

18   I loved that job.  I got to work hand-in-hand with dad.

19   Oftentimes, I would walk into his office after having a bad

20   day, and he would just be a dad to me, and we were such great

21   work partners, and I enjoyed every minute that I got to work

22   for my dad.

23   Q.  Did you see doing the house calls type of practice as

24   being sort of a calling for your dad?

25   A.  Yes.  Can I read kind of what I wrote?

Carlson - Direct

22

1    My dad had a unique practice built on the foundation
2    of you were sick and he visited you, and my dad approached his
3    work as a way to serve.  He often visited patients in areas
4    that many people would fear to go to.  He had unique stories
5    and unique patients and he loved what he did.  I watched him
6    work long hours visiting patients, and I just admire his work.
7    He taught me a strong work ethic.  And I just watched him work
8    not for the sake of money, but for the sake of just loving
9    what he did, and that's something I will take with me, too, is
10   just love what you do and it doesn't feel like work.  And
11   that's another thing I take with me.
12   Q.  Is there anything else you would like to tell Judge Kapala
13   about your father before you step down?
14   A.  Yes.  This whole process has been very confusing to me
15   because I know who my dad is in my heart.  It is hard for me
16   to hear the things that have been said because they are so
17   opposite of what I know about my dad.  And he has my full
18   support, and I totally believe in his character, and I have
19   never questioned it throughout this whole process.  I believe
20   my dad is who he is, and I'm very thankful to be his daughter.
21       MS. SCHAFER:  Thank you.
22       And Mary Dehaan.
23
24
25

```
 1              MARY DEHAAN, DEFENDANT'S WITNESS, SWORN
 2                       DIRECT EXAMINATION
 3   BY MS. SCHAFER:
 4   Q.  Would you please tell us your name?
 5   A.  Mary Dehaan.
 6   Q.  And is Chuck Dehaan your husband?
 7   A.  Yes.
 8   Q.  How long have the two of you been married?
 9   A.  36 years.
10   Q.  How long have you known him?
11   A.  38 years.
12   Q.  And the two of you have three children?
13   A.  Yes, three grown daughters, married daughters.
14   Q.  Okay.  What was it -- can you tell us what it was that
15   first drew you to Chuck?
16   A.  Well, I went to work at Maranatha Bible Conference in
17   Michigan, and actually a friend of mine liked Chuck, so I
18   didn't really give him the time of day, but over time I heard
19   all these great things about Chuck.  You know, there were all
20   these young men around him.  He was working construction at
21   the time between medical school, and all these guys just
22   looked up to him, and I just saw his kindness and compassion
23   and his heart towards God.  And eventually, actually, my
24   friend said, "I don't think Chuck likes me.  He likes you."
25   So over time, then, actually, we got together.
```

1    Q.  Have you seen the influence of the church in Chuck's life?

2    A.  Oh, yes.

3    Q.  How so?

4    A.  Well, it is God working in his life, but we have always

5    been involved in our church, and Chuck would always -- like

6    work was -- he loved what he did, but he also really loved

7    ministry.  So we had several -- when we first got married, we

8    worked with a high school group and with the McCrays.  And

9    then we went on to have bible studies for college young people

10   and Roaring 20's and then eventually a college group from our

11   other church which launched into Harvest Bible Chapel.

12   Q.  So that is a church the two of you started or the two of

13   you in conjunction with others?

14   A.  With others.  It met in our home, but God led us to the

15   right people, and it was his timing to start this church.

16   Harvest Bible Chapel in Elgin was the one -- or in Rolling

17   Meadows that helped us plan it.

18   Q.  How would you describe your husband?

19   A.  He puts the girls and myself above himself.  He loved his

20   work, but if I had a need at home or if the girls had a need,

21   he would make sure he could come home and be there for us.

22   Like Rachel said, I would go to him for advice because he

23   always led me to the truth and God's word, and that's, you

24   know, our foundation.  He is a man of integrity.  He loved

25   what he did.  His house call practice was a passion of his.

M. Dehaan - Direct

25

```
 1           Do you want me to talk about that?
 2    Q.  Sure.
 3    A.  In 1993, he really had this passion and dream to do a
 4    house call practice, which is, you know, a difficult practice.
 5    But his grandfather and father had done that practice.  So
 6    Chuck just met a guy who was doing this out of state and we
 7    bought a franchise.  This guy actually was franchising a house
 8    call practice.  He was from California.
 9           And Chuck -- it started in Chicago, and by 1995, the
10    man who started the franchise went bankrupt and left us with a
11    lot of debt.  And, you know, we tried to figure out should we
12    bankrupt ourselves or should we continue, and we had
13    consultants come in and say, "You guys can work really hard
14    and make this thing go."
15           So they trained me in bookkeeping and all three girls
16    helped.  You know, we were in Chicago.  We had to drive in
17    there.  We hired more staff, and we kept the business going
18    because we really knew it was such a benefit to patients that
19    couldn't get out of their homes.  And we had so many patient
20    calls.  I -- well, I will say this later, but I mean people
21    just saw the value in this practice.
22    Q.  And do you believe that he was good at what he did?
23    A.  Yes, he was so good.  Well, even now, everywhere I go,
24    church, the store, volunteer work, people always tell me that
25    Chuck was so good with their parent, you know, a cancer
```

1    patient, an ALS patient, an MS patient, and that he would go

2    above and beyond, and that's how Chuck was.  We would be at

3    home.  We may be at home having dinner and someone like the

4    nurse couldn't get a tracheotomy in, so Chuck would go off and

5    help them do that, or there would be a cancer patient who was

6    dying and he would go and sit with them and talk to the

7    caretakers.  But he loved what he did, and people always told

8    me they knew that he really loved what he did.

9    Q.  You have mentioned the influence that the church has had

10   in your life and the work that he has done with the church.

11   A.  Uh-huh.

12   Q.  Has there been other volunteering work that he has done

13   over time?

14   A.  Yes, he has done work at the rescue mission.  I'm trying

15   to think.  The church has been a big influence because that

16   has taken a lot of our time because Chuck was kind of

17   the go-to person because he has a servant's heart.  So he

18   would help.  He would even help me with the decorating.  There

19   was so much.  I do all the decorating at our church, all the

20   Christmas, Easter, and Chuck would always be there to help me

21   and organize me.

22   Q.  Is there anything else that you would like Judge Kapala to

23   know about your husband in deciding his sentence today?

24   A.  Well, I said most of the things, but I would like you to

25   know that my husband is a man of integrity.  He loved what he

1    did.  People now -- like all our friends would ask medical

2    questions, and Chuck could just figure anything out, you know.

3    And all of this is confusing to me, but we are trusting God.

4    When I go see Chuck in the jail, all these guys pop their

5    heads in the monitor because they have gotten to know Chuck,

6    and he has said he is not going to waste any opportunity, you

7    know, wherever he is.  And he is a man who puts others first

8    and God first in his life, and he has always pointed us girls

9    back to that or the people that have been around him.  So this

10   is confusing to me, but we are all trusting in God.  And

11   that's it.

12           MS. SCHAFER:  Okay.  Thank you very much.

13           I know the court has already reviewed the other

14   letters that have been submitted on his behalf, but I have no

15   further witness to testify at this time.

16           THE COURT:  Thank you.

17           Any argument by the government?

18           MR. PACCAGNINI:  Yes, your Honor.

19           Your Honor, there appears to be two Charles Dehaans.

20   There is the Charles Dehaan that we heard about today who is a

21   man of integrity and of faith, who these people have come and

22   spoke about, and there is the Charles Dehaan that this court

23   knows, and that Charles Dehaan is a man who engaged in a

24   multifaceted scheme to defraud Medicare and then lied to the

25   court on 67 different occasions and landed himself in jail in

1    the process.

2         The Medicare fraud many people would probably

3    consider a victimless crime, but there would be nothing

4    farther from the truth in this case.  That said, the defendant

5    engaged in a multifaceted scheme to defraud Medicare that this

6    court is fully aware of.  That scheme included billing for

7    patients that were not alive, billing for patients he never

8    even saw, billing patients at the highest amount of

9    reimbursement for visits that arguably didn't even make the

10   minimum for reimbursement.

11        But the most disturbing parts of the defendant's

12   scheme to defraud is the sexual contacts he made with his

13   patients, his female patients, some of them, and then billed

14   Medicare.  The hardest part for this case for me was after the

15   defendant was charged and he was indicted and we got phone

16   calls from family members.  The phone calls would go something

17   like "My name is so-and-so.  My mom was a patient of Charles

18   Dehaan.  She died two years ago.  Did he touch her?"  And all

19   I could say was "I don't know.  I don't know."  And then

20   usually it would go along with "She told me that Charles

21   Dehaan was her boyfriend, that they were dating each other,

22   that they were seeing each other, and I didn't believe her.

23   She was older.  I figured 'Sure, mom.  Okay, yes, you are

24   dating your doctor' and just kind of laughed it off."  These

25   were sons and daughters, multiple calls.

1        Yet the defendant questions why women like Joan

2   Shortridge didn't say something, how this could have gone on

3   and she wouldn't have spoke.  Bedbound, agoraphobic, Joan

4   Shortridge.  The reason is because there is no relationship we

5   experience in our life like the relationship we have with our

6   doctor.  For most people, their doctor essentially is a

7   stranger.  You see your doctor a couple times a year at most.

8   You go into a room and you answer the most intimate -- you

9   answer questions about the most intimate details of your life,

10  without hesitation: drug history, sexual history, family

11  history.  You don't bat an eye.  You answer the question.

12  Then you leave.

13       The closest relationship I can relate would be maybe

14  with a pastor or a priest, but I think most people like

15  myself, you have a relationship with your pastor, your priest

16  outside of church.  You see those individuals socially, eat

17  dinner with them, see them at functions.  Most people don't do

18  that with their doctor.  Most people don't have dinner with

19  their doctor or have a social relationship with their doctor

20  unless, as we heard today, maybe they have kids and their kids

21  are friends and that type of relationship happens.

22       Now, the reason why when you see your doctor you

23  don't bat an eye to answer those intimate questions, to do

24  what is asked and to answer whatever questions are asked of

25  you, is because doctors are supposed to be the best among us.

1    They are supposed to be the brightest, the smartest.  They are

2    driven by a calling, a calling to help, a calling to heal, a

3    calling to do no harm, no harm.

4         As I said, most of the visits would have happened in

5    an office, in a sterile room, where you go and see somebody

6    for a short period of time.  The defendant was different.  The

7    defendant went into these women's homes, into their living

8    rooms, their dining rooms, and their bedrooms, to treat them;

9    their homes, where they were supposed to be secure,

10   comfortable; their homes, where they would have their

11   furniture, pictures of family members, photos on the wall, and

12   he shattered that security and that comfort.  He violated the

13   very nature of the relationship between a patient and her

14   doctor.

15        And there is a reason why the defendant told

16   Ms. Shortridge and others that no one will believe them,

17   because he is right.  The police didn't believe them.

18   Multiple people came forward.  There were multiple police

19   reports that this court is aware of and nothing happened.

20   Sons and daughters didn't believe their moms.

21        The guidelines don't take into account what the

22   defendant did to these women.  There is no guideline for

23   sexual contact with a Medicare patient.  There isn't.  The

24   government has put forth a guideline, an enhancement, as an

25   analogy that applies.  Is it directly applicable?  No,

1    obviously not, because there is no guideline.  And the defense

2    points out it applies to minors, but that enhancement does not

3    apply to minors.  And, again, it is a reference.  You know,

4    the government, I suppose we could have argued that

5    Section 2A2.3, which is assault, the base offense level for

6    that is 7 or otherwise it is 4.  I could have argued that that

7    would be an analogy that the court should have looked at with

8    this type of situation, but I went with what I believed was

9    the strongest analogy, the strongest reference in the

10   guidelines that seemed to apply.

11           As I said, the guidelines don't take that into

12   account.  This court's order setting the guideline range

13   didn't take it into account.  This court should take that into

14   account.

15           Thank you.

16           THE COURT:  Attorney Schafer?

17           MS. SCHAFER:  As I understand the 3553 factors for

18   the court to consider, you are to consider, in addition, of

19   course, to the nature and circumstances of the offense, you

20   are to consider the history and characteristics of the

21   defendant.  That's why I thought it was important to bring to

22   you evidence relating to his history and character through the

23   witnesses that I presented today, plus the written statements

24   provided by other witnesses.  I think that they tell a tale of

25   a very dedicated professional who found a need, saw a need,

1    and tended to it in terms of taking care of people who did not

2    otherwise have access to health care or it was very difficult

3    for them.  So it was providing a tremendous service to them.

4         He has a long history of charitable work, both

5    through actions in and out of church, and I think that it is

6    significant for the court to hear that information in deciding

7    what an appropriate sentence is.

8         In this particular case, Dr. Dehaan has appeared

9    before you and has pled guilty to two counts of Medicare

10   fraud.  I think that you can hear in the voices of the people

11   who testified that it is very hard for them to reconcile that

12   with the person that they know, the integrity that they speak

13   of.  I don't, however, stand here and tell you that Charles

14   Dehaan is perfect.  Obviously, he is not, and he is standing

15   before you convicted of a crime and prepared to be sentenced.

16        However, he does not stand before you guilty of the

17   actions that the prosecution has attempted to show through the

18   hearings that we held on this matter.  They have presented

19   witnesses directly claiming that they have been sexually

20   abused, and as the court knows, I have urged the court to

21   reject that testimony and let that testimony play out in the

22   courtrooms where he has been accused of that, where he will

23   have the opportunity to speak.  Because those matters are

24   still pending, he has been unable to do so at this stage, and

25   I'm asking the court to set those issues aside and sentence

 1    him instead for the offenses that he is in front of you.

 2         He committed Medicare fraud, as counsel indicated,

 3    for billing for a deceased patient that he obviously could not

 4    have seen and for billing for a patient who was alive, who he

 5    did not see and indicating that that was part of a scheme.

 6    The court has heard additional evidence relating to other

 7    relevant conduct, some of which the court has found to be

 8    relevant, and while maintaining our objection to the ultimate

 9    loss calculation that the court came up with, we understand

10    that the court was tasked with the responsibility of

11    calculating the loss and making a decision based on that.  And

12    on that basis, we are asking the court to sentence him within

13    the guideline range that the court has determined and not to

14    increase the sentence by two levels or any levels as indicated

15    by the government.

16         That evidence that has been received by the court, as

17    I indicated in my previous filings, has been information that

18    he cannot adequately respond to or is information, in many,

19    many cases, which was many layers of hearsay.  We don't have

20    the direct people coming in and the ability to cross-examine

21    them concerning the nature of the allegations they are making.

22         Counsel argues that he had very difficult phone calls

23    with people because of the media attention that the case has

24    had with people calling in and saying, you know, "What about

25    my parent?"  I would urge the court not to consider that

1    information either.  The idea of making this bigger than it is

2    in this environment, I would urge the court to reject.

3           Under the testimony that the court has heard based on

4    the history and characteristics of the defendant, it would

5    warrant a sentence, if you establish the guideline range where

6    it is, it would establish a sentence at the low end of that,

7    and I'm urging the court to sentence him to no more than the

8    97 months that you found to be the appropriate sentencing

9    range and to reject the testimony and the arguments of counsel

10   relating to the sexual allegations.  Allow those matters to be

11   played out in court, as they will be.

12          And I thank you.

13          THE COURT:  You're welcome.  Thank you.

14          Dr. Dehaan, you have an opportunity to address the

15   court.  You don't have to say anything.  There is no

16   requirement that you do so and you are under no obligation to

17   speak.  But if there is something that you would like to say

18   and put on the record in this case, make a part of these

19   proceedings, and that you believe will help me arrive at a

20   fair disposition, I invite you to do so now.

21          MS. SCHAFER:  Would you like him to do it at the

22   podium or here?

23          THE COURT:  Wherever he feels most comfortable.

24          DEFENDANT DEHAAN:  I would prefer it here.

25          Your Honor, I first just want to say I appreciate so

1   much what my family and friends have said.  I feel like my

2   words now are going to be quite inadequate, but I'm really

3   very thankful.

4         But for your Honor, at the plea hearing, you asked me

5   if I trusted you.  In fact, specifically you asked twice if I

6   trust you.  Although it was a very difficult moment for me at

7   that time, the answer was something I didn't know.  I sensed

8   it was right and chose it was right to trust you.  As I saw

9   the harsh sentence, I stumbled in that trust.  I then

10  remembered some crucial facts, your position and earned

11  respect.  I trust in my family and my friends and my faith.

12        So I persist in that trust.  You deserve it.  This is

13  a difficult case.  And I believe you have seriously considered

14  the sentence as I have watched this go through, and the case,

15  I believe you have followed a very trustworthy manner, and

16  your difficult task has been to determine what you can trust.

17        I have not made that task easy for you.  My handling

18  of the privilege to be at home, I broke that trust, causing

19  questions for you and putting more difficulty on my wife and

20  family, and for that I'm sorry.  I was suddenly unavailable to

21  them at a very difficult time.  Please know I was at church

22  volunteering on all those occasions without exception.  I took

23  my volunteering there seriously.  It was my one way to connect

24  with some people who I had lost touch with.  I volunteered

25  there for over two years, hoping to serve some fashion, even

1    in the midst of all that I was going through.

2          I can only imagine how difficult it must be and what

3    you must have had to work through in all the evidence

4    presented, especially with respect to the allegations by some

5    of the patients.  It has been extremely difficult for me to

6    remain silent through all of this.  I can say without any

7    question those allegations are not true.  My practice

8    involved -- and I just want to say I look forward to my

9    opportunity to deal with those in the proper way and the

10   proper place.  My practice involved many wonderful patients,

11   by far more than the difficult ones, but I also handled some

12   difficult ones.  Some required restrictions or even dismissal

13   from my care due to their behavior and threats to me.  There

14   were some that were not happy with this.  In the right court

15   and the proper time, I hope to defend myself.

16         I pled to two counts of a scheme to defraud Medicare.

17   I billed for patients I had not seen.  I'm responsible and did

18   not in these cases protect Medicare, which was my

19   responsibility.  Medicare gave me a privilege and

20   responsibility.  The basis for how Medicare has been

21   established depends on a confidence in the physician's

22   integrity in billing.

23         I recognize that our arguments related to home health

24   certification was not developed fully.  The regulations are

25   complicated.  Even the expert under oath admitted that he did

1    not understand some factors.  How can a patient be under my

2    care without being seen by me, the doctor?  The truth is this

3    is a common part of medical practice in many areas beginning

4    during our training, under supervision, and continuing more

5    often now with other physician extenders working under the

6    physician's license such as nurse practitioners.  I supervised

7    and was responsible for other physicians and nurse

8    practitioners who act as extensions to my care.  Rather than

9    this being wrong, it actually allows for more patients to

10    receive the care that they actually deserve.

11         This case is about trust.  I was given a great

12    privilege in life to practice medicine for the past 30 years

13    in this community.  I was given the trust and privilege to

14    care for patients in the Medicare program, most of whom were

15    in the most difficult phase of life, seriously ill and even

16    dying.  As my wife mentioned, my grandfather practiced

17    medicine in the early 1900s and did house calls.  That's

18    primarily how they did medicine back in those days.  My father

19    was a physician.  He took us kids on house calls while we were

20    growing up.  It impressed me that this manner of seeing

21    patients was right, but by the time I started practice, house

22    calls was mostly discarded, not being efficient enough for our

23    time.

24         But the idea wouldn't go away.  Why should the

25    healthy, mobile person, the doctor, have the ill, immobile

1    person come in to him?  It was not the pattern of service that

2    seemed best to me.

3         While working in the emergency room department of

4    Swedish American Hospital, a very frail woman in the last

5    stages of breast cancer came in to the emergency department by

6    ambulance.  In her weakness, she had fallen, and she had

7    lacerated her face.  She was very cachectic and frail.  She

8    told me how humiliated she was to have to be out in public,

9    this ill, unpresentable, looking as she did.  She felt as if

10   everyone was staring at her frail state.  She was humiliated.

11   She said to me, "Why couldn't someone have come to my home?"

12        That triggered my action to start this practice and

13   care for those isolated and forgotten but still valuable

14   people who were too ill to leave home.  No practice was like

15   it.  It was difficult, as my wife mentioned, but it has been a

16   privilege to serve my patients in this way for over 20 years.

17   I recognize I will no longer be able to serve in this way

18   because of my actions and, further, my family suffers greatly

19   for something they have no fault in.  I'm grateful to them.

20   Words can't express that.

21        My responsibility was to give good care to my

22   patients.  My responsibility was also to protect Medicare's

23   trust.  I take responsibility for not protecting that trust in

24   these cases.

25        Your Honor, I recognize for you that handing out

1    sentences can be difficult.  It is not my intention to sound

2    manipulative with this, but I don't have anywhere else to go

3    to and to trust with this request.  I just ask and hope to be

4    with my family again as soon as it seems right to you and

5    justice is served.

6            And I just want to tell my family and friends thank

7    you.  I love you.

8            Thank you, your Honor.

9            THE COURT:  You're welcome.  Thank you.

10           I have considered the presentence report and other

11   sentencing materials.  I have considered the written

12   submissions and arguments by the parties, the evidence

13   presented during the course of these proceedings as well as

14   the statement of the defendant.  I have considered the

15   sentencing guidelines calculations and all of the other

16   sentencing factors contained in Section 3553(a).  Among those

17   factors are the nature and circumstances of the offense and

18   the history and characteristics of the defendant.

19           I also recognize the need for the sentence imposed to

20   reflect the seriousness of the offense, to promote respect for

21   the law and to provide just punishment for the offense, to

22   afford adequate deterrence to criminal conduct, to protect the

23   public from further crimes of the defendant, to provide the

24   defendant with needed educational or vocational training,

25   medical care, or other correctional treatment in the most

1  effective manner, and the need to avoid unwarranted sentence

2  disparities among defendants with similar records who have

3  been found guilty of similar conduct.

4       I believe that the guidelines calculations in this

5  case provide an accurate starting point to evaluate the other

6  3553(a) factors.  Those guideline calculations take into

7  account the loss amount, a two-level enhancement, in view of

8  the fact that Medicare, a government health care program,

9  suffered a loss of more than $1 million; a two-level

10 enhancement for the number of victims; a two-level enhancement

11 as the offense involved a vulnerable victim; a two-level

12 enhancement as the offense involved a large number of

13 vulnerable victims; a two-level enhancement for an abuse of

14 position of trust; a two-level reduction for the defendant's

15 acceptance of responsibility and his criminal history.

16      Some of the factors in mitigation are that the

17 defendant has expressed regret for what he has done, he is 64

18 years old, he has a substantial employment history.

19      In aggravation, this scheme to defraud occurred over

20 a long period of time.  At any point during the approximately

21 five years he was committing these fraudulent acts, he could

22 have recognized the criminality of his actions and ceased to

23 defraud Medicare, but month after month, year after year, he

24 deliberately and intentionally persisted in this deceitful

25 conduct.  The defendant's conduct was so unscrupulous that he

 1   actually billed for services of some patients that were

 2   deceased at the time the medical care was claimed to have been

 3   rendered.

 4           I also note that the defendant by deceitful means

 5   violated the conditions of his bond and in doing so violated

 6   the trust that the court placed in him.

 7           I note particularly that Medicare plays a critical

 8   role in our society, providing essential medical care to

 9   people who are frequently unable to provide it for themselves.

10   Its proper functioning depends to a large extent upon the

11   integrity and honesty of its medical providers.  As this case

12   clearly demonstrates, it is a daunting task for the persons

13   charged with overseeing the program's operation to monitor the

14   actions of the health care providers, and as we have seen

15   here, Medicare fraud is lucrative and can easily go

16   undetected.  Cunning and corrupt providers such as the

17   defendant can take advantage of this situation and essentially

18   rape the program and steal massive amounts of money from the

19   government and the taxpayers who fund the system.

20           As the Seventh Circuit stated in United States vs.

21   Heffernan, 43 F.3d 1144, considerations of general deterrence

22   argue for punishing more heavily those offenses that are

23   either lucrative or are difficult to detect and punish since

24   both attributes go to increase the expected benefits of the

25   crime and hence the punishment required to deter it.

1    I think people generally are aware of what types of

2    offenses get what types of punishment.  White collar crimes

3    such as these get special attention in the news because they

4    frequently occur in situations where the cases have

5    high-profile defendants or have defendants which otherwise

6    lead respectful and law-abiding lives.

7    Here, given the lucrative nature of this offense and

8    the difficulty inherent in detecting it, the court finds that

9    the need for general deterrence is urgent and that a strong

10   punishment is needed in order to achieve adequate deterrence.

11   I have reviewed the letters that have been provided.

12   I have listened carefully to the testimony that I have heard

13   today in court.  Obviously, there are people who within and

14   outside the defendant's family hold the defendant in high

15   regard.  They say he has done wonderful work, he is a man of

16   integrity.  They feel he is a fine physician.  These

17   sentiments stand in stark contrast to the victim impact

18   statements and evidence that I received during the guidelines

19   hearing as to the care that defendant provided and the way he

20   dealt with them.  It is difficult to reconcile these two

21   versions of who the defendant is.

22   Carol testified that he has never been motivated by

23   money, but I'm afraid money had a lot to do with his offense

24   conduct.  Cam said that he would give services away for free,

25   but, unfortunately, he would also take money for services that

1 he did not provide.  As Rachel testified, the father she knows

2 is very different from the descriptions given by the other

3 witnesses in this case.

4       The government has filed a motion seeking a sentence

5 above the advisory guidelines range of 130 months imprisonment

6 in order to take into account the defendant's sexual conduct

7 with some of his patients.  The government argues that this is

8 an aggravating factor that is not already taken into account

9 by the guidelines calculations.  The defendant opposes this

10 request, arguing among other things that there are pending

11 charges concerning these same allegations that will be fully

12 litigated in state court, and he urges the court to leave any

13 sentencing decision on those charges in the state court in the

14 event of a conviction.

15       Both parties make legitimate arguments.  The court is

16 required to take into account the nature and circumstances of

17 the offense when determining what sentence to impose, but

18 imposing a longer sentence for the defendant's two health care

19 fraud convictions is not necessarily the only way or even the

20 best way to account for the defendant's alleged sexual

21 conduct.

22       The court is aware that there are numerous criminal

23 charges pending against the defendant in Cook and Winnebago

24 counties based on the allegations of sexual misconduct.  In

25 Cook County, there is an 18-count indictment pending for

1    charges of aggravated criminal sexual assault of a handicap

2    victim and aggravated criminal sexual abuse of a handicap

3    victim.  There are three cases pending locally in Winnebago

4    County.  There is an eight-count indictment charging

5    aggravated criminal sexual abuse of a physically handicap

6    person and criminal sexual abuse without consent.  There is a

7    two-count indictment for aggravated criminal sexual abuse and

8    there is a 16-count indictment for aggravated criminal sexual

9    abuse.

10          While acknowledging that the defendant is presumed to

11   be innocent of those charges, the court believes that those

12   courts would be in the best position to fully evaluate the

13   defendant's conduct and determine an appropriate sentence to

14   impose in the event he is found guilty.  Although this court

15   has heard some of the evidence concerning those allegations of

16   sexual misconduct, that was not the primary focus of these

17   proceedings like it will be in the state courts.  Those

18   allegations were only significant for purposes of this case to

19   show that the defendant's actual conduct during his patient

20   visits was not always consistent with his billing practice.

21          In contrast, in the various state prosecutions, the

22   evidence of sexual misconduct concerning all the people that

23   appeared before me to testify and those victims who were

24   referenced in the guidelines hearing on this matter will be

25   the focus of those criminal prosecution proceedings and can

1   potentially be used against the defendant in the state's

2   case-in-chief pursuant to state criminal procedural rules such

3   as Chapter 725 ILCS 5/115-7.3 or can certainly be raised as an

4   aggravating factor if the cases go to sentencing.

5        It is worth noting that while the maximum penalty in

6   each of the two counts in this case is ten years, six of the

7   counts against the defendant in the Cook County indictment are

8   Class X felonies punishable by a term of imprisonment of

9   between six and 30 years, which provides a greater penalty

10  range that can better account for the seriousness of the

11  sexual misconduct and the harm to all of the defendant's

12  victims than the sentence requested by the government which is

13  only nine months greater than the upper guideline limit.

14       Therefore, under the circumstances, the court finds

15  that the best course of action is to sentence the defendant

16  based solely on his health care fraud offenses and then leave

17  it to the state court to determine what sentences should be

18  imposed with respect to the alleged sexual misconduct.

19       As the disposition in this case will be separated

20  from the dispositions in the pending state criminal cases, the

21  court finds that it is appropriate under the authority set

22  forth in the Supreme Court's opinion of Setser vs. United

23  States, 566 U.S. 231, to order that the sentence imposed in

24  this case will run consecutively with any sentence that may

25  later be imposed in the state court for any of the pending

1    criminal charges relating to the sexual misconduct.

2         So the sexual misconduct will be litigated in the

3    state court.  He will be assigned a punishment for those

4    charges.  This case is separate.  He will be assigned

5    punishment for the Medicare fraud, but the punishment won't be

6    concurrent.  He won't be serving any prison sentence or jail

7    sentence at the same time for both charges.

8         Under the framework that I am using, the sentence

9    that is imposed in this case will have no bearing on the

10   sentence that will imposed in the state court in the event the

11   defendant is convicted of one or more of the pending charges.

12   By ordering my sentence to be consecutive to any subsequent

13   state court sentence, the court is taking into account the

14   fact that the guideline range in this case does not punish the

15   defendant in any way for the alleged sexual misconduct as the

16   government argues in its motion, but it also allows for those

17   charges to be fully litigated before a determination is made

18   on what sentence will be most appropriate based on the sexual

19   misconduct.

20        It is also worth noting that two of the alleged

21   victims in the sexual misconduct allegations chose to file

22   civil suits against the default and have sought redress for

23   the alleged harm done to them through that means.

24        So there will be no misunderstanding, the court

25   encourages the U.S. attorney's office to make the state's

 1    attorneys of Cook and Winnebago County aware of the parameters

 2    of this court's sentence.

 3            In view of the foregoing, I have determined that a

 4    sentence within the guideline range is the most appropriate

 5    sentence in this case.  I conclude that a sentence sufficient

 6    but not greater than necessary to comply with the purposes set

 7    forth in Paragraph 2 of Section 3553(a) is as follows:

 8            Probation, I believe, would deprecate the seriousness

 9    of the offender's conduct, would improperly minimize his

10    culpability, and would be inconsistent with the ends of

11    justice.  The defendant is hereby committed to the custody of

12    the United States Bureau of Prisons to be imprisoned for a

13    total term of 108 months on Count 9 and 108 months on

14    Count 21.  Those sentences are to be served concurrently;

15    however, I am also ordering that those sentences shall be

16    consecutive to any state sentences imposed as a result of the

17    pending criminal offenses against the defendant in state

18    court.

19            In regard to a fine, I have considered the factors

20    contained in Section 3572 and Guidelines Section 5E1.2.  I

21    note that the presentence investigation report indicates the

22    defendant has a total net worth of negative 2.6 million and a

23    negative monthly cash flow.

24            By the way, is the defendant receiving

25    Social Security benefits?

```
 1          MS. SCHAFER:  Not since he has -- because he is in
 2   custody, no.
 3          THE COURT:  No, but before that he was?
 4          MS. SCHAFER:  Yes.
 5          THE COURT:  All right.  I also note that the
 6   defendant will have a substantial restitution obligation.  The
 7   court declines to impose a fine in this case because the
 8   defendant is unable to pay a fine and is not likely to be able
 9   to do so.
10          I will order the defendant to pay a special
11   assessment of $100 on Count 9 and $100 on Count 21 for a total
12   of $200.  That special assessment is due immediately.
13          As for restitution, the government seeks an order
14   requiring the defendant to repay $2,787,054.58, which is the
15   amount of lost Medicare based on the defendant's fraudulent
16   home health certification.  The court notes that the
17   government is not seeking any restitution based on the
18   defendant's practice of billing Medicare under the CPT codes
19   for in-home visits that should have been billed under lower
20   CPT codes.  The defendant has raised no objection to this
21   figure in its response to the defendant's stated position.
22   Accordingly, the court will order restitution in the requested
23   amount.
24          As to supervised release, in view of the specific
25   facts and circumstances in this case, I believe continuing
```

1    court oversight after his term of imprisonment would benefit

2    the defendant and the community.  Based on the considerations

3    that I have previously mentioned, particularly in

4    consideration of the seriousness of these offenses as well as

5    the fact that the defendant's pretrial bond was revoked, I

6    think a maximum term of supervised release is appropriate and

7    therefore I will order the defendant to serve a term of

8    supervised release of three years on Count 9 and three years

9    on Count 21.

10          As far as conditions of that supervised release, I

11   will work from the proposed conditions of supervised release

12   contained in the presentence investigation report.

13          As to mandatory conditions, I will order that the

14   defendant shall not commit another federal, state, or local

15   crime.

16          As to proposed condition No. 2, I will order that he

17   shall not unlawfully possess a controlled substance.

18          Pursuant to proposed condition No. 5, I will order

19   that he shall cooperate in the collection of a DNA sample if

20   the collection of such a sample is required by law.

21          As to discretionary conditions of supervised release,

22   I will order, consistent with proposed condition No. 4, that

23   the defendant shall seek and work conscientiously at lawful

24   employment or pursue conscientiously a course of study or

25   vocational training that will equip him for employment.

1          As to No. 5, I will order that he shall refrain from

2     engaging in a specified occupation, business, or profession

3     bearing a reasonably direct relationship to the conduct

4     constituting the offense or engage in such a specific

5     occupation, business, or profession only to a stated degree or

6     under stated circumstances, particularly having any contact

7     with elderly, disabled, or infirm individuals, aside from

8     immediate family members.

9          As to No. 6, I will order that the defendant shall

10    refrain from knowingly meeting or communicating with any

11    person whom he knows to be engaged or planning to be engaged

12    in criminal activity and from visiting the following type of

13    places: hospitals, medical facilities, facilities housing or

14    treating elderly, disabled, or infirm individuals, except for

15    care necessary for the defendant, his wife, his children, or

16    his grandchildren.

17         Going back to No. 5, the proposed condition states

18    that the defendant shall engage in such a specific occupation,

19    business, or profession only to a stated degree or under

20    stated circumstances.  Who is going to state the degree of the

21    circumstances, or was that --

22         MS. SCHAFER:  I'm sorry, I don't have the agreement

23    in front of me, the agreed language.

24         MR. PACCAGNINI:  Excuse me, your Honor.  That was a

25    condition that I think we indicated no changes.  So are you

1    asking about the condition as it is listed in the PSR, how it

2    is going to be?

3            THE COURT:  Right.  Right.  Maybe I should ask the

4    probation officer.

5            MS. POWELL:  Judge, I believe the stated degree would

6    be limiting the defendant to not have contact with elderly,

7    disabled, or infirm individuals, aside from family members.

8            THE COURT:  Okay.  Specifically to those conditions

9    that I mentioned there?

10           MS. POWELL:  Yes, your Honor.

11           THE COURT:  Okay.  Thank you.

12           All right.  Going back to 6, I will order that the

13   defendant refrain from knowingly meeting or communicating with

14   any identified victims in this case.

15           As to No. 7, the defendant shall refrain from

16   excessive use of alcohol defined as having a blood alcohol

17   concentration greater than .08 percent or any use of a

18   narcotic drug or other controlled substance as defined in

19   Section 102 of the Controlled Substances Act without a

20   prescription by a licensed medical practitioner.

21           As to No. 8, the defendant shall refrain from

22   possession of firearm, destructive device, or using any object

23   as a dangerous weapon.

24           As to No. 14, I will accept the modifications

25   suggested by the parties and order that the defendant shall

1    remain within the jurisdiction where he is being supervised

2    and not knowingly leave the jurisdiction where he is being

3    supervised unless granted permission to leave by the court or

4    a probation officer.

5            As to 15, I will order that the defendant shall

6    report to a probation officer as directed by the court or a

7    probation officer.

8            As to 16, I will accept the modification of the

9    parties and order that the defendant shall permit the

10   probation officer to visit the defendant at home between the

11   hours of 6:00 a.m. and 10:00 p.m. or at work upon prior notice

12   to the defendant and allow the probation officer to confiscate

13   any contraband in plain view of the officer.

14           As to 17, I will order that the defendant shall

15   notify a probation officer promptly, within 72 hours, of any

16   change in residence, employer, or workplace and, absent

17   constitutional or other legal privilege, answer inquiries by a

18   probation officer.

19           As to 18, I will order that the defendant shall

20   notify a probation officer promptly, within 72 hours, if

21   arrested or questioned by a law enforcement officer.

22           I will decline to impose 22.  I believe it is

23   duplicative.

24           As to No. 23, if required to register under the Sex

25   Offender Registration and Notification Act, the defendant

1    shall submit at any time, with or without a warrant, to a

2    search of his person and any property, house, residence,

3    vehicle, papers, computer, other electronic communication or

4    data storage devices or media, and effects, by any law

5    enforcement or probation officer having reasonable suspicion

6    concerning a violation of a condition.

7            I believe the parties mean of that Sex Offender

8    Registration Notification Act rather than a condition of

9    supervised release.

10           MR. PACCAGNINI:  I'm sorry, your Honor?

11           THE COURT:  The proposed condition says "Shall submit

12   without a warrant to a search," and then it goes on to say "of

13   a condition of supervised release or unlawful conduct."  I

14   think what it should say is "a violation of the Sex Offender

15   Registration Notification Act."

16           Do you agree or disagree?  Because there are no

17   conditions in the supervised release order that relate to

18   sexual misconduct, except for the --

19           MR. PACCAGNINI:  The one condition under 9, which I

20   assume the court will get to?

21           THE COURT:  Right.

22           MR. PACCAGNINI:  Yes, I think that is right, your

23   Honor.

24           Can I talk to Ms. Schafer?

25           MS. SCHAFER:  It makes sense that it would be changed

1     to say violation of the registration act.

2          MR. PACCAGNINI:  Can I have a moment, your Honor, to

3     speak with Ms. Powell?

4          THE COURT:  Certainly.  Certainly.

5          By the way, in regard to special condition No. 9, I

6     agree with the sentiments suggested by the parties, but this

7     case doesn't deal with the defendant's sexual misconduct and

8     is not being used as a factor in imposing the sentences in

9     this case, so I don't know that special condition No. 9 is

10    appropriate to impose.

11         MR. PACCAGNINI:  I would agree, your Honor.  We

12    submitted this before the court had decided.

13         THE COURT:  Right.

14         MR. PACCAGNINI:  So it was based on the condition

15    that was identified as a possible issue the court would take

16    up.

17         THE COURT:  You know, it also might be appropriate to

18    say that the search can be by any law enforcement or probation

19    officer having reasonable suspicion concerning a violation of

20    any of the terms of probation or parole that would be imposed

21    in the state courts.

22         MR. PACCAGNINI:  That's fine, your Honor.

23         All right.  As to special conditions, I will order

24    that the defendant shall not incur new credit charges or open

25    additional lines of credit without the approval of a probation

1   officer unless he is in compliance with the financial

2   obligations imposed by this judgment.

3          As to No. 6, the defendant shall provide a probation

4   officer with access to any requested financial information

5   necessary to monitor compliance with conditions of supervised

6   release.

7          As to No. 7, I will order that the defendant shall

8   notify -- I will accept the suggestion of the parties and

9   modify 7 to provide "The defendant shall notify the court or

10  his probation officer of any material change in his economic

11  circumstances that might affect his ability to pay restitution

12  and special assessments."

13         As to No. 8, I will order that he shall provide

14  documentation to the IRS and pay taxes as required by law.

15         I will decline to impose No. 9.

16         As to No. 11, I will order that he shall not enter

17  into any agreement to act as an informer or special agent of a

18  law enforcement agency without the permission of the court.

19         I will decline to impose 13.  That's been questioned

20  by the appellate courts and it is vague.

21         I will amend 14 to provide that the defendant is to

22  pay any special assessment and restitution balance to the

23  clerk of the court at a rate of not less than 10 percent of

24  the defendant's gross earnings, minus federal and state income

25  tax withholding, until the criminal monetary penalties have

1   been paid in full.

2          I will decline to impose 15 because I believe it is

3   duplicative.

4          As to reasons, I believe that proposed discretionary

5   conditions No. 4, 5, 6, and 7 should be imposed because they

6   will support the defendant's rehabilitation and reintegration

7   into the community and ensure that the defendant is engaged in

8   lawful pursuits rather than criminal activity.

9          Proposed discretionary condition No. 8 should be

10  imposed because it will promote deterrence and protect the

11  public.

12         Proposed discretionary conditions No. 14, 15, 16, 17,

13  18, and 23 and proposed special conditions No. 5, 6, 7, 8, 11,

14  and 14 should be imposed because they will facilitate

15  supervision by the probation officer and in doing so encourage

16  the defendant to comply with the law and deter him from

17  committing future crimes.

18         Attorney Schafer, have I addressed all of your

19  arguments, including your main arguments in mitigation?

20         MS. SCHAFER:  Yes, your Honor.

21         THE COURT:  Other than those objections previously

22  presented to the court in these proceedings, do the parties

23  have any legal objection to the sentence that I have

24  pronounced or request further elaboration of my reasons under

25  Section 3553(a) both as to the term of imprisonment or the

1    terms of and conditions of supervised release?

2          MR. PACCAGNINI:  Your Honor, with regard to

3    supervised release, those are concurrent; is that correct?

4          THE COURT:  Pardon me?

5          MR. PACCAGNINI:  The three years for the two, that's

6    concurrent?

7          THE COURT:  Yes, yes.  Thank you for that reminder.

8          MR. PACCAGNINI:  Otherwise, your Honor, the

9    government would move to dismiss the remaining counts, and

10   also we are going to be dismissing the forfeiture allegation.

11   I have for the court the victim information for the

12   restitution.

13         THE COURT:  Restitution is to be made to the Medicare

14   Trust Fund.  The address is C-O CMS Office Financial

15   Management, Division of Accounting Operations, 7500 Security

16   Boulevard in Baltimore, Maryland, 21244, in the amount of

17   $2,787,054.58.

18         All right.  Any other objections?

19         MR. PACCAGNINI:  No, your Honor.

20         THE COURT:  Does the defense have any objections,

21   other than those previously presented to the court in these

22   proceedings?

23         MS. SCHAFER:  No, your Honor.

24         THE COURT:  Do the parties know of any reason, other

25   than those reasons already presented, why the sentence should

1   not be imposed as stated?

2            MR. PACCAGNINI:  No, your Honor.

3            MS. SCHAFER:  I'm sorry, I didn't catch your last

4   statement.

5            THE COURT:  Do the parties know of any reason, other

6   than those reasons already presented, why the sentence should

7   not be imposed as stated?

8            MS. SCHAFER:  No, your Honor.

9            THE COURT:  I will enter a judgment of conviction and

10  order the sentence imposed as stated.

11           Dr. Dehaan, although you have pled guilty, you have a

12  right to appeal your conviction if you believe that your

13  guilty plea was somehow unlawful or involuntary or if there

14  was some other fundamental defect in the proceedings that was

15  not waived by your guilty plea.  You also have a statutory

16  right to appeal your sentence under certain circumstances,

17  particularly if you think the sentence is contrary to law.

18           Any notice of appeal must be filed within 14 days of

19  the entry of judgment.  You or your attorney may file a notice

20  of appeal.  If you so request, the clerk will prepare and file

21  a notice of appeal on your behalf.  If you are unable to pay

22  appeal costs, you have a right to ask for permission to appeal

23  in forma pauperis.  If you are unable to afford an attorney,

24  the court of appeals may appoint an attorney to represent you

25  on appeal at no cost to you.

1    I believe that's all.  The court is in recess.  The

2    defendant is remanded.

3         (Which were all the proceedings heard.)

4                          CERTIFICATE

5    I certify that the foregoing is a correct transcript from

6    the record of proceedings in the above-entitled matter.

7    */s/ Heather M. Perkins-Reiva*          *June 16, 2017*

8    _____        _____

     Heather M. Perkins-Reiva                    Date
9    Official Court Reporter

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25